## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| MAURICE A. PIMBLE,                    ) | |
| ) | |
| Plaintiff,                    ) | |
| ) | |
| v.                                              ) | Civil Action No. 08-0344 (RJL) |
| ) | |
| DISTRICT OF COLUMBIA, *et al.*,   ) | |
| ) | |
| Defendants.                    ) | |

## ADMINISTRATIVE RECORD

Attached is an index and the record of the administrative proceedings at issue in this action.

Respectfully submitted,

PETER NICKLES
Acting Attorney General for the District
  of Columbia

GEORGE C. VALENTINE
Deputy Attorney General
Civil Litigation Division

*/s/ Edward P. Taptich*
EDWARD P. TAPTICH [012914]
Chief, Equity Section 2

*/s/ Juliane DeMarco*
JULIANE DEMARCO [490872]
Assistant Attorney General
441 4th St., N.W., Sixth Floor South
Washington, D.C. 20001
Tel. - (202) 724-6614
Fax. - (202) 727-3625

August 26, 2008

**Index of Record**

|  |  | **Page** |
|---|---|---|
| 1. | Certification of Record | 1 |
| 2. | Due Process Hearing Request, 3/21/05 | 2-5 |
| 3. | Hearing Notice, 3/28/05 | 6 |
| 4. | Plaintiff's Disclosure Letter w/att., 4/18/05 | 7-8 |
| 5. | MP-1 Request for Hearing, 3/21/05 | 9-14 |
| 6. | MP-2 Letter to Lisa Russell requesting evaluation, 11/29/04 | 15-17 |
| 7. | MP-3 Letter to Lisa Russell requesting evaluation, 2/15/05 | 18-22 |
| 8. | MP-4 Letter to M. Snipes re: communication with Russell, 3/21/05 | 23-26 |
| 9. | MP-5 Letter to Lisa Russell re: special ed. evaluation, 4/4/05 | 27-31 |
| 10. | MP-6 Letter to Lisa Russell re: lack of records, 4/12/05 | 32-40 |
| 11. | MP-7 Letter to Horton re: special ed. evaluation, 4/12/05 | 41-53 |
| 12. | MP-8 Letter to Marianne Cantwell, 4/11/05 | 54-58 |
| 13. | MP-9 Letter to Marianne Cantwell, 4/14/05 | 59-72 |
| 14. | MP-10 Most Recent IEP, 10/1/04 | 73-83 |
| 15. | MP-11 Roosevelt High School Report Card, 00/01- 01/02 | 84-85 |
| 16. | MP-12 Johnson JHS Student Master Record, 9/5/00-9/17/01 | 86-87 |
| 17. | MP-13 Johnson JHS Report Card, 2/5/01 | 88-89 |
| 18. | MP-14 Raymond ES Student Master Record, 3/4/98-10/13/99 | 90-91 |
| 19. | MP-15 Fifth Grade Report Card, 1998-1999 | 92-93 |
| 20. | MP-16 Fifth Grade Report Card, 1999 | 94-95 |

21. MP-17 Stanford Achievement Test Series, 4/98                                    96-100

22. MP-18 Stanford Achievement Test Series, 9/98                                    101-104

23. MP-19 Stanford Achievement Test Series, 4/99                                    105-107

24. MP-20 Rudolph ES Student Master Record, 9/12/94-11/7/97                         108-109

25. MP-21 Rudolph ES Report Card, 4th grade                                         110-111

26. MP-22 Rudolph ES Report Card, 3rd grade                                         112-115

27. MP-23 Rudolph ES Report Card, 2nd grade                                         116-117

28. MP-24 Report Card, 1st grade                                                    118-119

29. MP-25 Progress Report, 2/9/93                                                   120-121

30. MP-26 Progress report, 6/18/93                                                  122-124

31. MP-27 Student Residence and Data Verification, 1997-1998 5th grade             125-126

32. MP-28 5 DCMR 2201.9; 45 D.C. Reg. 5240                                          127-129

33. Plaintiff's Brief on Joint Liability to Hearing Officer ("HO"), 5/1/05          130-137

34. Plaintiff's Brief on Statute of Limitation to HO, 5/1/05                        138-154

35. Telephone Conference Attendance sheet, 5/3/05                                   155

36. Request for Extension of Time to submit Cost Information, 5/19/05               156-157

37. Letter to HO on cost information, 5/26/05 w/att.                                158-159

38. Curriculum Vitae of Tina Lepage                                                160-164

39. Curriculum Vitae of Kristen Clark Wynns                                        165-170

40. Hearing Officer's Interim Order, 6/8/05                                         171-173

41. Letter advising DCPS of S & L.evaluation for Pimble, 4/27/06                   174

42. Page 2 of HO Interim Order, 6/8/05                                             175

43. Psycho-Educational Evaluation, 11/21-12/8/05                    176-179

44. Clinical Evaluation, 11/29/05                                  180-184

45. Curriculum Vitae of Rona Fields                                185-196

46. Motion to Reconvene Hearing, 8/22/07 w/att                     197-198

47. Att.-1 Due Process Complaint, 3/21/05                          199-202

48. Att.-2 Plaintiff's Brief on Statute of Limitation to HO, 5/1/05   203-219

49. Plaintiff's Brief on Joint Liability to HO, 5/1/05             220-227

50. Att.-3 Evaluations -Speech and Language, 6/27/06              228-233

51. Psycho-Educational, 11/21-12/8/05                             234-237

52. Clinical Evaluation, 11/29/05                                 238-241

53. Psychological Evaluation, 4/19/05                             242-248

54. Hearing Notice, 9/26/07                                       249-251

55. Motion to Extend Time/Move Due Process Hearing, 10/17-10/18/07   252-255

56. Plaintiff's Disclosure letter w/att., 10/24/07               256-258

57. MP-1 Pre-Hearing Motion, 10/24/07                            259-261

58. MP-2 Pre-Hearing Motion for Default Judgment, 10/24/07        162-274

59. MP-3 Pre-Hearing Motion to extend time, 10/18/07             275-277

60. MP-4 Grievance Process Initiated by Pimble, 2/8/07, 9/24/07 [1]   278

61. MP-5 Motion to reconvene, 9/24/07                            279-281

62. MP-6 Brief on Statute of Limitation, 5/1/05                   282-298

63. MP-7 Liability Brief, 5/1/05                                  299-306

64. MP-8 Request for Hearing, 3/21/05                             307-310

---

[1]  Plaintiff had no document attached to MP-4. The District will supplement the record when a copy of MP-4 is provided.

65. MP-9 Letter to Lisa Russell requesting evaluation, 11/29/04     311-312

66. MP-10 Letter to Lisa Russell requesting evaluation, 2/15/05     313-315

67. MP-11 Letter to M. Snipes re: communication with Russel, 3/21/05     316-318

68. MP-12 Letter to Lisa Russell re: special ed. evaluation, 4/4/05     319-323

69. MP-13 Letter to Lisa Russell re: lack of records, 4/12/05     324-331

70. MP-14 Letter to Horton re: special ed. evaluation, 4/12/05     332-344

71. MP-15 Letter to Marianne Cantwell, 4/11/05     345-349

72. MP-16 Letter to Marianne Cantwell, 4/14/05     350-363

73. MP-17 Letter to H. Lappin, BOP, 3/3/07     364-367

74. MP-18 Letter to M. Snipes, 2/28/07     368-370

75. MP-19 Letter to G. Snyder, 2/28/07     371-373

76. MP-20 Letter to G. Snyder, 2/21/07     374-376

77. MP-21 Most Recent IEP, 10/1/04     377-384

78. MP-22 Roosevelt High School Report Card, 00/01- 01/02     385-386

79. MP-23 Johnson JHS Student Master Record, 9/5/00-9/17/01     387-388

80. MP-24 Johnson JHS Student Master Record, 9/5/00-9/17/01[2]     389

81. MP-25 Johnson JHS Report Card, 2/5/01     390-391

82. MP-26 Raymond ES Student Master Record, 3/4/98-10/13/99     392-393

83. MP-27 Fifth Grade Report Card, 1998-1999     394-395

84. MP-28 Fifth Grade Report Card, 1999     396-397

85. MP-29 Stanford Achievement Test Series, 4/98     398-401

86. MP-30 Stanford Achievement Test Series, 9/98     402-405

---

[2]   Duplicate of MP-23.

87. MP-31 Stanford Achievement Test Series, 4/99        406-408

88. MP-32 Rudolph ES Student Master Record, 9/12/94-11/7/97        409-410

89. MP-33 Rudolph ES Report Card, 4th grade        411-412

90. MP-34 Rudolph ES Report Card, 3rd grade        413-416

91. MP-35 Rudolph ES Report Card, 2nd grade        417-418

92. MP-36 Report Card, 1st grade        419-420

93. MP-37 Progress Report, 2/9/93        421-423

94. MP-38 Progress report, 6/18/93        424-426

95. MP-39 Student Residence and Data Verification, 1997-1998 5th grade 427-428

96. MP-40 HO Order to Brief the issues, 4/25/05        429-431

97. MP-41 Speech and Language Evaluation, 7/27/06        432-437

98. MP-42 Clinical Psychological Evaluation, 4/19/05        438-444

99. MP-43 Psychological Educational evaluation 11/21-12/8/05        445-453

100. HOD, 11/8/07        454-462

101. Transcript of Hearing,  4/25/05        463 *et seq.*

102. Transcript of Hearing, 10/31/07

Page 1

Hearing in the Matter of:

Maurice Pimble

Monday, April 25, 2005

3:10 p.m.

Job No.:  120843

Volume 1. of 1

Transcribed by:  Bonnie Panek

Page 2

1                           C O N T E N T S

2                                                          PAGE

3    PRELIMINARY MATTERS DISCUSSED:                          5

4    OPENING STATEMENTS:
          By Ms. Catlett                                    26
5         By Ms. Verra                                      34

6    EXAMINATION OF MR. PIMBLE:
          By Ms. Catlett                                    40
7         By Ms. Verra                                      45

8    EXAMINATION OF MR. HOBDY:
          By Ms. Catlett                                    52
9         By Ms. Verra                                      57
          By Ms. Catlett                                    61
10        By Ms. Verra                                      62

11   CLOSING ARGUMENTS:
          By Ms. Catlett                                    76
12        By Mr. Tulman                                     77
          By Ms. Verra                                      82

13

14

15

16

17

18

19

20

21

22

Page 3

1                    P R O C E E D I N G S

2              (The hearing began at 3:10 p.m. as follows:)

3              HEARING OFFICER:  Okay.  We're on the

4    record.  Good afternoon.  Today is April 25th, 2005,

5    and this is an administrative hearing for Maurice --

6    how do you pronounce it?

7              MS. CATLETT:  Maury.  You said it right.

8              HEARING OFFICER:  Huh?

9              MS. CATLETT:  Maury.

10             HEARING OFFICER:  Last name?

11             MS. CATLETT:  Pimble.

12             HEARING OFFICER:  Maurice Pimble, who was

13   born on ████-1985.  I'll ask the parties to introduce

14   themselves for the record at this time.

15             MS. VERRA:  DCPS court liaison, attorney

16   advisor Lenora Verra.

17             MR. TULMAN:  I'm Joseph Tulman, supervisor

18   for Cynthia Catlett (phonetic).

19             MS. CATLETT:  And I'm Cynthia Catlett,

20   education advocate for Maurice.

21             HEARING OFFICER:  All right.

22             MR. TULMAN:  Should we get Maurice on the

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 4

1    phone right now?

2              HEARING OFFICER:  No.

3              MS. CATLETT:  Not yet?

4              HEARING OFFICER:  Okay.  He's in North

5    Carolina, right?

6              MS. CATLETT:  Right.

7              HEARING OFFICER:  You can't call him on this

8    phone.  You have to have him call in.

9              MS. CATLETT:  Well, I can call him and

10   they'll call.

11             HEARING OFFICER:  You have to call him on

12   the cell phone.

13             MR. TULMAN:  Yeah, just give us the number.

14             HEARING OFFICER:  Give them the number here,

15   which is 442 --

16             MR. TULMAN:  Hold on for a second.  Yeah.

17             HEARING OFFICER:  442-5621, and that's area

18   code 202.

19             MR. TULMAN:  Okay.

20             HEARING OFFICER:  Okay.  All right.  This

21   hearing is being conducted pursuant to IDEIA, the '97

22   amendments to IDEIA, and the rules of the District of

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 5

1   Columbia Board of Education to determine whether or not

2   DCPS acted in accordance with these applicable special

3   educational relations in regards to Maurice Pimble.

4           I'm Sy (phonetic) DuBow, impartial hearing

5   officer.  I'm not an employee of DCPS, nor am I related

6   to or a close acquaintance of the student other than

7   through the hearing process.  I'm prepared to hear both

8   sides and act only on the evidence presented.  Is the

9   formal reading of rights waived?

10          MR. TULMAN:  Yes.

11          MS. CATLETT:  Yes.

12          HEARING OFFICER:  The formal reading of

13  rights is waived by counsel for the parent and -- the

14  student, and my determination will be submitted within

15  10 working days.  As a preliminary matter --

16          MS. CATLETT:  This call is in reference to

17  an inmate, Maurice Pimble.  I need to speak to Ms.

18  Sexton, please.  I'm sorry.

19          HEARING OFFICER:  Why don't you have your

20  professor deal with that while we do this.  All right.

21          MR. TULMAN:  Hello.  Hi.  How are you?

22          HEARING OFFICER:  Okay.  As a preliminary

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 6

1    matter I have documents that are labeled MP 1 through

2    MP 28 that are entered into the record at this time.

3    Is there any objection?

4            MS. VERRA:  No objection from DCPS.

5            HEARING OFFICER:  Okay.  Does DCPS have any

6    documents?

7            MS. VERRA:  DCPS has no documents, but we

8    will be relying on parent's -- counsel's disclosure.

9            HEARING OFFICER:  Do you have a disclosure?

10           MS. VERRA:  No, we don't.

11           MR. TULMAN:  Okay.  Well, I thought Ms.

12   Catlett had set this up with you folks.  With who?

13           MS. CATLETT:  Ms. Sexton.

14           MR. TULMAN:  With Ms. Sexton.

15           HEARING OFFICER:  Okay.  All matters

16   discussed today are confidential and this hearing is

17   being recorded, and any party may request a copy of the

18   CD by writing through the Student Hearing Office.  Come

19   on in.  Is there somebody out there?

20           MS. VERRA:  Somebody opened the door.  Why

21   is the door open?

22           MS. CATLETT:  Hm?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 7

1                MS. VERRA:  I can't hear.  Why is the door

2      open?

3                HEARING OFFICER:  Just keep it --

4                MS. VERRA:  Slightly.  Okay.  All right.

5                MR. TULMAN:  Cynthia says that she called

6      you all this morning to confirm it.

7                HEARING OFFICER:  No, just keep it -- don't

8      close it.  Just keep it ajar.

9                MS. CATLETT:  Okay.

10               HEARING OFFICER:  It's locked so you have to

11     open it.

12               MS. CATLETT:  Okay.

13               HEARING OFFICER:  There you go.

14               MS. CATLETT:  Okay.

15               MR. TULMAN:  Okay.  It's 202-442-5621, and

16     if he calls in there we can put him on the speaker

17     phone, but the hearing is for him so he really needs to

18     be with us.  All right.  So you'll go track him down

19     for us?  Thank you.

20               HEARING OFFICER:  As a preliminary matter --

21     are there any other preliminary matters besides the

22     documents?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 8

1           MS. VERRA:  Actually, yes, there are two,

2    two preliminary matters, and both of them pertain to

3    documents.

4           HEARING OFFICER:  And you're going to have

5    to speak into the microphone.

6           MS. VERRA:  Sorry, Your Honor.  There are

7    two preliminary matters and they both deal with the

8    documents, and I did have a discussion with counsel

9    regarding this but we're going to have to leave it up

10   to the hearing officer's discretion on the issue.

11          The first issue is that -- the parent's

12   counsel -- we're relying on parent's counsel disclosure

13   and parent's counsel has pretty much provided the

14   entire student's record on the student regarding

15   Maurice Pimble.  In going over the records, though, one

16   document appears to be missing, and I don't know

17   whether it's an oversight on parent's counsel's part or

18   it's just conveniently missing, but it appears to be

19   the one document that deals with the attendance

20   regarding the student, and we'd ask that it be included

21   in the record because it's the entire case regarding

22   this student and whether he received FAPE or not.

Page 9

1        DCPS did provide documents to the school and

2    that's what they provided to us, and I did have a

3    discussion with her and asked her if she would waive I

4    guess the oversight and allow us to include this in her

5    record but she said no, so it's up to the hearing

6    officer as the rest of the IEP --

7        HEARING OFFICER:  All right.  None of the

8    documents, none of the documents MP 1 through 28 relate

9    to attendance; is that correct?

10       MS. VERRA:  Well, actually it's the rest of

11   the IEP, Hearing Officer.  It's not just attendance.

12   It's the rest of the IEP.

13       HEARING OFFICER:  You initially were saying

14   that the attendance is not in these documents?

15       MS. VERRA:  No.  What I meant to say is that

16   this part of the IEP is missing for whatever reason.

17       HEARING OFFICER:  What part of the IEP?

18       MS. VERRA:  The MDT meeting notes.

19       HEARING OFFICER:  Okay.

20       MS. CATLETT:  I requested that --

21       HEARING OFFICER:  Wait a minute.  MP 10 is

22   what you want me to look at?  Is that the most recent?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 10

1          MS. VERRA:  Yeah -- it's not the most

2     recent.  MP 10 is not the most recent.

3          HEARING OFFICER:  Well, Counsel, you have

4     the burden of proof.  How come you don't have any

5     documents?

6          MS. VERRA:  In going through the documents,

7     Hearing Officer, this should have been included in the

8     IEP.

9          HEARING OFFICER:  Well, they can put in

10    whatever documents they want to, can't they?

11         MS. VERRA:  And they can, Hearing Officer.

12         HEARING OFFICER:  Okay.

13         MS. VERRA:  And I did call counsel.

14         HEARING OFFICER:  So I don't understand.

15    You have the burden of proof and you have put no

16    documents in so -- and you say you're relying on their

17    documents, so if their documents don't have a

18    particular document then you're out of luck.

19         MS. VERRA:  All right.  Well, their

20    documents are incomplete, so --

21         HEARING OFFICER:  Yeah, but it --

22         MS. VERRA:  And in the best interests of

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 11

1    this student the hearing officer should look at the

2    complete record if they're going to put in documents.

3    How are they going to put in incomplete documents, the

4    documents that just suit their case, and not provide

5    all the documents, Hearing Officer?

6            HEARING OFFICER:  But you've (inaudible)

7    with it.  You have to submit a five-day disclosure with

8    your documents that you're going to rely on.  I don't

9    have any disclosure.

10            MS. VERRA:  All right.

11            HEARING OFFICER:  I mean, I -- you know,

12    they could decide to put no documents in.  You still

13    have the burden of proof.

14            MS. VERRA:  The burden of proof.  Okay.  All

15    right.  In addition, Hearing Officer, part of the

16    record and that we received -- part of this issue is

17    that part of our records come from -- there are two

18    different agencies that are involved.  One is in D.C.

19    Jail and also the Federal Bureau of Prisons which are

20    out of DCPS's control.

21            We did receive today dated April the 25th at

22    12:44 from the D.C. Jail copies of the attendance

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 12

1    records for this student, which of course shows that he

2    didn't attend class, and again we'd ask because that is

3    not within DCPS's control that these be admitted.

4            HEARING OFFICER:  Attendance where?

5            MS. VERRA:  Oh, at the -- at D.C. Jail to

6    the classroom.  That's part of the issue, is that we

7    denied FAPE to this student, and our position is that

8    we made FAPE available to him.  He just didn't come to

9    class, and again the D.C. Jail sent these over today.

10   D.C. Jail is not within my control so these would have

11   been disclosed had I had these documents, but again as

12   you can see dated here, April the 25th, I just got

13   these documents.

14           HEARING OFFICER:  And these are from the

15   D.C. Jail which is not in the control of?

16           MS. VERRA:  Of DCPS.

17           HEARING OFFICER:  How long has he been at

18   the D.C. Jail?

19           MS. VERRA:  He's no longer at the D.C. Jail.

20           HEARING OFFICER:  I know.  I know he's in

21   North Carolina, but I'm saying how long was he at the

22   D.C. Jail?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 13

1            MS. VERRA:  Oh.

2            MS. CATLETT:  From August to -- from August

3    to February of 2005.

4            MS. VERRA:  Well, we have an exit date of

5    January, but he was there for a period of August --

6    around six months or so.

7            MS. CATLETT:  Yeah.

8            HEARING OFFICER:  So you're requesting the

9    documents that you just received today be entered into

10   the record?

11           MS. VERRA:  Yes.

12           HEARING OFFICER:  Is there an objection from

13   counsel for the parent?

14           MS. CATLETT:  There is an objection because

15   I spoke with Lisa Russell from Incarcerated Youth on

16   April 4th, and she told me that she had these records,

17   that she would send them to me and never did.  I spoke

18   to Ms. Verra on Friday.  She said she had those records

19   and would fax them over and didn't, and I left for the

20   hearing at 2 o'clock and still haven't seen these

21   records.

22           MS. VERRA:  Hold on.  Hearing Officer?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 14

1          HEARING OFFICER:  Ms. Russell works for?

2          MS. CATLETT:  Lisa Russell works for --

3    she's director of Incarcerated Youth.

4          MS. VERRA:  First of all, these documents

5    didn't come from Lisa Russell's office.  These came

6    directly from D.C. Jail and the person who handles the

7    attendance records.  I talked to you on Friday and told

8    you that these documents were coming over.  I did not

9    have a copy of them and did not receive them, as you

10   can tell per the date stamp, until this morning -- at

11   12:44.  I never told her I would fax her a copy of

12   these documents.

13         MS. CATLETT:  Ms. Verra, you told me you

14   were going to fax them on Friday.

15         HEARING OFFICER:  Okay.

16         MS. VERRA:  I didn't have them on Friday.

17         HEARING OFFICER:  Stop.  Wait a minute.  You

18   know, if you're going to engage in a point/counterpoint

19   you can go on Saturday Night Live.  We're not on that

20   tonight so I want one person to speak at a time, and

21   when they're finished then the other person so we have

22   some courtesy.  All right.  Let me just look at this.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 15

1              (There was a brief pause in the

2      proceedings.)

3              MS. CATLETT:  Hearing Officer?

4              HEARING OFFICER:  Wait a minute.

5              MS. CATLETT:  Oh, I'm sorry.

6              (There was a brief pause in the

7      proceedings.)

8              HEARING OFFICER:  Sometimes he's there,

9      sometimes he's not.  Okay.  All it tells me -- all I

10     know is his unit is called.  I don't know what it --

11     what are you saying, this indicates he's receiving

12     specialized education?

13             MS. VERRA:  No.

14             HEARING OFFICER:  Or he's just receiving

15     education there?

16             MS. VERRA:  This is saying that he's

17     refusing to come to the specialized education classes.

18     The unit calls up to tell him it's time to go to class

19     and when he's there they check time in.

20             HEARING OFFICER:  Yeah.  Well, some of the

21     times he's there.

22             MS. VERRA:  Yeah, and sometimes he's not.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 16

1          MR. TULMAN:  Can we see it?

2          MS. VERRA:  So on a denial of FAPE he wasn't

3    available for services.

4          HEARING OFFICER:  But as I understand it --

5          MS. VERRA:  No, I can only let you see it if

6    he decides whether to admit it or not.

7          HEARING OFFICER:  Wait a minute.  Wait a

8    minute.

9          MS. VERRA:  No, I'm saying because I need to

10   dedact -- there are other people on here.

11          HEARING OFFICER:  I understand that there

12   are other people on it.

13          MS. VERRA:  Yeah.

14          HEARING OFFICER:  Okay.  But --

15          MS. VERRA:  I'll be more than happy to let

16   you see it.

17          HEARING OFFICER:  Wait.  Are you objecting

18   to the introduction of this document or not?

19          MR. TULMAN:  Sure.

20          HEARING OFFICER:  All right.

21          MR. TULMAN:  We've been asking them for

22   months --

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 17

1              HEARING OFFICER:  What is the basis of your

2    objection?

3              MS. CATLETT:  I've been requesting DCPS for

4    records since March, but former student advocate from

5    the juvenile clinic has also been communicating with

6    DCPS personnel to request records they had on file for

7    Mr. Pimble, and DCPS has to date not given me

8    absolutely anything.

9              HEARING OFFICER:  All right.

10             MS. CATLETT:  With the exception of an IEP

11   which they faxed over incomplete and I requested Ms.

12   Russell for MDT notes, and I have this on record as MP

13   5, and still DCPS hasn't provided --

14             HEARING OFFICER:  Wait a minute.  The thing

15   is on that document on the top it says DCPS schools.

16             MS. VERRA:  That's their way to identify,

17   Hearing Officer, while they're at D.C. Jail who --

18   which kid comes from which program.

19             HEARING OFFICER:  Which program?

20             MS. VERRA:  Yeah.

21             HEARING OFFICER:  All right.

22             MR. TULMAN:  And DCPS is running the program

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 18

1    as far as I know.

2                MS. VERRA:  No, DCPS is not running the

3    program.

4                HEARING OFFICER:  All right.

5                MR. TULMAN:  In any case, it violates the

6    five-day rule and we've been -- as we say, MP 5 says

7    that we've been asking them for documents.

8                MS. VERRA:  They've been asking DCPS for

9    documents.

10               MR. TULMAN:  Asking you, yeah.

11               MS. VERRA:  Yeah.

12               MR. TULMAN:  So they didn't ask the people

13   at the D.C. Jail for them.  It's obvious they didn't

14   ask for them from the D.C. Jail, and so they come in at

15   the last minute and probably ask D.C. Jail folks on

16   Thursday or Friday to send them whatever they have.

17   You know, I mean, when they send it is not the

18   operative fact.  When they ask for it might be

19   significant.

20               HEARING OFFICER:  Well --

21               MR. TULMAN:  But we've in writing been

22   asking them for it.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 19

1          HEARING OFFICER:  I at this late date am --

2    I'm going to not allow -- in fact, on top of that I

3    don't know how much value they are to you.

4          MS. VERRA:  Okay.  The last preliminary

5    issue.  The remedy that they're seeking, DCPS is

6    willing to offer him of course if he were available the

7    -- whatever he would be getting per his IEP, which is

8    the six hours that's currently on his IEP.

9          MR. TULMAN:  I want to object to this, too.

10   If you're going to talk about negotiation and

11   settlement --

12         MS. VERRA:  No, it's not even negotiation.

13   It's regarding the fact --

14         HEARING OFFICER:  Is this a preliminary

15   matter you're raising?

16         MS. VERRA:  It is a very preliminary matter.

17         HEARING OFFICER:  Okay.  What is the

18   preliminary matter?

19         MS. VERRA:  The preliminary matter is that

20   even if we give an issue of compensatory ed. we're

21   unable to comply with giving of the compensatory ed.

22   because he's in a federal prison.  If the hearing

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 20

1    officer will take notes of Hearing Officer Sinclair's

2    (phonetic) decision regarding this issue, we have no

3    jurisdiction over the Federal Bureau of Prisons.

4              So even if we give him all the compensatory

5    ed. in the world he has no way of receiving the

6    compensatory education.  We have no jurisdiction over

7    Federal Bureau of Prisons.  There's a letter dated here

8    --

9              HEARING OFFICER:  Where is this HOD?

10             MS. VERRA:  I'll give you -- the HOD is in

11   -- right here.

12             MS. LEWIS:  Hello.

13             HEARING OFFICER:  Have a seat, please.

14             MS. VERRA:  I'd like for the hearing officer

15   to note the HOD, and then they filed one -- a request

16   to rehear it.

17             HEARING OFFICER:  Let the record show the

18   parents of the student have entered.  Please sign in,

19   please.  Have a seat.  The hearing is in progress.

20             MS. VERRA:  This is part of parent's

21   disclosure.

22             HEARING OFFICER:  What is the HOD number?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 21

1          MS. VERRA:  The HOD number is -- hold on

2     just for a second.  Hold on.  I'll tell you in a

3     second.

4          HEARING OFFICER:  I don't see it in here.

5          MS. VERRA:  No, it's in here.  Oh, no, it's

6     in here.

7          HEARING OFFICER:  It's not listed.

8          MS. VERRA:  It's under -- it might be under

9     MP 9, letter from Ms. Cantwell.  It's part of their

10    disclosure.

11          HEARING OFFICER:  All right.  I have it.

12          MS. VERRA:  The Federal Bureau of Prisons

13    has weighed in on this issue.  If you look under Ms.

14    Cantwell's letter to the student --

15          HEARING OFFICER:  All right.  Hold on.  Hold

16    on.  Let me get a chance to look at it.

17          MS. VERRA:  All right.

18          (There was a brief pause in the

19    proceedings.)

20          HEARING OFFICER:  Is the November 1999

21    hearing officer's determination in this record?

22          MS. VERRA:  Yes, it is, uh-huh.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 22

1              HEARING OFFICER:  Which one is that, or what

2    document is that?  Is it back in here?

3              MS. VERRA:  They're all attached.

4              HEARING OFFICER:  They're all in the same

5    position?

6              MS. VERRA:  Yes, Hearing Officer.

7              HEARING OFFICER:  There's a second one.  I

8    got a January of '05 from Mr. Sinclair.

9              MS. VERRA:  Yes, uh-huh, January of '05, and

10   then again he wrote on this.

11             HEARING OFFICER:  And this is Sinclair

12   again?

13             MS. VERRA:  Uh-huh.

14             HEARING OFFICER:  Again, March '05, so

15   that's fairly recent.

16             MS. VERRA:  Uh-huh, yes.

17             HEARING OFFICER:  March '05.  And then do we

18   have another HOD decision?

19             MS. VERRA:  No, just those two that rule on

20   this issue.

21             HEARING OFFICER:  I need to refer back to --

22   there was a November of '99 HOD.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 23

1           MS. VERRA:  Oh, the November '99 HOD dealt

2     with the issue of them getting the compensatory ed. for

3     that particular student, so he agreed that we owed them

4     compensatory ed. but there was no way to --

5           MR. TULMAN:  He actually give us a little

6     more.  That's all.

7           MS. VERRA:  Yeah.

8           HEARING OFFICER:  He added some.

9           MR. TULMAN:  He added some.

10          MS. VERRA:  He added some, but then again --

11          MR. TULMAN:  He added from the time that

12    that student was at the first hearing in '99 until the

13    end of the semester which the student --

14          HEARING OFFICER:  All right.  Let's cut to

15    the chase.  What exactly is it that -- the issue that

16    is before me because we have all these documents here

17    and I haven't had a chance to look at them?

18          MS. VERRA:  Okay.

19          HEARING OFFICER:  So what is the issue you

20    want me to decide today?

21          MS. CATLETT:  I'm requesting compensatory

22    education for the 11 years that Maurice was denied a

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 24

1    free appropriate public education.

2              HEARING OFFICER:  Well, what about Judge

3    Green's three-year statute of limitations decision?

4              MS. CATLETT:  Well, I'm prepared to discuss

5    the exception to the statute of limitations.

6              HEARING OFFICER:  All right.  All right.

7    Let the student (inaudible).  All right.  Now, there's

8    the only way they're going to limit.  All right.  So

9    you're saying you have some documents that distinguish

10   Judge Green's decision.  Okay.  So you are here today

11   regarding solely comp. ed.?

12             MS. CATLETT:  Comp. ed., and I'm requesting

13   that Maurice be evaluated in North Carolina at the

14   expense of D.C. Public Schools.  These evaluations were

15   requested in November while Maurice was still at D.C.

16   Jail.  DCPS failed to respond in writing or initiate a

17   hearing violating 34 CFR --

18             HEARING OFFICER:  Wait a minute.  Now, when

19   is the last time the student has been evaluated?

20             MS. CATLETT:  The last time he was evaluated

21   was January 1st, 2001.

22             HEARING OFFICER:  Is that in the record?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 25

1          MS. CATLETT:  DCPS has told me numerous

2     times that they don't have those records on file.

3     They've lost the records.

4          HEARING OFFICER:  So your record does not

5     have any (inaudible)?

6          MS. CATLETT:  My records has his most recent

7     IEP conducted at D.C. Jail.

8          HEARING OFFICER:  I understand that, but

9     that's not my question.  There's no evaluations in the

10     record.

11          MS. CATLETT:  No, that's when it says that

12     he was last evaluated.

13          HEARING OFFICER:  All right.  An IEP

14     indicates when he was last evaluated?

15          MS. CATLETT:  Yes.

16          HEARING OFFICER:  And he's now how old?

17          MS. CATLETT:  He's 19.

18          MS. VERRA:  Can we -- we need to weigh in on

19     that, Hearing Officer.

20          HEARING OFFICER:  All right.  Wait a minute.

21     You know -- okay.  So the issue you have before me is

22     the issue of comp. ed., is that correct, and the issue

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 26

1   of evaluations?  Is there anything else?

2            MS. CATLETT:  Yes, that is correct.

3            HEARING OFFICER:  What else?  Let her do it.

4            MR. TULMAN:  Yeah.  Can I consult with her

5   for a second?

6            HEARING OFFICER:  Yeah.

7            MS. VERRA:  I can resolve the issue of

8   evaluations, Hearing Officer, quickly.

9            HEARING OFFICER:  Let her make an opening

10  statement.

11           MS. VERRA:  All right.

12           MS. CATLETT:  I also wanted to discuss with

13  you joint liability between D.C. Public Schools and the

14  Federal Bureau of Prisons.

15           HEARING OFFICER:  All right.  Okay.  You can

16  make an opening statement at this time to be followed

17  by DCPS.  You're on.

18           MS. CATLETT:  I'm here because D.C. public

19  school personnel failed to provide Maurice with a free

20  appropriate public education from August 1991 to

21  present in violation of the Individuals with Disability

22  and Education Act.  A free appropriate public education

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 27

1    consists of educational instruction specially designed

2    to meet the unique needs of a child with a disability

3    supported by such service as necessary to prevent the

4    child to benefit from the instruction.

5              Maurice is an 18-year-old student classified

6    with a learning disability.  Prior to being identified

7    as a student with a learning disability on January

8    30th, 2001 Maurice had encountered serious difficulties

9    in his academics.  I created a chart on --

10              HEARING OFFICER:  Wait a minute.  Is that in

11    the documents?

12              MS. VERRA:  Is that in the documents?

13              MS. CATLETT:  It's outlining all of the

14    documents since the list is so extensive.  As you can

15    see, every exhibit is cited.  It's just so that we

16    don't have to go through the 60 pages that I've

17    provided.  Nothing that is here is not in the documents

18    that I disclosed to you.

19              HEARING OFFICER:  All right.  So we're

20    getting this as an aid?

21              MS. CATLETT:  As an aid.

22              HEARING OFFICER:  All right.  Go ahead

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 28

1          MS. CATLETT:  He attended several schools

2     from -- several D.C. Public Schools throughout his

3     education.  The yellow parts in this chart are every

4     time he repeated a grade, he did a grade more than

5     once.  Maurice attended D.C. Public Schools throughout

6     his academic career.

7          He failed the first grade at (inaudible)

8     campus, failed the third grade at Rudolph Elementary

9     School, and completed the fifth grade in three years.

10    It took DCPS 10 years before they realized Maurice had

11    a learning disability, and even after he was identified

12    as a student with a learning disability his progress

13    remained the same or even worsened.

14          If you look at -- if you look at MP 11

15    you'll see that the last year Maurice attended a D.C.

16    public school he failed every single course in the

17    ninth grade.  It also comes to no surprise to me that

18    DCPS failed to prepare for this hearing considering how

19    Maurice got lost in the system.  They've provided me

20    with no witnesses or any disclosure requests.

21          MS. VERRA:  Objection.

22          HEARING OFFICER:  She's making an opening

Case 1:08-cv-00344-RJL    Document 10-2    Filed 08/26/2008    Page 29 of 48
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 29

1    statement.  She's allowed to -- you can't object in

2    opening.

3              MS. VERRA:  All right.  I object to her

4    reference of how we prepared.  She has no idea how we

5    prepared.

6              HEARING OFFICER:  Counsel, I would request

7    that that is a well taken point, so --

8              MS. CATLETT:  The evidence will show that

9    DCPS personnel denied Maurice FAPE because they

10   violated child find 34 CFR 300.125A1.  At the time

11   Maurice repeated the first, the third and the fifth

12   grade there was a D.C. municipal regulation in effect

13   that mandated DCPS to evaluate all students who got

14   held back a grade for special education services.  DCPS

15   failed to do that.

16             Also, Maurice's IEP is inappropriate.  The

17   law requires that students with disabilities have an

18   appropriate IEP in place.  DCPS personnel violated 34

19   CFR 300.343C1 saying that each public agency shall

20   insure that the IEP team reviews the child's IEP

21   periodically but not less than annually to determine

22   whether the annual goals for the child are being

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 30

1    achieved.

2            Maurice's last IEP was January 30th, 2001

3    and he didn't have any IEPs following his first IEP on

4    January 30th, 2001.  DCPS also didn't use Maurice's

5    evaluation in the creation of his most recent IEP

6    violating 34 CFR 300.346A2.  Maurice's special

7    education evaluations are 15 months overdue violating

8    34 CFR 300.536.

9            DCPS personnel also denied Maurice's right

10   to an independent educational evaluation.  Numerous

11   requests were made.  Maurice requested an initial

12   evaluation on November 15th, 2004.  In a letter dated

13   November 19th, Exhibit MP 2, Victoria Concoski

14   (phonetic), former student advocate, offered to contact

15   independent evaluators to evaluate Maurice at D.C.

16   Jail.  DCPS did not respond.

17           I requested evaluations on February 15th, MP

18   3, and there was still no response.  DCPS has also

19   denied Maurice's right to obtain his educational

20   records violating 300.501.  Maurice's rights

21   transferred from his mother to him when he obtained the

22   age of majority, and he had a right to inspect and

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 31

1    review all educational records on file with DCPS.

2          On March 21st I requested from Mr. Snipes

3    all evaluations on record.  Mr. Snipes never responded

4    to my request.  On April 4th I requested from Ms.

5    Russell a copy of the individualized instruction plans

6    at D.C. Jail.  I didn't receive any response.  On April

7    12th I sent Ms. Russell a letter regarding Maurice's

8    educational background and the fact that there were

9    some gaps in my outline, and she also did not -- was

10   not able to help me with that information.

11         I sent her a fax with the records that I had

12   for the academic years in question.  She provided no

13   feedback.  DCPS personnel owes Maurice compensatory

14   education from August 2001 to May 2002.  The

15   appropriate standard is day for day and the remedy

16   requested is 11 years of comp. ed.

17         HEARING OFFICER:  No, it isn't anymore.

18   According to appeals Justice -- Judge (inaudible) has

19   changed it.  We no longer have a mechanical day for

20   day.  The D.C. Circuit Court of Appeals (inaudible)

21   ruled in Reed (phonetic).

22         MS. CATLETT:  In the Reed case.  The hearing

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 32

1    officer has the authority to grant any relief you deem

2    necessary inclusive a compensatory education to insure

3    that Maurice receives a free appropriate public

4    education.  This is an equitable remedy considering the

5    fact that Maurice has been denied an education

6    throughout his life.

7              This is a student who, if you look at his

8    IEP, is reading at a second grade level and doing math

9    on a third grade level, and the evidence will show that

10   Maurice has suffered concrete injury and the only

11   equitable remedy is compensatory education.  Now, DCPS

12   has the burden of proof in regards to providing FAPE.

13             HEARING OFFICER:  And you have the burden of

14   proof as to comp. ed.

15             MS. CATLETT:  Comp. ed.

16             HEARING OFFICER:  All right.  You're up.

17             MS. VERRA:  All right.  I have just one

18   question.  I didn't hear the part -- there's one part

19   you said about comp. ed. for 2001 and 2002.  Was that

20   the only period you were asking for?  I missed that

21   part.

22             MS. CATLETT:  Well, no, I'm asking comp. ed.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 33

1    until --

2                MS. VERRA:  For the --

3                MS. CATLETT:  For all of the years that he

4    was denied an education, which would actually be from

5    January -- I'm sorry -- from August 2001 until --

6                MR. TULMAN:  1991.

7                MS. CATLETT:  From August 1991.

8                MS. VERRA:  Okay.  It's '91.

9                MR. TULMAN:  Yeah, we forget a decade.

10                MS. VERRA:  Okay.

11                HEARING OFFICER:  However, there have been

12    HODs in this case; is that not correct?

13                MS. CATLETT:  In this particular case?

14                MR. TULMAN:  No.

15                MS. CATLETT:  No, there has been none.

16                HEARING OFFICER:  Wait a minute.  I just --

17    that's not correct.  You just pointed to me --

18                MR. TULMAN:  Those are HODs in another case.

19                MS. CATLETT:  That's an HOD in another case.

20    It's attached to a letter from the Federal Bureau of

21    Prisons.

22                MS. VERRA:  It is in another.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 34

1           HEARING OFFICER:  All right.

2           MR. TULMAN:  We just wanted to give you --

3           HEARING OFFICER:  That was not made clear.

4           MR. TULMAN:  We had one other case in which

5    --

6           HEARING OFFICER:  All right.  That's another

7    case.  Okay.

8           MS. CATLETT:  It's another case.

9           HEARING OFFICER:  Obviously another person.

10           MR. TULMAN:  Yeah.

11           HEARING OFFICER:  Okay.  All right.  All

12    right.  So there's never been an HOD in this case?

13           MS. CATLETT:  No, never.

14           HEARING OFFICER:  All right.

15           MS. VERRA:  All right.  It's DCPS's position

16    -- two things, that FAPE was provided to the student

17    while he was at D.C. Jail.  We do admit that there were

18    no recent evaluations for his 2000 -- actually, for his

19    current IEP, which is dated 10-15-04, I believe -- oh,

20    the 10-04 IEP, and the reason for that is because

21    apparently the student had dropped out of school for

22    some time and so we couldn't get evaluations done.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 35

1            Part of the 10-04 IEP, Lisa did state that

2    this student does need updated evaluations and we are

3    willing to do those, so there is a plan for him to have

4    a psychoed., a psychological and also a clinical if the

5    psychoed. warrants.  They were in the process of

6    getting evaluations done when he was moved to the

7    federal prison, and so with him being unavailable we

8    were unable to complete those and then therefore update

9    the IEP.

10            There is an issue regarding whether we have

11    -- well, actually there is no issue.  We have no

12    jurisdiction over the Federal Bureau of Prisons, so we

13    can't get him evaluated and complete his IEP, and both

14    the hearing officers have ruled on that.  DCPS is

15    willing, if he's made available, to offer him the one to

16    do the evals. that we stated and update his IEP and

17    then continue on with services until he's 22 years old.

18            It's just that with him being unavailable

19    we're unable to offer him services and, I mean, that's

20    pretty much where we are.  I mean, it's not that we're

21    unwilling to do it.  He's just unavailable, Hearing

22    Officer.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 36

1              HEARING OFFICER:  All right.  How long is he

2    incarcerated in the North Carolina correctional

3    facility?  What was the sentence?

4              MS. CATLETT:  His sentence was 17 years.

5              HEARING OFFICER:  So he'll be there a while.

6              MS. CATLETT:  There's an appeal pending for

7    a new trial.

8              HEARING OFFICER:  All right.  But in any

9    case --

10             MS. CATLETT:  But in any case --

11             HEARING OFFICER:  In any case he's -- at the

12   present he's in North Carolina in a federal

13   correctional facility?

14             MS. CATLETT:  Uh-huh.

15             HEARING OFFICER:  And --

16             MS. CATLETT:  Here are the regs. that I

17   cited.

18             HEARING OFFICER:  It's your position that

19   DCPS must evaluate this student while he's in that

20   facility?

21             MS. CATLETT:  Well, I think DCPS was

22   obligated to evaluate him while he was at D.C. Jail and

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 37

1    failed to do this.

2            HEARING OFFICER:  All right.

3            (There was a brief interruption in the

4    proceedings for a telephone ringing.)

5            HEARING OFFICER:  There's your -- hello.

6    Hello.  Who's calling?  Yeah.  Who's calling?  All

7    right.  Here's your client.  Do you want me to just --

8            MR. TULMAN:  Can you put him on speaker

9    phone?

10           MS. CATLETT:  Can you put him on speaker?

11           HEARING OFFICER:  That's what I'm going to

12   do.  Hello?

13           MR. PIMBLE:  Yes.

14           HEARING OFFICER:  All right.  Is your name

15   Maurice Pimble?

16           MR. PIMBLE:  Uh-huh.

17           HEARING OFFICER:  All right.  This is the

18   hearing being conducted for you, due process hearing.

19           MR. PIMBLE:  They said, because they're

20   about to count down here, if it take more than 10

21   minutes then -- you know, because you get off at 4

22   o'clock.  The counts start at 3:50, 5 minutes.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 38

1              HEARING OFFICER:  So you mean you have to go

2    back somewhere?

3              MR. PIMBLE:  Huh?  Yeah.

4              HEARING OFFICER:  You have to go back?

5              MR. PIMBLE:  Yeah.

6              MS. CATLETT:  I think they're only letting

7    him -- they're only paying for 10 minutes of the call

8    probably in prison.

9              MR. TULMAN:  Well, ask him if he can come

10   back after the count, but we'll take him for 10 minutes

11   if that's what we can get, you know, obviously.  Maybe

12   we should take his testimony.

13             HEARING OFFICER:  All right.  Do you want to

14   take his testimony out of order?

15             MR. TULMAN:  Yeah.

16             MS. CATLETT:  Yes.

17             HEARING OFFICER:  All right.

18             MS. VERRA:  That's fine.

19             MR. TULMAN:  Say hello to Maurice, will you?

20             MS. CATLETT:  Hi, Maurice.  How are you?

21             MR. PIMBLE:  Fine.

22             HEARING OFFICER:  Okay.  I have to swear him

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 39

1    in.

2              MR. PIMBLE:  Huh?

3              HEARING OFFICER:  Please raise your right

4    hand.

5              MR. PIMBLE:  Uh-huh.

6                   MAURICE PIMBLE,

7    having first been duly sworn, was examined and

8    testified telephonically as follows:

9              HEARING OFFICER:  Okay.  Please state your

10   name for the record.

11             THE WITNESS:  Maurice Pimble.

12             HEARING OFFICER:  All right.  Your lawyer

13   will ask you some questions.

14             THE WITNESS:  Uh-huh.

15             MS. CATLETT:  Hang on, sir.  I'd like to

16   request -- I would like to request some leniency.  I

17   don't think -- it might be necessary in questioning

18   this student considering the severity of his

19   disability.

20             HEARING OFFICER:  Excuse me?  Do you have

21   any questions?

22             MS. CATLETT:  I would like to request some

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 40

1    leeway.  I do have some questions for him.

2                HEARING OFFICER:  Well, then ask your

3    questions.

4                MS. CATLETT:  Okay.

5                      DIRECT EXAMINATION

6                BY MS. CATLETT:

7        Q     Maurice, how old are you?

8        A     Nineteen.

9        Q     What's your date of birth?

10       A     5-19-85.

11       Q     Tell me a little bit about your educational

12   career.

13       A     I stopped going to school at Johnson Junior

14   High School.  I went to Meyers, Rudolph, Wilson, Moten.

15       Q     Tell me about your first encounter in

16   school.  Tell me about the first grade.  Was it

17   difficult for you, was it easy for you?

18       A     No, it was kind of difficult.

19       Q     Okay.  Did DCPS ever evaluate you when you

20   were in the first grade?

21       A     No.

22       Q     And then you repeated the third grade; is

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 41

1    that correct?

2        A    Yes.

3        Q    Did anyone from D.C. Public Schools evaluate

4    you in the third grade?

5        A    No.

6            MS. VERRA:  Hearing Officer, I'd like to

7    make an objection.  Only going back all the way past

8    the three-year compensatory ed. issue she hasn't made

9    the argument for the exceptions to Green's ruling for

10   the three years.  That hasn't been made.

11           HEARING OFFICER:  I understand that.

12           MS. VERRA:  Okay.  All right.  I'm just

13   making --

14           HEARING OFFICER:  This person is only here

15   for 10 minutes, so I would like to be able to get

16   whatever she asks and then --

17           MS. VERRA:  I've still got a client to

18   represent.

19           HEARING OFFICER:  -- I will take it under

20   advisement and rule on it later.  I can determine the

21   weight to give to it.

22           MS. VERRA:  Okay.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 42

1           HEARING OFFICER:  So go ahead.  Ask your

2    questions and try to bring it up to date, please.

3           BY MS. CATLETT:

4      Q    Maurice?

5      A    Uh-huh.

6      Q    Tell me a little bit about your experience

7    in school in general all the way from when you first

8    attended school until the classes you were taking at

9    D.C. Jail.

10     A    The classes over at the jail was like mainly

11   on the computer or talking about some type of book or

12   something like that.

13     Q    Could you understand everything that you

14   were being taught in school?

15     A    No.

16     Q    Did you skip any grades in school?

17     A    From Moten they skipped me to I think the

18   seventh or the eighth, and I started going to Johnson.

19     Q    Did you -- once you were at D.C. Jail did

20   you ever request anyone to evaluate you for special

21   education?

22     A    At Johnson I was in the special ed. for I

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 43

1    think a year and a half or a year -- one school year,

2    as a matter of fact.

3         Q    I have records that say that you were at

4    Roosevelt High School?

5         A    Yeah.

6         Q    Were you receiving special ed. at Roosevelt

7    High School?

8         A    No.

9         Q    You're currently enrolled at a GED program

10   at Rivers, right?

11        A    Uh-huh.

12        Q    How has that been for you?

13        A    They don't really go over the lessons

14   because everybody is on a different page, so the

15   teacher really doesn't go out and explain certain

16   things, you know.

17        Q    Is it hard for you?

18        A    Yeah.

19        Q    What is particularly difficult?

20        A    Math.

21        Q    Clarify something for me.

22        A    Uh-huh.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 44

1      Q      From what grade to what grade -- what grades

2   did you skip?

3      A      Huh?

4      Q      What grades did you skip?

5      A      I think back -- I think I was in Cs and Ds.

6      Q      But what -- you were in the fifth grade and

7   then you skipped to what grade?

8      A      To the seventh or the eighth, and I started

9   going to Johnson Junior High.

10      Q      Oh, okay.  So after you were in the fifth

11   grade for three years you skipped two grades?

12      A      Huh?

13      Q      So you repeated the first grade, the third

14   grade and then the fifth grade, and then they skipped

15   you to the eighth grade?

16      A      Uh-huh.

17              MS. CATLETT:  Oh, okay.  Thank you, Maurice.

18              THE WITNESS:  Okay.

19              HEARING OFFICER:  Wait a minute.

20              MS. CATLETT:  We're still on the record.

21              HEARING OFFICER:  The lawyer for DCPS is

22   going to ask you a few questions, so just hold on a

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 45

1    minute.  Okay.  She's going to ask you some questions.

2                        CROSS-EXAMINATION

3                BY MS. VERRA:

4        Q      Mr. Pimble?

5        A      Uh-huh.

6        Q      Hi.  How are you?

7        A      Fine.

8        Q      Great.  DCPS attorney advisor.

9        A      Uh-huh.

10       Q      I have just a few questions.  You stated

11   earlier that you stopped going to school, meaning

12   Johnson Junior High.  Can you expound on that for me?

13   What do you mean you stopped going to school?

14       A      My mother moved and I was forced to move

15   somewhere else because I was too old for the place that

16   she was going, so it was hard for me to get to school

17   from where I was at.

18       Q      Were you within the District of Columbia?

19       A      Yes.

20       Q      Okay.  So you moved and you just didn't go

21   to school?

22       A      I didn't have no transportation to get me to

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 46

1    school.

2        Q    So how long of a period was that?

3        A    Johnson, Roosevelt -- I think that was about

4    a year.

5        Q    All right.  So you were unavailable to get

6    evaluated or get your special ed. services, is that --

7        A    Uh-huh.

8        Q    So is that about a year?

9        A    Yes.

10            MR. TULMAN:  Objection.  There's no

11    foundation for that.

12            MS. VERRA:  He just made a foundation for

13    it.

14            MR. TULMAN:  No, there's no --

15            HEARING OFFICER:  All right.  I'm going to

16    allow him to -- he's only got a short time.  I'll

17    determine what weight to give it.  Just go ahead and

18    ask your questions.

19            BY MS. VERRA:

20        Q    All right.  So then after you finally moved

21    and you were able to get transportation you went back

22    to attend D.C. Public Schools?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 47

1    A    Yeah, I started going -- I got transferred

2    to Roosevelt.

3    Q    All right.  So you went to Roosevelt after

4    being out of school for a year and a half, a year?

5    A    About a year.

6    Q    Okay.  And so they put you in the eighth

7    grade at that time?

8    A    Uh-huh.

9    Q    Okay.  Did you let them know you were

10    special ed. or that you had been out for a year?

11    A    I thought that would come in my jacket, you

12    know what I'm saying, but they put me in all the

13    difficult classes I didn't understand.

14    Q    Okay.  So what happened at Roosevelt?  Did

15    you stay at Roosevelt?

16    A    Huh?

17    Q    Did you stay at Roosevelt?

18    A    Yeah.  I got to go.  They're about to start

19    the count.

20         MS. VERRA:  Okay.  Okay.

21         HEARING OFFICER:  Okay.  Thank you very

22    much.  You'll have to -- we'll try to see if we can get

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 48

1    you after the count.

2              THE WITNESS:  Okay.

3              HEARING OFFICER:  Okay.  Goodbye.

4              THE WITNESS:  Bye.

5              HEARING OFFICER:  Whatever that -- I don't

6    know how long the count is, but --

7              MR. TULMAN:  Usually when I'm trying to get

8    in or out of the jail it takes forever.

9              MS. VERRA:  Okay.  One last point on my

10   burden of proof here.

11             HEARING OFFICER:  Wait.  Okay.  They called

12   that witness.  You had your opening, you had your

13   opening.  Now, are you going to call any witnesses?

14             MS. VERRA:  No, I wasn't finished when they

15   called their witness on my last --

16             HEARING OFFICER:  Okay.

17             MS. VERRA:  I just had one more point.

18             HEARING OFFICER:  Okay.  That's fine.

19   Sorry.  Go ahead.

20             MS. VERRA:  I just -- I want the hearing

21   officer to take note that also in the hearing officer's

22   decision and also in the letters from the correctional

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 49

1    facility that there is a public law that's out there

2    that transfers the responsibility of educational

3    services to the Federal Bureau of Prisons.

4             It's not -- it doesn't belong with the DCPS

5    once they move, so again, even if we -- I mean, we're

6    willing to offer the services.  Right now the issue is

7    the matter of how he's going to get these services.  We

8    have no jurisdiction over the Federal Bureau of

9    Prisons.  DCPS is willing to offer the special

10   education services.  We just have no jurisdiction to

11   enforce FBOP to do it and, I mean, that's where we are.

12            HEARING OFFICER:  So it's your position that

13   as to the evaluations that you would not be able to do

14   it because he's in a federal prison?

15            MS. VERRA:  Yes.

16            HEARING OFFICER:  And they would have

17   responsibility according to this law that you have?

18            MS. VERRA:  Under the public law, yes.

19            HEARING OFFICER:  Okay.  Second point on the

20   comp. ed., if comp. ed. was to be awarded that could

21   not be provided because the federal prison would have

22   to provide it?  Is that what you're saying, or what are

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 50

1    you saying about that?

2              MS. VERRA:  On the issue of compensatory ed.

3    he's unavailable for us to --

4              HEARING OFFICER:  No, but that's what I'm

5    trying to determine here.

6              MS. VERRA:  Yes.

7              HEARING OFFICER:  He is in a federal prison

8    facility.  He's got a sentence of 17 years.

9              MS. VERRA:  Uh-huh.

10             HEARING OFFICER:  All right.  If he was to

11   be awarded comp. ed. that D.C. would owe him what is

12   your argument as to whether you can or cannot provide

13   comp. ed.?

14             MS. VERRA:  Oh, my argument is clear in

15   Hearing Officer Sinclair's decision and also redecision

16   regarding the issue that it's not our -- I mean, it's

17   not our responsibility.  We can't force the Federal

18   Bureau of Prisons to --

19             HEARING OFFICER:  And Reed doesn't apply on

20   that issue.  Okay.

21             MS. VERRA:  Okay.  Yeah.

22             HEARING OFFICER:  But in terms of the

Case 1:08-cv-00344-RJL    Document 10-3    Filed 08/26/2008    Page 3 of 49
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 51

1    Federal Bureau of Prisons you're saying I should look

2    to Mr. Sinclair's decision on the law cited there?

3              MS. VERRA:  Yes, yes, definitely.  Yes, I

4    think it's precedent here.  He's ruled twice on this

5    issue and also the Federal Bureau of Prisons has

6    weighed in on this issue stating pretty much you have

7    no jurisdiction over here.

8              HEARING OFFICER:  All right.  Do you wish to

9    put on any evidence at this time?

10             MS. VERRA:  Oh, no.  I'll wait for

11   cross-examination.

12             HEARING OFFICER:  All right.  Okay.  Does

13   DCPS rest then?

14             MS. VERRA:  DCPS rests.

15             HEARING OFFICER:  All right.  DCPS rests.

16   You're up.

17             MS. CATLETT:  Do I -- what's the procedure?

18             MR. TULMAN:  Do you want to (inaudible)

19             MS. CATLETT:  Okay.  Do I just transfer this

20   over there or --

21             HEARING OFFICER:  (Inaudible) there and just

22   -- no, no.  Have the witness sit next to you and put

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 52

1    the microphone in between you.

2              MS. CATLETT:  Okay.

3              MR. TULMAN:  I'll switch these up.

4              HEARING OFFICER:  Raise your right hand,

5    sir.

6                      ALFRED HOBDY,

7    having first been duly sworn, was examined and

8    testified as follows:

9              HEARING OFFICER:  Please state your full

10   name.

11             THE WITNESS:  Alfred Hobdy, H-O-B-D-Y.

12             HEARING OFFICER:  (Inaudible).

13             MS. CATLETT:  Yes.

14                   DIRECT EXAMINATION

15             BY MS. CATLETT:

16        Q    Hi, Mr. Hobdy.

17        A    How are you doing?

18        Q    How long have you known Maurice for?

19        A    I guess for five years now.

20        Q    Did he ever talk to you about his

21   educational goals and frustrations with school?

22        A    He did once he was staying with me, that he

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 53

1    was trying to --

2                    HEARING OFFICER:  Put it in between you so I

3    can get both of you.

4                    THE WITNESS:  Trying to get his education

5    because he had met a female girlfriend of his and she

6    went on to graduate and go on to college, so he was

7    trying to get his GED some kind of way.  So I put him

8    in D.C.'s Link and Learn (phonetic) to -- because he

9    wanted so bad to learn how to get his GED because he

10   wanted to go to college.

11                   BY MS. CATLETT:

12       Q     Did he ever take his GED exam?

13       A     He took it.  They gave it to him one time

14   but he had just got there so they said he had to take

15   it and they'll see where he was coming from from there

16   so he failed it and he reapplied for next year.

17                   HEARING OFFICER:  He applied for what?

18                   THE WITNESS:  It was over with for that

19   year, so the next year started.  He had to start all

20   over again.

21                   HEARING OFFICER:  And where was this at?

22                   THE WITNESS:  D.C. Link and Learn on 15th.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 54

1    and Columbia Road.

2               HEARING OFFICER:  D.C.?

3               THE WITNESS:  Link and Learn.

4               HEARING OFFICER:  Link and Learn?

5               MS. CATLETT:  Link and Learn.

6               THE WITNESS:  Yes.

7               HEARING OFFICER:  Who runs that program?  Is

8    it a District of Columbia program?

9               THE WITNESS:  It's a district, yes, I

10   believe so.

11              HEARING OFFICER:  District of Columbia

12   Public Schools?

13              THE WITNESS:  I don't know public schools,

14   but I know it's something that --

15              HEARING OFFICER:  Is it a government agency?

16              THE WITNESS:  It's a government agency that

17   President Clinton started.

18              HEARING OFFICER:  Oh, okay.

19              MS. VERRA:  Yeah, because we no longer do

20   GED programs, Hearing Officer.

21              MS. CATLETT:  I think -- for the record, I

22   think that this is valuable information whether --

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 55

1            MS. VERRA:  Oh, extremely.

2            MS. CATLETT:  -- just to show consistent

3    failure and to illustrate the severity of Maurice's

4    disability.

5            HEARING OFFICER:  What time period are you

6    talking about?

7            MS. CATLETT:  This was --

8            HEARING OFFICER:  No, no, ask him.

9            MS. CATLETT:  I'm sorry.  When did Maurice

10   --

11           HEARING OFFICER:  When did he first go to

12   this D.C. Link and Learn program?

13           THE WITNESS:  Let me see.  Before he got

14   incarcerated he was there a year before, so it was from

15   -- let's say from February to February.

16           HEARING OFFICER:  So he went there February

17   of '03, '04?

18           THE WITNESS:  It had to have been '03, I

19   believe.

20           HEARING OFFICER:  February '03 to February

21   '04, was in the D.C. --

22           THE WITNESS:  Link and Learn, yes.

Case 1:08-cv-00344-RJL    Document 10-3    Filed 08/26/2008    Page 8 of 49
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 56

1                    HEARING OFFICER:  -- Link and Learn to get

2    his GED?

3                    THE WITNESS:  Yes.

4                    BY MS. CATLETT:

5        Q      Did he ever talk to you about his

6    educational goals?

7        A      He talked to me, told me that he was

8    a lot of things, reading, especially math, but there

9    was a lot of things he didn't understand and I tried to

10   help him out as much as possible, and just the little

11   things that he just -- writing and reading, he had a

12   little problem with that, but he had a lot of street

13   smart in him so he could get around like that, but

14   educationwise he couldn't do it.

15       Q      So he talked to you about his academic

16   career, going to school?

17       A      He talked to me about he was trying to get

18   in school and his age stopped him from going back to

19   school because the kids were so -- he's so older than

20   other kids, so he try -- he was going around looking

21   for programs he could get into to get his GED because

22   he was too old to get back into public school, and he

Case 1:08-cv-00344-RJL   Document 10-3   Filed 08/26/2008   Page 9 of 49
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 57

1   was so eager to learn.

2           He just wanted to learn.  The older he get

3   it seems like the more he want to do and just the

4   education was holding him down, so he was trying his

5   best to get back in school some kind of way.

6       Q    And did you help him with his work and with

7   reading and writing?  Were you able to assess --

8       A    No, I didn't help him with his work because

9   D.C. Link and Learn wasn't too far from where he was

10  staying and they had also had tutors there, and after

11  that program was over with he stayed there because he

12  wanted to learn so bad he just stayed there, and they

13  helped him with his work a lot.

14          MS. CATLETT:  Okay.  Thank you.

15                  CROSS-EXAMINATION

16          BY MS. VERRA:

17      Q    Hi.

18      A    How are you doing, ma'am?

19      Q    Just a couple of questions.  So you helped

20  him with this?  You, I guess, introduced him to this

21  D.C. Link and Learn program; is that correct?

22      A    Yes.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 58

1        Q      All right.  Was he attending school when you

2    introduced him to this D.C. Link and Learn program at

3    all?

4        A      No, he wasn't attending school.

5        Q      How long had he been out of school?

6        A      At that time I don't know.

7        Q      Okay.

8               HEARING OFFICER:  What was that, the time

9    you've known him?

10              THE WITNESS:  Yes.

11              MS. CATLETT:  No, you said --

12              HEARING OFFICER:  Wait a minute.

13              MS. CATLETT:  I'm sorry.

14              HEARING OFFICER:  What was your answer?

15              THE WITNESS:  I didn't know.

16              HEARING OFFICER:  The question was -- what

17    was your question again, please?

18              MS. VERRA:  The question was how long had he

19    been out of school.

20              HEARING OFFICER:  And your answer?

21              THE WITNESS:  I didn't know.

22              BY MS. VERRA:

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 59

1      Q      Okay.  But you did state that the Link and

2    Learn program was approximately a year long?

3      A      Yes.

4      Q      And he was able -- he went through classes

5      A      He took classes every morning.

6      Q      Every morning?

7      A      Yes.

8      Q      Took the GED test?

9      A      Right.

10     Q      And then I guess failed?

11     A      It wasn't just the GED.  He was learning.

12     Q      Okay.  So he was in classes?

13     A      Right, he was in class every day.

14     Q      And during that time as far as you knew he

15   wasn't at a D.C. public school, he wasn't attending any

16   high school?

17     A      No.

18     Q      Okay.  So that was about a year?

19     A      Yes.

20     Q      Okay.  All right.  So in the conversation

21   you had with him he stated that he was trying to get

22   into a D.C. public school?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 60

1       A       He was trying.

2       Q       Okay.  But he stopped or couldn't get in

3   because he felt like he was too old?

4       A       That and he said he was like -- didn't know

5   how to go back to get -- you know, get back.  He didn't

6   know what to do to start back.

7       Q       So do you know if -- did he make any -- did

8   he go to any schools to talk to anybody?  Did they make

9   a request for reevaluations?  Do you know if he talked

10  to anybody from DCPS regarding --

11      A       He went to -- he went to -- I don't know

12  what schools he went to, but he went to try to get back

13  in school.

14      Q       Okay.

15      A       So I don't know what happened from that.

16      Q       Okay.  But as far as you know he did this

17  Link and Learn?

18      A       He did Link and Learn.

19      Q       For a year?

20      A       And I know he tried to get back in school.

21              MS. VERRA:  Okay.  All right.  No further

22  questions from DCPS.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 61

1              HEARING OFFICER:  Any redirect?

2              MS. CATLETT:  Yes, I have one question.

3                    REDIRECT EXAMINATION

4          BY MS. CATLETT:

5      Q      Maurice -- Alfred, do you know if Maurice

6   had been homeless or in a shelter at any point before

7   he met you?

8              HEARING OFFICER:  What was the question,

9   please?  I couldn't hear you.

10             MS. CATLETT:  Oh, I'm sorry.  Whether

11  Maurice had been homeless or in a shelter before he met

12  Alfred.

13             THE WITNESS:  No, not that I know of.

14             BY MS. CATLETT:

15     Q      So at no time he went from living with his

16  mom to living with you?

17     A      Right, as far as I know, yeah.

18     Q      Okay.  And when he was with his mom was he

19  ever in a homeless shelter, do you know?

20     A      I don't know.

21             HEARING OFFICER:  If you don't know, you

22  don't know.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 62

1             MS. VERRA:  I can't --

2             HEARING OFFICER:  You don't know.  If you

3     don't know, you don't know.

4             MS. CATLETT:  That's fine.

5             THE WITNESS:  Okay.

6             MS. CATLETT:  Thank you.

7             THE WITNESS:  Uh-huh.

8             MS. VERRA:  Oh, one quick redirect.

9             HEARING OFFICER:  Yes, recross.

10            MS. VERRA:  Recross.

11                      RECROSS-EXAMINATION

12            BY MS. VERRA:

13      Q     I just need to know -- recross.  What was

14    the time period that he lived with you?  I didn't know

15    that he lived with you, but I guess he lived with you.

16    What was the time period?  Can you give me some kind of

17    idea when he came to live with you and when he left?

18            MS. CATLETT:  What's the relevance?

19            MS. VERRA:  Oh, it's --

20            HEARING OFFICER:  She can ask that.  That's

21    fine.

22            MS. CATLETT:  Okay.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 63

1                    HEARING OFFICER:  You already said

2     (inaudible) redirect.

3                    MS. VERRA:  It's extremely relevant.

4                    HEARING OFFICER:  So go ahead.

5                    THE WITNESS:  I think -- let me see.  I

6     believe two years.  Yeah.

7                    BY MS. VERRA:

8          Q     All right.  And just a quick follow-up.  Was

9     he in school during any of that time that he lived with

10    you?

11         A     He was going to -- I don't know what -- he

12    had been going to --

13         Q     Well, one of those years he was in Link and

14    Learn.

15         A     Yeah, one year Link and Learn.

16         Q     Okay.

17         A     And he had been going back and forth -- so

18    what school was that he was going to?  He was going

19    somewhere --

20         Q     Okay.

21         A     -- but I don't know what school.

22                   HEARING OFFICER:  Was he going to Roosevelt

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 64

1   High School?

2          THE WITNESS:  I don't know if it was

3   Roosevelt or -- it could have been Roosevelt, but let

4   me see.  I believe it was Roosevelt.

5          HEARING OFFICER:  So he lived with you for

6   two years.  One of those years he was going to D.C.

7   Link and Learn?

8          THE WITNESS:  Right.

9          HEARING OFFICER:  And then what was he doing

10  the other year?

11         THE WITNESS:  Before?

12         HEARING OFFICER:  Yeah.  Was he going -- is

13  it your testimony he was going to Roosevelt?

14         THE WITNESS:  He had been going -- he had

15  been going -- I don't know the name of the school, but

16  I believe it was Roosevelt.

17         HEARING OFFICER:  Do you know if the

18  mornings he got up and would go to school?

19         THE WITNESS:  Right, right, he got up.

20         HEARING OFFICER:  For a whole year prior to

21  going to D.C. Link and Learn?

22         THE WITNESS:  I believe so.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 65

1          HEARING OFFICER:  But you're not sure

2    because you don't know if he went to school or didn't

3    go to school?

4          THE WITNESS:  Right.

5          HEARING OFFICER:  Thank you very much.

6          MS. CATLETT:  Thank you.

7          HEARING OFFICER:  This witness is excused.

8    Next witness.

9          MR. TULMAN:  That's it.

10          HEARING OFFICER:  You rest?

11          MS. CATLETT:  Uh-huh.

12          MR. TULMAN:  Unless we can get Maurice back

13    on and we'd probably have more questions for him.

14          MS. VERRA:  Oh, yeah.

15          MR. TULMAN:  But that's okay.  We're

16    prepared to discuss the issues, and if he gets back

17    we'll probably have some follow-up, redirect.

18          HEARING OFFICER:  Well, we may not get back.

19    All right.  All right.  I'm going to ask for legal

20    memorandum from both sides on the issue of

21    responsibility on whether DCPS -- what is the

22    relationship in terms of the United States Department

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 66

1    of Justice Federal Bureau of Prisons and whether, in

2    light of what Mr. Sinclair wrote in his -- and I've not

3    had a chance to read the decision or the

4    reconsideration, but I don't see any cases cited.

5              MR. TULMAN:  No.

6              HEARING OFFICER:  So -- and I'd assume there

7    are probably --

8              MS. CATLETT:  There are.

9              HEARING OFFICER:  If you can give me any

10   case law on the issue of jurisdiction of the Bureau of

11   Prison -- what responsibility DCPS may have to, one,

12   evaluations, and two, comp. ed. over another facility

13   that's in another state.

14             MR. TULMAN:  Can we discuss this a little

15   bit before we talk about the memo?  I think we might be

16   able to help focus the issues a little bit.

17             HEARING OFFICER:  All right.  I'm open to

18   hear and --

19             MS. VERRA:  Just one clarification.  Hearing

20   Officer, there's a distinction made in the HODs, not

21   just another facility but a federal facility, so I need

22   to know in this --

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 67

1          HEARING OFFICER:  We're talking about a

2    federal facility.  I said the Federal Bureau of

3    Prisons.

4          MS. VERRA:  Oh, when you said a comp. ed. at

5    another facility I just wanted to make sure you meant a

6    federal facility.

7          HEARING OFFICER:  The Federal Bureau of

8    Prisons.

9          MS. VERRA:  Okay.  All right.

10          HEARING OFFICER:  All right.  And you wish

11   to -- I'm willing -- since I have not had an

12   opportunity to review the record I may have a more

13   detailed memo, but I'll be willing to take your -- any

14   help you can provide at this time.  Go ahead,

15   Professor.

16          MR. TULMAN:  I'm going to turn it over to

17   Cynthia, and let me follow up after she's done if

18   there's a need to follow up.

19          HEARING OFFICER:  All right.  Do you have

20   cases cited there?

21          MS. CATLETT:  Not really.

22          MR. TULMAN:  No, there are no cases.

Case 1:08-cv-00344-RJL    Document 10-3    Filed 08/26/2008    Page 20 of 49
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 68

1          MS. CATLETT:  There are no cases on point on

2    this issue.

3          HEARING OFFICER:  Have you already

4    researched it?  Are there no cases relating to the

5    Federal Bureau of Prisons in IDEIA?

6          MR. TULMAN:  Right.  So let me ask Ms.

7    Catlett to present what we know and what we think the

8    issues are.

9          HEARING OFFICER:  Yes, Counsel.

10          MS. VERRA:  Just DCPS would like to say I

11    mean, it's pretty much laid out in the hearing

12    officer's decision and reconsideration, and we stand

13    behind our hearing officer's decision.

14          MR. TULMAN:  Well --

15          HEARING OFFICER:  I understand that, but

16    that's not my question.

17          MR. TULMAN:  Right.

18          HEARING OFFICER:  My question is usually

19    there is federal case law --

20          MR. TULMAN:  Yeah.

21          HEARING OFFICER:  -- usurping a federal

22    statute in terms of -- and I cannot believe that there

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 59

1    has not been some issue that has arisen between a

2    special ed. student, an incarcerated individual in a

3    federal prison so, I mean, the question I have is I am

4    not in the business of, even though you though may have

5    been denied a right, to get a futile remedy.

6            I mean, if it's futile to do something then

7    there's -- if the Federal Bureau of Prisons says you

8    can't send anybody else in here to give (inaudible)

9    because we run our own program --

10           MS. CATLETT:  But they --

11           HEARING OFFICER:  -- if the Federal Bureau

12   of Prisons says we do our own evaluations, you can't

13   send somebody else, then I can't be ordering somebody

14   else to do it, and I don't want us to go through all

15   that.

16           MR. TULMAN:  Right.

17           HEARING OFFICER:  So what I'm trying to get

18   is I don't know if they're -- I have not had an

19   opportunity to review documents to determine whether

20   in fact, there is a violation, but if there is the

21   question is -- from my mind is remedy.

22           MR. TULMAN:  Yeah, sure.  Let me just say

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 70

1    one thing preliminarily.  I think it's fair to say that

2    DCPS is saying the Bureau of Prisons is responsible and

3    the Bureau of Prisons is saying DCPS is responsible.

4    We're not asking you to rule in a way that says this is

5    what people are necessarily going to have to do down

6    the road.

7                It's clear that we're going to have to go to

8    federal court against the Bureau of Prisons.  They've

9    never provided special ed. to anybody.  There is no

10   case law, and this is a unique situation because in the

11   revitalization act Ms. Catlett will talk about there is

12   language saying that the Bureau of Prisons will take

13   over DCPS's or D.C.'s educational obligations.  That's

14   never been litigated either.

15               That doesn't answer the question whether one

16   or both are liable here.  It just doesn't answer that

17   question.  So assuming that we're not going to be able

18   to answer what's going to eventually happen here

19   because the Bureau of Prisons won't submit itself to a

20   hearing officer's jurisdiction --

21               HEARING OFFICER:  Absolutely correct.

22               MR. TULMAN:   -- we're going to have to

Case 1:08-cv-00344-RJL   Document 10-3   Filed 08/26/2008   Page 23 of 49
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 71

1    litigate against them.  It's clear from our point of

2    view that Maurice didn't get appropriate services

3    including evaluations from the time he was in the first

4    grade on.  He failed a total of --

5            HEARING OFFICER:  So you want a declaration

6    of rights of what he was denied and then a separate

7    federal litigation to implement that?

8            MR. TULMAN:  We're going to have to do that.

9    We went ahead and gave you the hearing officer's

10   determinations from the only other case we've had like

11   this because we want to put everything on the table so

12   know.  We don't subscribe to Hearing Officer Sinclair's

13   ruling.

14           HEARING OFFICER:  And was that not appealed?

15           MR. TULMAN:  We're about to.  We're not

16   appealing it as an aggrieved party because we want the

17   compensatory ed.  We want it, but we will be taking the

18   Federal Bureau of Prisons to federal court and we're

19   hoping frankly the D.C. Public Schools will find some

20   way to join us on that litigation, but that's a

21   separate matter.

22           At this point what we face is both DCPS and

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 72

1    the Bureau of Prisons saying we're not responsible, so

2    we're going to have to litigate that.  Right now as you

3    said we're just looking for declaration of how much

4    compensatory ed. is due and there are a number of ways

5    to interpret that.  One is whether or not the Bureau of

6    Prisons does special ed.  They don't.

7              It's analogous from one point of view to if

8    a student was denied education for X number of years

9    here and then moved to another state would DCPS still

10   be responsible for compensatory ed. in the other state,

11   so even if the Bureau of Prisons did take over

12   educational responsibility for D.C. prisoners that

13   still doesn't answer the question are they liable for

14   past violations by DCPS.

15             In other words, did they inherit not only

16   the obligation to provide special ed. but also the

17   liabilities of comp. ed., and that's not been litigated

18   obviously either.  So even if we were to say here DCPS

19   had no obligation perspectively that doesn't answer the

20   question whether DCPS would still be liable or the

21   Bureau of Prisons for DCPS's former or previous

22   violations, their compensatory ed.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 73

1          MS. CATLETT:  Here's the actual act.

2          MR. TULMAN:  This is from the revitalization

3    act?

4          MS. CATLETT:  Uh-huh.

5          MR. TULMAN:  Okay.

6          MS. VERRA:  There's a class action that's

7    going on.  I don't understand why you all don't join

8    the class action.

9          MR. TULMAN:  There is no class action.

10          MS. CATLETT:  There is no class action.

11          MS. VERRA:  I just talked to Judith Smith.

12    The -- DCPS is a part of that right now.

13          MR. TULMAN:  No, excuse me.  There's a class

14    action, JC versus Janey (phonetic), which has to do

15    with the provision of special ed. at the D.C. Jail.  It

16    has nothing to do with the Bureau of Prisons.  I mean,

17    I talked with those people before they filed the suit.

18          HEARING OFFICER:  (Inaudible) still doesn't

19    answer the problem I have, is I can't order the Federal

20    Bureau of Prisons to do anything, and they don't have

21    to listen to anything I say.

22          MR. TULMAN:  Yeah.  That's an open question

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 74

1    too, and we'll be happy to brief that.

2                HEARING OFFICER:  No, I -- okay.

3                MR. TULMAN:  But there are a number of ways

4    of looking at it.

5                HEARING OFFICER:  I'm just saying that's one

6    practical problem.

7                MR. TULMAN:  Right.

8                HEARING OFFICER:  And the other issue is

9    you've just told me he's in a sentence for 17 years.

10               MR. TULMAN:  Sure.

11               HEARING OFFICER:  He's going to be there

12   while unless it's overturned on appeal or whatever.

13               MR. TULMAN:  Right, right.

14               HEARING OFFICER:  So he's going to be there

15   for a while.

16               MR. TULMAN:  Right.

17               HEARING OFFICER:  And --

18               MR. TULMAN:  The only right he loses

19               HEARING OFFICER:  The question is whether or

20   not if the Federal Bureau of Prisons says, one, and

21   you're saying they don't provide special ed. -- they're

22   saying one, we don't do it, and two, we don't bring in

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 75

1   other people to come in and evaluate our prisoners then

2   --

3              MS. CATLETT:  They haven't said that.

4              MR. TULMAN:  They haven't said that.

5              HEARING OFFICER:  Okay.  I didn't say you

6   said that, but I'm saying theoretically --

7              MR. TULMAN:  Right.

8              HEARING OFFICER:  -- it is possible for them

9   to say that they will not take outside people into --

10  which I might understand, into the facility to do

11  evaluations of prisoners or to provide tutoring or

12  comp. ed. --

13             MR. TULMAN:  Right.

14             HEARING OFFICER:  -- to prisoners.

15             MR. TULMAN:  Right.

16             HEARING OFFICER:  And if they take that

17  position then I'm in a position of a meaningless order.

18             MR. TULMAN:  Well --

19             HEARING OFFICER:  And if they decide look,

20  we're not listening to some hearing officer in D.C.,

21  we're a federal institution in North Carolina, we don't

22  have to pay any attention to him.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 76

1          MR. TULMAN:  Go ahead.

2          MS. CATLETT:  I personally think that --

3     I've spoken with numerous people at Rivers where

4     Maurice is currently placed and no one has objected to

5     him being evaluated there at DCPS's expense.

6          I think there is nothing wrong with -- I

7     think Maurice is owed compensatory education and I'm

8     prepared to discuss that with you, and I think if he's

9     granted comp. ed. we could arrange something either

10    with the Federal Bureau of Prisons, and it is a novel

11    issue and -- but I don't think that the fact that he is

12    currently in a Federal Bureau of Prison facility

13    relinquishes his right to comp. ed., and for us to try

14    to work with the BOP and DCPS in order to get him

15    educated there.

16          The case that you're reading from that we

17    submitted from -- Gibson v. DCPS, it's a different

18    case.  The --

19          HEARING OFFICER:  I'll read it.

20          MS. CATLETT:  It's a very different case.

21    It's a different case from this.

22          HEARING OFFICER:  Okay.  All right.  Do you

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 77

1    have anything you want to say at the moment?

2                MR. TULMAN:  Yeah, let me jump in for

3    another minute.  The IDEA only has one mention of

4    federal incarceration.  It's in 20 USC 1415M1D.  That's

5    a provision that talks about the transfer of rights

6    from the parent to the student, and it says that

7    transfer occurs and then it lists out where the student

8    might be, and it includes federal incarceration

9    facilities.

10                So the IDEA is explicit about federal

11   prisons in one place, and that is that students have a

12   right to enforce their special ed. rights if they're in

13   a federal prison.  The significant -- the IDEA, as you

14   know, is a state structured statute.  I mean, it talks

15   about what each state must do, so there are a number of

16   possibilities.  One is that for people who are in the

17   Federal Bureau of Prisons each state remains

18   responsible for their prisoners.

19                What's happened here is that the United

20   States Government in the bailout of the District of

21   Columbia 1997, the revitalization act explicitly took

22   over the education responsibility.  It's not been

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 78

1    litigated whether their taking over educational

2    responsibility includes special ed. responsibility.

3    Okay.  So there are a number of different

4    possibilities.

5             One is that the Federal Bureau of Prisons is

6    just responsible.  The other is that the Bureau of

7    Prisons is responsible as if they were the District of

8    Columbia, and we've said to them and we would ask you

9    to think about this and invite them back for a

10   continuation of this hearing if you rule this way, that

11   they agreed to take over DCPS's role and they are

12   acting as a state for purposes of the IDEA.

13            Now, that's one interpretation.  If they

14   decided to take over DCPS's responsibility and act as a

15   state then in our view you would have jurisdiction over

16   them and their refusing to come to this hearing is a

17   refusal of continuing with their obligation to act as a

18   state.

19            HEARING OFFICER:  Were they notified about

20   this hearing?

21            MR. TULMAN:  Oh, yeah.

22            MS. CATLETT:  Yes, they were.  That letter

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 79

1    --

2              MS. VERRA:  Oh, they weighed in.

3              MR. TULMAN:  Yeah.

4              MS. VERRA:  Their legal counsel weighed in.

5              MR. TULMAN:  That's why we gave you that

6    letter.  They said --

7              HEARING OFFICER:  Where is that?

8              MS. VERRA:  Ms. Catlett's letter, the letter

9    to Ms. -- yeah.

10             MR. TULMAN:  It's from Mary Ann Cantwell.

11             MS. CATLETT:  Mary Ann Cantwell.

12             MS. VERRA:  They cleared weighed in.

13             MS. CATLETT:  MP 8 and MP 9.

14             HEARING OFFICER:  Nine?

15             MR. TULMAN:  Yeah.

16             MS. CATLETT:  MP 8 and MP 9.

17             MR. TULMAN:  So in other words, one argument

18   is that in 1997 through the revitalization act that

19   they did take over D.C.'s, and that to some extent is

20   what we're getting from DCPS.

21             MS. VERRA:  And state how they're going to

22   meet his educational needs, his special ed. needs.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 80

1          MR. TULMAN:  No, they don't say how they'll

2   meet the special ed. needs.

3          MS. VERRA:  Yeah, they do in this letter.

4          MR. TULMAN:  No, they say we don't do

5   special ed.

6          HEARING OFFICER:  All right.  I can read the

7   letter.

8          MR. TULMAN:  They don't do special ed.  They

9   say this is how we'll meet his educational needs.

10          MS. VERRA:  Yeah, you might want to read the

11   letter again --

12          MR. TULMAN:  I've read the letter.

13          MS. VERRA:  -- because it's right here.

14          MR. TULMAN:  Read the paragraph before that.

15          HEARING OFFICER:  Okay.  I'm reading it now.

16          MS. VERRA:  Okay.

17          (There was a brief pause in the

18   proceedings.)

19          MR. TULMAN:  In any case, the burden would

20   be with them if they were here to show that they were

21   providing -- but they don't.  Trust me.  They don't do

22   special ed.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 81

1              (There was a brief pause in the

2    proceedings.)

3              MR. TULMAN:  IDEA is not applicable to the

4    Bureau of Prisons.

5              MS. VERRA:  You might want to check out this

6    sentence right here, to the extent --

7              MS. CATLETT:  That's their educational

8              MS. VERRA:  Yeah, but it still meets the

9    special education needs.

10             MR. TULMAN:  But they say the IDEA does not

11   apply.  That's their position.

12             MS. VERRA:  Well, we can argue about that

13   all day.

14             MR. TULMAN:  No, it's straightforward.  They

15   said the IDEA does not apply.

16             MS. VERRA:  They should be at the table with

17   us.

18             MR. TULMAN:  In any case --

19             HEARING OFFICER:  All right.  All right.  I

20   don't --

21             MR. TULMAN:  It's clear we're going to have

22   to go to federal court against the Bureau of Prisons.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 82

1   What we're asking primarily is that you do make a

2   finding on compensatory ed. because whether we need to

3   enforce it against DCPS or whether we need to enforce

4   it against the Bureau of Prisons we need that finding

5   to enforce it.

6            We will have to sue both because both are

7   saying that the other is responsible and that they

8   aren't, and again, this is a kid who from first grade

9   on was failing continuously.  They tried to make up for

10  his failures by skipping him two grades at one point or

11  three grades at one point and he just couldn't keep up,

12  and so we need a lot of compensatory ed. here to be

13  fair to him because they missed him from first grade

14  on.

15           HEARING OFFICER:  Okay.  Are you through,

16  Professor?  Are you finished?

17           MR. TULMAN:  Oh, I could keep going.

18           HEARING OFFICER:  I'm asking are you

19  finished because she wants to --

20           MR. TULMAN:  Oh, no, please.  Go ahead.

21           MS. VERRA:  Two points, Hearing Officer.

22  One, the three-year statute of limitations, they never

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 83

1    laid out their argument for the exception to the Green

2    ruling.  It doesn't exist.  They didn't lay it out.

3    Number two --

4              MR. TULMAN:  We didn't reach that issue yet.

5    We're happy to do it.

6              HEARING OFFICER:  All right.  Wait a minute.

7    I'm going to talk about the comp. ed. issue.

8              MR. TULMAN:  Yeah.

9              HEARING OFFICER:  Anything else to say in

10   regards to what he just said about --

11             MS. VERRA:  Yeah, just number two.  They

12   didn't skip him a grade.  He was consistently

13   unavailable and not attending school for whatever

14   reason.  He was unavailable for at least three good

15   years per the testimony by the witness and also the

16   defendant himself so, I mean, he was unavailable for

17   about three good years, so when he came back to school

18   I mean, they had to put him in the grade level he was

19   at, I mean, so we didn't skip him grades.

20             HEARING OFFICER:  All right.  I've heard

21   enough.  What I'm going to do here, what I'm going to

22   do here, (inaudible) you don't get day to day for comp.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 84

1    ed.  It's a flexible approach.  It's supposed to be

2    tied (inaudible).  I don't have from you -- you have

3    the burden and I'm not at this hour about to go through

4    all the comp. ed. year by year issues.

5              However, what I would like to as a

6    preliminary matter, because there is a three-year

7    statute of limitations according to one judge, and then

8    we have Judge Kessler saying it goes forever as a

9    continuing, and so there's a good difference in the

10   district judges as to how they look at how far back it

11   goes.

12             Now, so what I'm going to ask you to combine

13   in your memo is one memo to deal with the statute of

14   limitations, and then a second memo -- I mean, as one

15   part of the memo, and the second issue is one of -- as

16   to the Federal Bureau of Prisons as to (inaudible),

17   what -- the interpretations there are in statute or

18   case law as to responsibilities for IDEA and whether I

19   have jurisdiction (inaudible).

20             MR. TULMAN:  And we're not necessarily

21   asking you to.

22             HEARING OFFICER:  All right.  So what are

Page 85

1    you asking?  You tell me exactly what you're asking me

2    to do is just (inaudible) of rights.

3              MR. TULMAN:  It would be fine if you want to

4    assert jurisdiction over the Bureau of Prisons, but --

5              HEARING OFFICER:  I am not asserting

6    jurisdiction over the Bureau of Prisons.

7              MR. TULMAN:  We'll give you at least a

8    reason to try to do that, but --

9              HEARING OFFICER:  I'm not going to do that.

10   What I'm trying to determine is if there is a violation

11   is there a remedy --

12             MR. TULMAN:  Right.

13             HEARING OFFICER:  -- that's practical that

14   can be enforced, and if it can't be enforced by me then

15   you got to go somewhere else.

16             MR. TULMAN:  Your hearing officer

17   determination is probably never enforceable except in a

18   federal court.

19             HEARING OFFICER:  Well, then I fully am

20   aware it's not going to be enforceable over there.

21             MR. TULMAN:  And we're going to -- that's

22   what we're going to end up doing anyway, so I would ask

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 86

1    you not to say I can't rule if you can't get me to

2    enforce it because you're not going to be able to

3    enforce it.  We know we have to go to federal court to

4    get this enforced.

5           What we're looking for now is an equitable

6    remedy, an equitable response to the record of this

7    child's education and then it'll be up to us to try to

8    get the Bureau of Prisons or D.C. --

9           HEARING OFFICER:  What I'm saying to you on

10   a preliminary threshold question is I have to rule on

11   whether or not it's only three years you go back or

12          MR. TULMAN:  Right.

13          HEARING OFFICER:  -- or whether you go back

14   to first grade.

15          MR. TULMAN:  Right.  We understand.

16          HEARING OFFICER:  Because if I go back to

17   the first grade then we got to put a lot more on it

18   than just three years and I'll have another hearing on

19   the comp. ed. in light of Reed.

20          MR. TULMAN:  Yes.

21          HEARING OFFICER:  I'm not going to -- you

22   came in here initially asking for day for day and another

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 87

1    Reed that's not the standard anymore, so -- and DCPS

2    can also -- since the burden is on you as you recognize

3    on comp. ed., not on D.C., D.C. at that hearing can

4    indicate any reasons if they provided some services, if

5    they provided --

6              MR. TULMAN:  Well, I think --

7              HEARING OFFICER:  You know, if there are

8    some of the years that the student was unavailable we

9    can hear that at that time so we can adapt according to

10   Reed a flexible interpretation and not a mechanical

11   approach.

12             MR. TULMAN:  So at that point you'll let

13   them produce more evidence about what they may or may

14   not have done?

15             HEARING OFFICER:  Well, on the comp. ed.,

16   but I mean, the point is I first have to rule on the

17   statute of limitations issue because why should I spend

18   a lot of time listening to all these other previous

19   years --

20             MR. TULMAN:  Uh-huh.

21             HEARING OFFICER:  -- four or three years if

22   I determine that Judge Green is right so, I mean,

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 88

1    that's a preliminary.  So once I get a memo from you on

2    that at the same time you give me a memo on the federal

3    prison issue then I'll make a decision and then we'll

4    have another hearing --

5              MR. TULMAN:  All right.

6              HEARING OFFICER:  -- on the comp. ed. issue

7    in light of Reed.

8              MR. TULMAN:  Okay.  Let's if we could talk

9    about the scheduling of the memo and also scheduling of

10   a hearing, and I know Ms. Catlett goes back to Brazil

11   where she's from at the end of the semester, but --

12             HEARING OFFICER:  You have other students.

13             MR. TULMAN:  Well, we have other students,

14   but --

15             HEARING OFFICER:  I'm sorry, but (inaudible)

16   professor too, and you work on a semester basis.

17             MR. TULMAN:  I understand that, but I want

18   to talk about --

19             MS. VERRA:  I can't do scheduling.  They do

20   it for me.

21             HEARING OFFICER:  Excuse me?

22             MS. VERRA:  I can't do scheduling at this

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 39

1   point.

2                HEARING OFFICER:  Huh?

3                MS. VERRA:  I said I can't do scheduling.

4   They do it for me.

5                HEARING OFFICER:  I'm saying I'm not going

6   to do any scheduling --

7                MS. VERRA:  Oh.

8                HEARING OFFICER:  -- because the first thing

9   I have to rule on is the issue of statute of

10  limitations.

11               MR. TULMAN:  All right.  So you want to

12  schedule the memo, though?

13               HEARING OFFICER:  That's what I'm going to

14  do, so I'm giving you a week.

15               MR. TULMAN:  All right.

16               HEARING OFFICER:  Both of you.  Submit me so

17  today is Monday.  Next -- the close of business Monday

18  next week.

19               MR. TULMAN:  All right.

20               HEARING OFFICER:  It gives you the weekend.

21  It's not that difficult because I already know what the

22  case law is on it --

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 90

1             MR. TULMAN:  Yeah.

2             HEARING OFFICER:  It's to why should -- why

3     the statute of limitations applies and why not.

4             MR. TULMAN:  Let me tell you just two quick

5     problems.  I'm scheduled to be out of town the 29th

6     through the 3rd, and I know you have exams so do you

7     want to ask for two weeks?  When do you go back?

8             MS. CATLETT:  If -- is that at all possible?

9             MR. TULMAN:  When do you go back?

10            MS. CATLETT:  I can do it.

11            MR. TULMAN:  By Monday, would that work?

12            MS. CATLETT:  I can't do it by Monday.

13            HEARING OFFICER:  You probably have the

14     cases already, don't you?

15            MS. CATLETT:  I do, I do.

16            HEARING OFFICER:  I don't need a memorandum.

17     Just on the statute of limitations just provide me all

18     the cases you have.

19            MS. CATLETT:  Okay.

20            HEARING OFFICER:  I'll read it myself.  I

21     don't like your lawyers' spin on it.

22            MS. VERRA:  You don't like our spin?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 91

1              HEARING OFFICER:  Huh?

2              MS. VERRA:  You don't like our spin?

3              HEARING OFFICER:  Spin.  The lawyers put a

4      spin on it.

5              MS. VERRA:  That's what I get paid for.

6              MR. TULMAN:  Well, it's Hammond and it's --

7              HEARING OFFICER:  Well, you don't have to do

8      it, so all I'm asking you for is I'm aware of the two

9      cases of Judge Green and Judge Kessler.

10             MR. TULMAN:  Yeah.

11             HEARING OFFICER:  If there's anything else

12     you decide, submit me the cases.  You can also submit

13     me Kessler and Green's opinion.

14             MR. TULMAN:  Okay.

15             MS. CATLETT:  Okay.

16             HEARING OFFICER:  And then that should not

17     -- you should be able to do that by Monday of next

18     week.

19             MR. TULMAN:  Okay.

20             HEARING OFFICER:  The other thing is I'd

21     like -- you're saying they have exams next week and you

22     can't do the other part?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 92

1          MR. TULMAN:  Let me just confirm.

2          HEARING OFFICER:  And you're out of town?

3          MR. TULMAN:  Yeah.  Let me just confer with

4     her.

5          MS. VERRA:  The other part would be the

6     hearing, Hearing Officer?

7          HEARING OFFICER:  Wait a minute.  No, the

8     other part is the question of the Bureau of Prisons.

9          MR. TULMAN:  We can do this by Monday.  Is

10    that what you're saying?  Yeah?

11         MS. CATLETT:  Yeah.

12         MR. TULMAN:  We're good.

13         MS. CATLETT:  Both issues.

14         MS. VERRA:  Professor Tulman, I thought you

15    weren't asking us to I guess decide on the other part,

16    the Bureau of Prisons part.

17         MR. TULMAN:  We're just going to lay out the

18    law on the -- this responsibility of the Bureau of

19    Prisons and the responsibility of DCPS.  That's the

20    other part you're asking for, right?

21         HEARING OFFICER:  Correct.

22         MR. TULMAN:  Yeah, we'll do that by Monday.

Case 1:08-cv-00344-RJL    Document 10-3    Filed 08/26/2008    Page 45 of 49
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 93

1    That's fine.  I've already told you there's not a lot

2    there.

3                HEARING OFFICER:  Okay.

4                MS. CATLETT:  There's a lot of

5    interpretation --

6                HEARING OFFICER:  If DCPS wishes to add --

7    you know, whenever you want to state on that issue

8    by close of business on Monday.  Does that give you

9    enough time?

10               MS. VERRA:  It's going to have to.

11               HEARING OFFICER:  And then after I have

12   a decision based on the statute of limitations issue

13   and maybe on the other issue if I can then we can

14   schedule a comp. ed. hearing --

15               MR. TULMAN:  Yeah.

16               HEARING OFFICER:  -- at a later date --

17               MR. TULMAN:  That's fine.

18               HEARING OFFICER:  -- through the hearing

19   office.

20               MR. TULMAN:  Let me just say this also about

21   scheduling.  In the Bureau of Prisons there's a

22   four-stage grievance process, and before we get into

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 94

1    federal court we have to exhaust that.  Maurice

2    recently went off to the Federal Bureau of Prisons so

3    we haven't done the grievance process yet, so one

4    possibility from our perspective would be to put off

5    the comp. ed. hearing until the fall when Ms. Catlett

6    is back, but by then we will have exhausted our

7    grievance through the Bureau of Prisons.

8              HEARING OFFICER:  That's fine with me.

9              MR. TULMAN:  So I don't know if that's going

10   to work for everybody, but it's a possibility because

11   as I say we're going to end up in federal court.  We

12   can't get into federal court until we exhaust this

13   four-stage process.

14             MS. VERRA:  In the meantime, Hearing

15   Officer, we're not -- I guess DCPS is not estopped from

16   making a -- an offer of settlement.

17             MR. TULMAN:  No, of course.

18             HEARING OFFICER:  You can always make an

19   offer of settlement.

20             MS. VERRA:  Okay.

21             MR. TULMAN:  That would be great, and as I

22   said, we're hopeful that DCPS will join forces with us

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 95

1    on this.

2               HEARING OFFICER:  Well, I don't know.

3    Whatever you -- that you're always able to do, but --

4               MS. VERRA:  Let me (inaudible) the offer.

5               HEARING OFFICER:  If you want to hold off on

6    the comp. ed. issue until after you exhaust your crimg

7    because you may have found another -- something else to

8    come up through that that will alter (inaudible), and I

9    have enough cases and I don't need to be spinning my

10   wheels.

11              MR. TULMAN:  Right.

12              HEARING OFFICER:  (Inaudible).

13              MR. TULMAN:  As we've indicated, we'd be

14   more than happy to come to terms with DCPS on the comp.

15   ed. issue if they want to do that.

16              HEARING OFFICER:  All right.

17              MR. TULMAN:  And the real fight here I think

18   is not amongst us, but it's -- the current situation,

19   no one is saying we're responsible for special ed. for

20   people in the Federal Bureau of Prisons so that DCPS --

21   I'm sorry, D.C. students are the only students in the

22   country convicted and incarcerated on local offenses

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 96

1    who aren't getting special ed.

2                HEARING OFFICER:  All right.  That's another

3    issue, but the issue DCPS is raising is that a student

4    may not be entitled to a certain amount of comp. ed.

5    because he was not available.

6                MR. TULMAN:  Understood.

7                HEARING OFFICER:  So that may be.

8                MR. TULMAN:  Okay.

9                HEARING OFFICER:  But until I rule on the

10   three years some of the issues are before me.

11               MR. TULMAN:  Right, right.

12               HEARING OFFICER:  So let's submit the memo

13   --

14               MR. TULMAN:  Great.

15               HEARING OFFICER:  -- on that and we hold

16   comp. ed. in abeyance for a full Reed type of hearing

17   until when the parties agree.

18               MR. TULMAN:  Okay.  That's good.

19               HEARING OFFICER:  All right.  Thank you all.

20               MR. TULMAN:  Thank you very much.

21               HEARING OFFICER:  Thank you.

22               (The hearing was concluded at 4:32 p.m.)

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON MONDAY, APRIL 25, 2005

Page 97

1                    CERTIFICATE OF TRANSCRIBER

2            I, Bonnie K. Panek, do hereby certify that

3      the foregoing transcript is a true and correct record

4      of the proceedings; that said proceedings were taken by

5      me stenographically and thereafter reduced to

6      typewriting under my supervision; and that I am neither

7      counsel for, related to, nor employed by any of the

8      parties to this case and have no interest, financial or

9      otherwise, in its outcome.

10

11

12

13     BONNIE K. PANEK

14

15

16

17

18

19

20

21

22

Page 1

Hearing in the Matter of:

Maurice Pimble

Wednesday, October 31, 2007

11:14 a.m.

Job No.:  120843

Volume 1 of 1

Transcribed by:  Bonnie Panek

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 2

1                          C O N T E N T S

2                                                        PAGE

3    PRELIMINARY MATTERS DISCUSSED:              8

4    OPENING STATEMENTS:
          By Ms. Harman                             17
5         By Ms. Harris-Lindsey                     24

6    EXAMINATION OF MR. PIMBLE:
          By Ms. Archer                             30
7         By Ms. Harris-Lindsey                     36
          By Ms. Archer                             52
8         By Ms. Harris-Lindsey                     57

9    EXAMINATION OF MS. LEWIS:
          By Ms. Archer                             61
10        By Ms. Harris-Lindsey                     65
          By Ms. Archer                             71
11
     EXAMINATION OF MR. HOBDY:
12        By Ms. Archer                             73
          By Ms. Harris-Lindsey                     78
13        By Ms. Archer                             82

14   EXAMINATION OF MS. FIELDS:
          By Ms. Harman                             90
15        By Ms. Harris-Lindsey                    115

16   CLOSING ARGUMENTS:
          By Ms. Archer                            124
17        By Ms. Harris-Lindsey                    132

18

19

20

21

22

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 3

1                    P R O C E E D I N G S

2                (The hearing began at 11:14 a.m. as

3    follows:)

4                HEARING OFFICER:  Okay.  We're on the

5    record.  Today is October 31st, 2007.  This is an

6    administrative hearing for Maurice Pimble -- is that

7    how you pronounce it?

8                MS. HARMAN:  Pimble.

9                HEARING OFFICER:  I'll ask the parties to

10   introduce themselves for the record.  Counsel, please.

11               MS. HARRIS-LINDSEY:  Quinn Harris-Lindsey,

12   attorney advisor on behalf of D.C. Public Schools.

13               MS. HARMAN:  Alleah Harman (phonetic), law

14   student advocate, UDC David Clarke School of Law.

15               Ms. Archer:  Colleen Archer, law student

16   advocate, UDC David A. Clarke School of Law.

17               MR. TULMAN:  Joe Tulman.  I'm the

18   supervising attorney from the law school.

19               MS. FIELDS:  Dr. Rhona Fields, psychologist.

20               MS. LEWIS:  Tawanda Lewis, mother.

21               MR. HOBDY:  Alfred Hobdy, friend.

22               HEARING OFFICER:  And we'll hear -- can you

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 4

1    identify yourself, Mr. Pimble, over the phone?

2              MR. PIMBLE:  Maurice Pimble.

3              HEARING OFFICER:  Okay.  Move that

4    microphone.

5              MS. HARRIS-LINDSEY:  Okay.

6              HEARING OFFICER:  Repeat, please.  Repeat

7    your name for the record.

8              MR. PIMBLE:  Maurice Pimble.

9              HEARING OFFICER:  Thank you very much.  And

10   you're the student involved in this case, correct?

11             MR. PIMBLE:  Yes.

12             HEARING OFFICER:  All right.  This hearing

13   is being conducted pursuant to the Individuals with

14   Disabilities Education Act, its amendments in 2004 and

15   1997, and DCPS regulations to determine whether or not

16   DCPS acted in accordance with these applicable laws

17   with regard to Maurice Pimble.

18             I'm Sy (phonetic) DuBow, impartial hearing

19   officer.  I'm not an employee of DCPS, nor am I related

20   to or a close acquaintance of the student or family

21   other than through the hearing process.  So I'll hear

22   both sides and act only on the evidence presented.  Is

Page 5

1   the formal reading of rights waived?

2          MS. HARMAN:  Yes.

3          HEARING OFFICER:  The formal reading of

4   rights is waived and my decision will be within 10

5   working days.  All matters discussed today are

6   confidential.  The hearing is being recorded and either

7   party may request a copy of the transcript by writing

8   to the Student Hearing Office.

9          Let the record reflect that this case --

10  there were -- counsel for Mr. Maurice Pimble filed a

11  motion to reconvene a due process hearing.  The

12  original due process hearing request was filed on March

13  21st, 2005.  A due process hearing was held on April

14  25th, 2005.  This hearing officer requested legal

15  memorandum to be filed on May 3rd, 2005, and on that

16  date counsel for Mr. Pimble filed their legal

17  memorandum.

18          Counsel for DCPS at that time, Ms. Lenora

19  Verra, requested an extension and stated settlement

20  negotiations were continuing.  This hearing officer,

21  hearing nothing from counsel for the parties, scheduled

22  a telephonic status conference on May 13th, 2005 to

Page 6

1    discuss the status of settlement discussions.  The

2    45-day rule was waived.

3            On May 13th the telephonic status conference

4    was held and counsel for DCPS agreed to fund

5    independent evaluations within the superintendent's

6    guidelines but would not agree to travel costs for the

7    evaluators to go to the federal correctional facility

8    in North Carolina.  This hearing officer requested from

9    counsel for Mr. Pimble information on travel costs for

10   the evaluators and whether Rivers Federal Correctional

11   Institution would allow access.

12           Counsel provided that information on May

13   26th, 2005.  On June 8th, 2005 this hearing officer

14   ordered DCPS to reimburse the evaluators for their

15   travels, costs to Rivers Correctional Institution upon

16   proper documentation.  Now more than two years later

17   counsel for Mr. Pimble is requesting the reconvening of

18   the due process hearing.

19           Counsel for DCPS, Lenora Verra, is no longer

20   employed by DCPS.  Counsel for Mr. Pimble sent a copy

21   of their motion to Ms. Erica Pearson (phonetic) at OGC

22   but Ms. Pearson is no longer there, and I have ordered

Page 7

1    counsel to send a copy of their motion with attachments

2    to counsel for DCPS Quinn Harris-Lindsey who is present

3    here today, and the case was set down for a hearing

4    October 31st, 2007 at 11:00 a.m.

5           Counsel subsequently requested a motion to

6    extend that time which I granted, and they requested

7    the hearing be moved to DCDO which I denied, and the

8    student is participating.  Mr. Pimble is participating

9    via telephone for this hearing.  The issue before me is

10   the issue of compensatory education as I understand it,

11   so the issue before me is whether or not the student is

12   entitled to compensatory education, and if so how much

13   compensatory education is warranted.  That, it's my

14   understanding, are the only issues because the previous

15   issue of independent evaluations has been resolved.

16          Is that correct, counsel for the parent --

17   student?  Is that correct?

18          MS. HARMAN:  Yes.

19          HEARING OFFICER:  Okay.  Is that correct for

20   DCPS?  That is the position at this time.  So at this

21   time I will hear a short opening statement or any

22   preliminary discussion it wishes to make from each.

Page 8

1    side, and then I will hear witnesses to be presented by

2    either side.  Go ahead.  You may begin.

3              MR. TULMAN:  There is a preliminary matter,

4    filing of the default motion.

5              MS. HARMAN:  Yes.  As a preliminary matter

6    we would like to raise our default motion which we

7    filed on October 24th.  We've asked for this motion

8    because DCPS failed to answer our complaint which we

9    filed more than two years ago, as you already stated,

10   as well as the fact that DCPS failed to submit the --

11             HEARING OFFICER:  I don't have that in my

12   file.  I don't have any default motion in the file I

13   have.

14             MS. HARMAN:  Okay.  That motion was

15   submitted with the five-day disclosure, as well as it

16   was faxed to the Student Hearing Office.

17             HEARING OFFICER:  I also don't have the

18   five-day disclosure.

19             MR. TULMAN:  Do you have a copy with you?

20             MS. HARMAN:  I do.

21             HEARING OFFICER:  Does counsel for DCPS have

22   either?

Page 9

1          MS. HARRIS-LINDSEY:  I have them, uh-huh.  I

2    have them.

3          MR. TULMAN:  We'll provide a copy.

4          HEARING OFFICER:  Okay.  Provide a copy to

5    this hearing officer since I have neither.  You don't

6    have to make a copy now, but if you can just share it

7    with me.

8          MS. HARMAN:  I will.

9          HEARING OFFICER:  And make a copy at a later

10   time.

11         MR. TULMAN:  And I'm sure Ms. Harman can

12   just summarize it.

13         MS. HARMAN:  This is the memorandum.

14         MR. TULMAN:  (Inaudible).

15         MS. HARMAN:  Okay.

16         HEARING OFFICER:  Okay.  If you can proceed

17   I have the motion.

18         MS. HARMAN:  Okay.

19         HEARING OFFICER:  You can go -- make your

20   oral presentation and I'll look at that.

21         MS. HARMAN:  Okay.  In our motion we are

22   arguing that -- I'm sorry.  Thank you.  We are arguing

Case 1:08-cv-00344-RJL    Document 10-4    Filed 08/26/2008    Page 10 of 50
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page  10

1    that pursuant to the Student Hearing Office standard

2    operating procedures 300.B2 that we requested default

3    judgment against DCPS because they failed to answer the

4    complaint which was filed two years ago.  No answer was

5    ever given to the complaint.

6              Hearing officers have discretion to decide

7    on a case by case basis how to handle when DCPS does

8    not submit an answer or they were required to submit an

9    answer and they failed to do so.  The hearing officer

10   has discretion about -- on a case by case basis how to

11   handle that, so we're requesting that you enter a

12   default judgment against them for their failure to

13   answer the complaint.

14             MR. TULMAN:  In addition --

15             HEARING OFFICER:  Counsel, anything further?

16             MR. TULMAN:  One moment.

17             (A brief off-record discussion was held.)

18             HEARING OFFICER:  Anything further?

19             MS. HARMAN:  I'm sorry.  One second, please.

20             (A brief off-record discussion was held.)

21             MS. HARMAN:  Okay.  Further, we are

22   requesting that you enter a default against DCPS

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 11

1    because they failed to brief the issues.  As you stated

2    in your opening, you ordered both parties to brief two

3    issues.  DCPS did not submit any briefs.  We submitted

4    the briefs.  They did not.  Pursuant to -- I'm sorry.

5    I'm just trying to find my place in my argument.

6              HEARING OFFICER:  All right.  I'll hear a

7    response from counsel, please.

8              MR. TULMAN:  We also said in the alternative

9    -- number one, she cited the default rule and asked you

10   to analogize to the default rule in the superior court

11   of the federal court and apply that rule, but we also

12   said in the alternative if you're not going to grant a

13   default that you should prohibit the other side from

14   raising defenses.

15             MS. HARMAN:  Affirmative defenses.

16             MR. TULMAN:  They also didn't file a

17   five-day disclosure.

18             HEARING OFFICER:  All right.  I'll hear from

19   counsel for --

20             MS. HARRIS-LINDSEY:  Sure.

21             HEARING OFFICER:  -- DCPS.

22             MS. HARRIS-LINDSEY:  First there's no --

Page 12

1    there is no -- first the only issue with respect to an

2    answer, first there is no obligation to file an answer.

3    That's not in the statute.   It's not in the legislation

4    and it's not in the regulations.   The complaint was

5    filed before the amendments to IDEIA took effect in

6    July 1, 2005 which requires the agency to provide prior

7    notice response and a response to a complaint,

8    administrative complaint that's filed.

9            This complaint was filed under the IDEA

10   1997.   The hearing was convened, so this motion for

11   default, one, is inappropriate because it's filed after

12   the complaint, after the hearing had started and had

13   been recessed and basically sat dormant for two years.

14   So if there was -- if there was, which I don't concede

15   there is, a basis for a default on responding to the

16   complaint that's been weighed.

17           The matter has started and is being brought

18   back on a remaining issue.   Second is if -- there's no

19   entitlement to commence the compensatory education.

20   It's an equitable remedy where there must be showing of

21   a denial and need, and that is the burden on the parent

22   under Reed so that doesn't change.   So I'm at a loss

Page 13

1    for where we come to a default, but if -- and if you

2    cite the rules of the district court -- superior court

3    which is 55, Rule 55, Provision D, I believe, C or D, I

4    don't remember the letter, but it says that a default

5    can't be entered against the agency of the District of

6    Columbia without a showing of a harm first.

7           So procedural violation cannot -- does not

8    form under the superior court rules, doesn't lead to a

9    denial, doesn't lead to the grant of a default motion.

10   The requester still must meet their burden and show

11   that there is injury and harm first, so -- and if so

12   and if you cite that rule and rely on it there's also

13   the opportunity on the party who default is entered

14   into has the right to come back and show why the

15   default should be removed if it's entered.

16          So I don't believe there's a basis for that

17   motion based on the procedural posture of this case,

18   but if it is then the Rule 55 is not a blanket motion

19   for default and there are limitations to how a default

20   can be entered against a D.C. agency.

21          HEARING OFFICER:  All right.  May I ask you

22   a question?  There is no motion for default filed from

Case 1:08-cv-00344-RJL    Document 10-4    Filed 08/26/2008    Page 14 of 50
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 14

1    the first hearing that was held in 2005.  Is that not

2    correct?

3                 MS. HARMAN:  That's correct.

4                 HEARING OFFICER:  Okay.  All right.  I do

5    not see how you can raise it now two years later, but

6    as I said, I did not have a copy of the papers you

7    filed --

8                 MS. HARMAN:  Okay.

9                 HEARING OFFICER:  -- and the supporting

10   documents, so I'll take this motion under advisement

11   until I've had an opportunity to review the documents.

12                MR. TULMAN:  The subsequent fact that I

13   think is relevant is that you ordered briefs to be

14   filed on the issues that we knew were the issues

15                HEARING OFFICER:  But that's separate from

16   the issue of whether a motion for default was filed two

17   years ago.

18                MR. TULMAN:  No, that's correct, but I'm

19   saying --

20                HEARING OFFICER:  So I just wanted to

21   clarify because it did happen a long time ago.

22                MR. TULMAN:  Absolutely.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 15

1          HEARING OFFICER:  My understanding was that

2    none was filed.

3          MR. TULMAN:  That's correct.

4          HEARING OFFICER:  I will take an opportunity

5    -- I understand the issue on the briefs as well.

6          MR. TULMAN:  Okay.

7          HEARING OFFICER:  So I will take an

8    opportunity since it was not provided to me to review

9    the documents, and after that I'll decide how to rule

10   on it.  Okay.  Anything further?  Opening statement.

11   I'll give you an opportunity for a short opening

12   statement at the present time so we can have an

13   opportunity to gather evidence.

14          MS. ARCHER:  We do have one other

15   preliminary matter if that's okay.

16          HEARING OFFICER:  All right.

17          MS. ARCHER:  We also submitted a motion of

18   our intention to discuss the McKinney-Vento Act.

19          HEARING OFFICER:  The what?

20          MS. ARCHER:  The McKinney-Vento Act, an

21   application to --

22          HEARING OFFICER:  I don't have that motion

Page 16

1    either.

2              MS. ARCHER:  Okay.  We apologize.  Here's a

3    --

4              HEARING OFFICER:  I'm sorry.  I have not

5    received and there's nothing in my file relating to

6    this, so just as in the other situation I will take it

7    under advisement until I've had an opportunity to

8    review it.

9              MR. TULMAN:  I think I can cut through this.

10   There's actually --

11             HEARING OFFICER:  Did counsel for DCPS get a

12   copy of this?

13             MS. HARRIS-LINDSEY:  It's attached to it.  I

14   do have a copy.  If it is one page --

15             MR. TULMAN:  Yeah.

16             MS. HARRIS-LINDSEY:  -- and signed by Ms.

17   Archer -- two pages, I'm sorry, then I have it.

18             HEARING OFFICER:  Okay.

19             MR. TULMAN:  I don't think it's a big deal.

20   There's actually a reference within the IDEA to

21   McKinney-Vento.  We just were giving people notice that

22   we're going to raise that.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 17

1              MS. ARCHER:  Right.

2              MR. TULMAN:  So it's not a big deal.

3              HEARING OFFICER:  Okay.  Fine.  Thank you.

4    Counsel for parent indicated it was not a big deal.

5    Okay.  Go ahead.  Anything further you wish to say as

6    an opening right now I'll give you some time, but I'd

7    like to be able to gather testimony because that's the

8    purpose of this.  Go ahead.

9              MS. HARMAN:  Okay.  This case is about an

10   egregious failure of DCPS to identify, evaluate and

11   provide FAPE to a student, the student who is a part of

12   this matter, Maurice Pimble.  Maurice has a learning

13   disability which affects his expressive and receptive

14   speech.  The disability is manageable with special

15   education and reading and math and speech language

16   therapy, yet Maurice never received appropriate special

17   education that he needed and was legally entitled to.

18              I want to give you a little bit of

19   background about his educational history.  Maurice

20   failed the third, the first and the fifth grades.  He

21   failed the fifth grade twice.  He was 12 years old in

22   the fourth grade and was 15 years old in the fifth

Page 18

1    grade.    34 CFR 311.A1 provides that a state must have

2    in effect policies and procedures to insure that all

3    children with disabilities residing in the states and

4    who are in need of special education and related

5    services are identified, located and evaluated.

6              DCPS failed to find Maurice even though his

7    lack of progress was obvious.    DCPS's apathy towards

8    Maurice's case was also a violation of 5 DCMR section

9    2201.10 which provides that if a student is retained

10   despite the intervention measures referenced in 2201.8

11   or if no intervention measures are taken and the

12   student has not already undergone assessment in an

13   evaluation for special education services under the

14   provisions of chapter 30 then that student shall be

15   referred for assessment and evaluation under chapter

16   30.

17             Prior to 1998 the regulations reflected an

18   analogous section that basically required DCPS to

19   evaluate children in elementary school who failed

20   multiple grades, and it was particularly -- the

21   regulation also stated that DCPS was mandated to

22   evaluate and assess a child for special education if

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 19

1    they failed the seventh grade as well.  He was not

2    assessed or evaluated for special education services.

3    He was just told to go sit in a special education

4    classroom in 2001.

5             Three years after he failed the fifth grade

6    he was skipped by -- DCPS skipped Maurice to seventh

7    grade in Johnson Junior High School.  He was placed in

8    three special education classes.  However, prior to his

9    placement he was never evaluated to assess his

10   particular special ed. needs.  He was just placed in

11   those classrooms.  34 CFR 300.112 states that a person

12   who has been identified as an individual with a

13   learning disability must be evaluated in accordance

14   with the provisions in the rules and regulations of the

15   IDEIA.

16             Further, 34 CFR 300.301 requires that each

17   public agency must conduct a full and individual

18   initial evaluation in accordance with 300.305 and

19   300.306 before the initial provisions of special

20   education and related services to a child with a

21   disability under this part.  Maurice was not properly

22   evaluated to determine the nature and extent of his

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 20

1    disability until 2005 at our request.

2              DCPS did develop an IEP for Maurice in 2001,

3    but we maintain that that IEP was inappropriate because

4    there was no evaluation that preceded that IEP when he

5    was placed in special education in Johnson Junior High

6    School.  Furthermore, the IEP that he had in 2001 was

7    not updated into 2004.  The regulations also require

8    that the IEP team under 34 CFR 300.324B1N2 requires the

9    public agency must insure that the IEP team reviews the

10   child's IEP periodically but not less than annually to

11   determine whether the annual goals for the child are

12   being achieved, and two, revises the IEP as appropriate

13   to address, A, any lack of progress towards the annual

14   goals described and in the general education

15   curriculum, if appropriate, the results of any

16   reevaluations conducted under 300.3.

17             As I stated, there was -- the IEP was out of

18   date so clearly it was never reassessed or reevaluated

19   to determine if he was meeting his annual goals.  The

20   IEP was left stagnant for three years until the next

21   IEP was developed in 2004.  That IEP was developed by

22   the staff at the D.C. Jail upon our request, but that

Page 21

1    IEP did not have an evaluation that preceded its

2    development.  He wasn't evaluated until 2005 at our

3    request.

4              So needless to say, the 2001 and 2004 IEPs

5    were inappropriate because they were not preceded by

6    evaluations.  It's clear that his special education

7    that he was receiving in Johnson Junior High School was

8    inappropriate because the following year when he was a

9    student at Roosevelt High School he virtually made Fs

10   and Ds in every subject and made essentially no

11   progress from the previous special education year until

12   the following year.

13             Throughout Maurice's education his parent,

14   Ms. Lewis, who is here today was uninformed about his

15   progress by DCPS.  She was misled to believe that his

16   problems -- his poor grades were behavioral problems,

17   not academic problems or educational problems.  She

18   specifically inquired are these -- what's going on as

19   she was told that he has poor behavior, so she never

20   knew about her procedural rights.  He was never given a

21   copy of any due process rights or any -- she was not

22   aware of any rights that she had.

Page 22

1        When DCPS on their own placed Maurice in

2    special education for the first time in 2001 at Johnson

3    and they developed an IEP we believe, but we don't have

4    records of, Ms. Lewis was not a part of that process.

5    34 CFR 300.503A1 requires -- I'm sorry.  I'm quoting

6    the wrong thing.  34 CFR 300.321A1 says the public

7    agency must insure that the IEP team for each child

8    with a disability includes the parent of the child.

9        Ms. Lewis is going to testify that she was

10   not at any IEP meetings, you know, she never knew about

11   any IEP meetings, and that was a clear violation of the

12   law.  In 2001 and again in 2002 Maurice became

13   homeless, and 34 CFR 300.519A4 requires that DCPS

14   provide a surrogate parent to protect his rights.

15   There was no surrogate parent appointed at that time.

16        In February 2004, as I stated, Maurice was

17   incarcerated at the D.C. Jail.  That IEP was developed,

18   but there was no evaluation preceding that IEP.  The

19   IEP was clearly inappropriate because it was not

20   supported by evaluations, and Maurice will testify that

21   he made no progress from that -- from -- in 2004

22   whatsoever.  As a -- when he was sentenced he was

Page 23

1    sentenced for more than one year.

2                D.C. passed a National Capital

3    Revitalization Act which provides that felony inmates

4    will be transferred to the Bureau of Prisons.  When he

5    was transferred to the Bureau of Prisons he did not

6    receive any special education.  It's our position that

7    both DCPS and the Bureau of Prisons were responsible

8    for providing the special education that was stated on

9    his 2004 IEP.

10               The Bureau of Prisons -- DCPS is responsible

11   pursuant to 34 CFR 300.2 because the Bureau of Prisons

12   is arguably excluded from the IDEIA.  The Bureau of

13   Prisons is not a state agency and they're excluded,

14   therefore making DCPS the state agency, and they would

15   be responsible for providing the education through his

16   21st birthday -- 22nd --

17               MR. TULMAN:  22nd birthday.

18               MS. HARMAN:  22nd birthday.  In the

19   alternative we believe that the BOP is responsible for

20   providing Maurice with the special education that his

21   IEP dictated because of the National Capital

22   Revitalization Act.  When he was transferred all the

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 24

1    rights that he would have in DCPS would transfer and

2    the responsibility to educate would transfer to the

3    BOP, so those are our contentions.

4                HEARING OFFICER:  Okay.  Thank you.  Ms.

5    Quinn Harris-Lindsey.

6                MS. HARRIS-LINDSEY:  Yes.  Just let me make

7    a couple of points.  The student was found eligible in

8    2001, and parents in the complaint that was filed and

9    in the motion -- excuse me, the brief that was filed

10   and given to the hearing officer dated May 1, 2005, in

11   fact served by petitioner, is that DCPS personnel

12   evaluated Maurice for special education needs.

13               HEARING OFFICER:  What page is that?

14               MS. HARRIS-LINDSEY:  Page one, the very

15   first line under the facts, and they determined Maurice

16   is severely learning disabled.  Maurice was 15 years

17   old at the time of this evaluation.  Prior --

18               HEARING OFFICER:  Wait, wait, wait.

19               MS. HARRIS-LINDSEY:  On the first page.

20               HEARING OFFICER:  Okay.  Yes.  Go ahead.

21               MS. HARRIS-LINDSEY:  That's a fact stated by

22   the petitioner.  Now, today we're arguing -- something

1    is being argued a little differently.  They're arguing

2    a child find violation.  I wasn't quite sure what time

3    period, but the concession made by the petitioner is

4    that the evaluation is in, eligibility made, determined

5    at that time.

6              It also indicates in the -- in this motion

7    that -- I'm sorry, in this filing that the student was

8    placed in special education when he was at Johnson

9    Junior High.  Nowhere in the complaint or in the

10   subsequent filings is there an allegation that the

11   parent was precluded or not advised of their due

12   process rights or any rights that would have prevented

13   them from bringing the claim earlier, thereby waiving

14   any statute of limitation time line that can be or was

15   properly raised.

16             At the time this complaint was filed there

17   was a three-year statute of limitations that was

18   applied that was borrowed from the catch-all in the

19   District of Columbia.  Presently under the amendments

20   to IDEA the statute of limitations is two years.  Also

21   interesting in the filing that was provided by counsel

22   it indicates that the hearing officer found that claims

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 26

1    prior to 1996 through '99 were barred.

2              HEARING OFFICER:  Which page?

3              MS. HARRIS-LINDSEY:  Page six under

4    subsection C.

5              MR. TULMAN:  Let me just interrupt for a

6    second.  I'm sorry.  I've got an objection.

7              HEARING OFFICER:  I don't allow objections

8    during opening really.  I mean, she's just making an

9    opening.

10             MR. TULMAN:  Right.

11             HEARING OFFICER:  So if you wish to respond

12   you can have an opportunity to respond.  She didn't

13   interrupt you.

14             MR. TULMAN:  No, I agree.  It was an

15   objection, but if you don't take them at this point

16             HEARING OFFICER:  Okay.  Go ahead.  Page

17   six.

18             MS. HARRIS-LINDSEY:  I think I misstated.

19   That was -- I think it was cited language in the

20   Hammond case, but what I will say is the allegation

21   there is an obligation of notice and that's on both

22   sides.  That's pre-IDEIA and under the IDEIA.  Both

Page 27

1    sides are entitled to be put on notice.

2            Now, this claim comes two years later.  It

3    was asked to be put back on the calendar, and based on

4    where the case ended at that time the only issue that

5    remained open was comp. ed., so that's how we come to

6    that conclusion.  The motion that brought the case back

7    on the record doesn't specifically state the particular

8    issue, but we're on comp. ed.

9            Anything that precedes that, it's inferred,

10   but I think there's an obligation to state what the

11   allegation is and how it is that there is an attempt to

12   step out beyond the statute of limitations allegation,

13   so DCPS would ask the hearing officer to limit based on

14   the evidence provided or presented the claim of comp.

15   ed., especially where there are indications where the

16   petitioner has been conceded that he was identified as

17   learning disabled and received special education while

18   he was enrolled in the seventh grade at Johnson Junior

19   High in the 2000/2001 school year.

20           HEARING OFFICER:  All right.  Do you wish to

21   make any short comment?

22           MR. TULMAN:  Yeah, it's just one of the

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 28

1    issues we brief, that you ordered us to brief, was the

2    statute of limitations, and it's hard for us to respond

3    to arguments that come up now when the issue was never

4    joined back then, and I think that's the purpose of

5    your asking for briefing and it was the purpose of our

6    saying alternatively if we don't get a default judgment

7    that there should be a limitation on what they can

8    bring up as arguments now and it's the same kind of

9    notice argument so that it's sort of like shadow

10   boxing.

11          We don't know what arguments they're going

12   to come up with, and that's why you asked us to brief

13   the issues.  I think it was clearly in our argument

14   that they failed to evaluate and they failed to

15   identify Mr. Pimble, and so I think that did open the

16   door to at least the context of the mom not being told

17   she had these rights and all that.  So I think that's

18   relevant evidence, but I'm just saying it's hard for us

19   to deal with arguments that were never briefed.

20          HEARING OFFICER:  All right.  Call your

21   first witness.

22          MS. ARCHER:  Okay.  Maurice?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 29

1          THE WITNESS:  Yes.

2          MS. ARCHER:  Hi.  It's Colleen.  How are you

3     doing?

4          THE WITNESS:  Fine.

5          MS. ARCHER:  Okay.  I'm going to ask you a

6     few questions.  Okay.

7          HEARING OFFICER:  All right.  Hold on.  Mr.

8     Pimble, I'm going to have to swear you in at the

9     present time.  Please raise your right hand

10               MAURICE PIMBLE,

11     having first been duly sworn, was examined and

12     testified telephonically as follows:

13          HEARING OFFICER:  State your full name for

14     the record.

15          THE WITNESS:  Maurice Anthony Pimble.

16          HEARING OFFICER:  All right.  And you are

17     the student in this complaint, correct?

18          THE WITNESS:  Yes.

19          HEARING OFFICER:  All right.  Your attorney

20     will ask you some questions to be followed by questions

21     for counsel for DCPS.  Move the microphone in front.

22     All right.  Go ahead.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 30

1              MS. ARCHER:  And if I may, Hearing Officer,

2    I'd like to request a little flexibility in asking

3    Maurice questions keeping in mind the severity of his

4    disability.

5              HEARING OFFICER:  You're asking me if you

6    can ask leading questions?

7              MS. ARCHER:  Not leading, but if he does not

8    understand that I'm allowed to --

9              HEARING OFFICER:  You know, you haven't

10   asked the question yet.

11             MS. ARCHER:  Okay.

12             HEARING OFFICER:  So he hasn't answered the

13   question, so if you could please just begin questioning

14   and go ahead.

15             MS. ARCHER:  Okay.

16                       DIRECT EXAMINATION

17             BY MS. ARCHER:

18        Q    Okay.  Maurice, will you please state your

19   name for the record?

20        A    Maurice Pimble.

21        Q    Okay.  How old are you?

22        A    Twenty-two.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 31

1      Q      When were you born?

2      A      In 1985.

3      Q      In what city did you go to school?

4      A      Washington, D.C.

5      Q      Can you tell me a little bit about your

6      education experience here in D.C.?

7      A      I went --

8      Q      Was it good -- was it easy, hard or

9      somewhere in between?

10     A      Hard.

11     Q      Okay.  Did at any time, if ever, did you

12     repeat a grade?

13     A      Yes.

14     Q      What grades did you repeat?

15     A      First, third and I stayed back in fifth

16     twice.

17     Q      Okay.  Did at any time -- okay.  Strike

18     that.  When you failed the first grade did at any time,

19     if ever, someone evaluate you?

20     A      No.

21     Q      When you failed the third grade did at any

22     time someone evaluate you?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 32

1    A    No.

2    Q    When you failed the fifth grade for the

3  first time did at any time someone evaluate you?

4    A    No.

5    Q    When you failed the fifth grade for the

6  second time did at any time someone evaluate you?

7    A    No.

8    Q    While you were a student at DCPS were you

9  ever, if ever, evaluated?

10    A    No.

11    Q    Okay.  Have you been evaluated any time

12  ever, since you've been imprisoned?

13    A    Yes.

14    Q    Okay.  While you were in D.C. schools do you

15  remember, if ever, going to meetings with teachers and

16  a psychologist where they talked about your educational

17  progress and goals?

18    A    No.

19    Q    To your -- based on your personal knowledge

20  did your mother ever attend a meeting where teachers

21  and a psychologist discussed your educational goals and

22  progress?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 33

1      A      No.

2      Q      Was there any time while you were in D.C.

3    schools, if ever, that you received special education?

4      A      Yes.

5      Q      And when did you receive that special

6    education?

7      A      I think it's 2001/2002 when I was going to

8    Johnson Junior High School.

9      Q      Okay.  And what did those -- what did that

10   special education consist of?  What did you do in

11   there?

12     A      Nothing.

13     Q      Can you elaborate a little bit on that?

14     A      It's a class -- it was a class in Johnson

15   Junior High when you come in there -- instead of you

16   going to other subjects in the class, in the school,

17   you only go to certain classes and you stay in there

18   all day with two teachers.

19     Q      Okay.  Did -- did -- at any time based on

20   your personal opinion and experience did your education

21   improve through that special education service?

22     A      No.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

1        Q        While you were at D.C. Jail did you ever, if

2    ever, receive special education services?

3        A        No.

4        Q        While you've been incarcerated in the BOP

5    have you ever, if ever, received special education

6    services?

7                 HEARING OFFICER:  Incarcerated where?

8                 MS. ARCHER:  The Federal Bureau of Prisons.

9    Sorry.

10                THE WITNESS:  No.

11                BY MS. ARCHER:

12       Q        Have you ever, if ever, requested that you

13   receive special education services while you've been

14   incarcerated in the Federal Bureau of Prisons?

15       A        Yes.

16       Q        How many times have you requested that, if

17   you can recall?  Was it never --

18                MS. HARRIS-LINDSEY:  Okay.  I'm going to

19   object now because there's a question on the table and

20   --

21                HEARING OFFICER:  He hasn't answered the

22   question, so I'll sustain the objection.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 35

1              MS. ARCHER:  Okay.  Can I repeat the

2     question?

3              HEARING OFFICER:  Can you repeat the

4     question?  Do you remember the question?

5              BY MS. ARCHER:

6         Q    Have you ever, if ever, requested -- I'm

7     sorry.  I repeated that question.  How many times, if

8     you can remember, have you requested special education

9     services while you've been incarcerated in the Federal

10    Bureau of Prisons?

11        A    Quite a few times.

12        Q    Okay.  How -- in what manner did you request

13    special education services while you've been in the

14    Federal Bureau of Prisons?

15        A    Through the grievance process.

16        Q    Currently what are your educational goals?

17        A    To get my GED.

18        Q    What do you expect, if you expect anything,

19    to obtain from getting your GED?

20        A    A job.

21        Q    What kind of job would you like?

22        A    Something dealing with fixing cars and my

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 36

1    commercial driver's license, and I would also like to

2    get my barber's license.

3         Q    Okay.  Do you place importance on receiving

4    your education?

5         A    Can you repeat the question, please?

6         Q    How important is it for you to get your

7    education?

8         A    It is important because it will further my

9    chances of doing something positive with my time on the

10   streets.

11            MS. ARCHER:  Thank you.  I have no more

12   questions at this time.

13            HEARING OFFICER:  All right.  Now counsel

14   for DCPS will ask you a few questions.  Are you still

15   there?

16            THE WITNESS:  Yes.

17            HEARING OFFICER:  Okay.  Hang on.  She's

18   going to ask you a few questions.

19                  CROSS-EXAMINATION

20            BY MS. HARRIS-LINDSEY:

21        Q    Hi, Mr. Pimble.  My name is Quinn

22   Harris-Lindsey.  I'm the attorney advisor for D.C.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 37

1    Public Schools.  I have just some follow-up questions

2    based on the information you provided to your counsel.

3    Okay?

4         A    Yes.

5         Q    All righty.  Just can you state for the

6    record what is your date of birth?

7         A    5-19-85.

8         Q    Okay.  And when was the last time you were

9    in a DCPS public school?

10        A    I think it was 2002.

11        Q    In 2002.  Do you remember what school was it

12   -- what school were you enrolled in at that time?

13        A    Roosevelt Senior High School.

14        Q    Okay.  All right.  Mr. Pimble, did you

15   attend Roosevelt consistently that school year?

16        A    Yes and no.

17        Q    Okay.  I need you to -- I'm going to need

18   you to tell me what does yes and no mean.

19        A    I attended -- at Roosevelt I attended at for

20   about two or three months, but it was difficult for me

21   to get transportation and get to school every day.

22        Q    And so you stopped attending?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 38

1     A    Yes.

2     Q    And was Roosevelt -- in 2002 was that your

3  -- what -- how many years did you attend Roosevelt

4  before you stopped attending?

5     A    Half the year.

6     Q    Half the year.  So that was your first year

7  at Roosevelt?

8     A    Yes.

9     Q    Okay.  And shortly after that time period

10  is that when you became incarcerated?

11     A    No.

12     Q    Okay.  So you can tell me after you -- how

13  long after you stopped attending were you incarcerated?

14     A    Can you repeat the question?

15     Q    Sure.  I'm just asking when were you -- what

16  year were you incarcerated?

17     A    February 24th, 2004.

18     Q    Okay.  And were you in D.C.?

19     HEARING OFFICER:  Is that '04, February 24,

20  '04?

21     MS. HARRIS-LINDSEY:  Yes.

22     BY MS. HARRIS-LINDSEY:

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 39

1      Q      And were you at D.C. Jail at that time?

2      A      Yes.

3      Q      Okay.  And when did you come under the

4   supervision of the bureau -- the Federal Bureau of

5   Prisons?

6      A      As far as Rivers?

7      Q      Is that -- that's the Federal Bureau of

8   Prisons?

9             HEARING OFFICER:  In North Carolina.

10            MS. HARRIS-LINDSEY:  In North Carolina.

11            THE WITNESS:  Not really.  It's like a

12   private home.

13            BY MS. HARRIS-LINDSEY:

14      Q      Okay.  Do you remember when that

15   incarceration began?

16      A      I think it was February 15th, 2005.

17      Q      15, 2005.  Okay.  Now, so you were at the

18   D.C. Jail for about a year; is that correct?

19      A      Yes.

20      Q      Okay.  And during the time that you were at

21   D.C. Jail, isn't it correct that you had communications

22   with a representative from D.C. Public Schools, Lisa

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 40

1   Russell?

2       A    Yes.

3       Q    Okay.  And what was the nature of that

4   communication and contact that you had with Ms.

5   Russell?

6       A    (Inaudible).

7       Q    I'm sorry.  Let me redirect that.  During

8   that year at D.C. Jail it is your testimony that you

9   had communications with Lisa Russell of D.C. Public

10  Schools?

11      A    Yes.

12      Q    Okay.  What was the nature of that contact

13  that you had with Ms. Russell?  Can you describe the

14  reasons that you -- do you remember how many times you

15  spoke with Ms. Russell?

16           MS. ARCHER:  Objection.  We have no

17  disclosure or any --

18           MS. HARRIS-LINDSEY:  I'm taking this from

19  your document.

20           MS. ARCHER:  -- facts on the record that it

21  stipulate those.

22           HEARING OFFICER:  The objection is

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 41

1    overruled.  Go ahead.

2                MS. HARRIS-LINDSEY:  Okay.

3                BY MS. HARRIS-LINDSEY:

4        Q    Do you remember how many times you spoke

5    with Ms. Russell during your time at D.C. Jail?

6        A    No.

7        Q    But you remember speaking with her?

8        A    Yes.

9        Q    Okay.  But do you remember what you spoke

10   with her about?

11               MR. TULMAN:  I think he answered.  I'm not

12   sure.

13               MS. HARRIS-LINDSEY:  He didn't.  He hasn't

14   answered yet.

15               BY MS. HARRIS-LINDSEY:

16       Q    If you can't answer, Mr. Pimble, that's

17   okay, but I need you to say something so we can record

18   it on the record.

19       A    I said no.

20               MR. TULMAN:  I thought I heard it.  He said

21   no right after you --

22               HEARING OFFICER:  Can you repeat that?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 42

1              MS. HARRIS-LINDSEY:  Sure.

2              HEARING OFFICER:  He said he spoke to Ms.

3    Russell.

4              MS. HARRIS-LINDSEY:  But he doesn't --

5    right.

6              HEARING OFFICER:  And the question is what

7    --

8              MS. HARRIS-LINDSEY:  I asked him how many

9    times.  He said he didn't know.

10             HEARING OFFICER:  I don't have an answer on

11   that.

12             MS. HARRIS-LINDSEY:  Right.

13             HEARING OFFICER:  And I don't have an answer

14   on your question of what he spoke to.

15             MR. TULMAN:  He said no.  That was what he

16   answered no to because you asked him what --

17             HEARING OFFICER:  I heard -- I heard -- go

18   ahead and ask the question again, please.

19             MS. HARRIS-LINDSEY:  Mr. Pimble, we've had

20   some confusion so I'm going to ask the questions again.

21             BY MS. HARRIS-LINDSEY:

22        Q    Do you remember how many times you spoke

Page 43

1    with Ms. Russell while you were at D.C. Jail?

2         A    No.

3         Q    Was it more than once?

4         A    I'm not sure.

5         Q    Okay.  Do you remember what you talked about

6    when you spoke with Ms. Russell?

7         A    No.

8         Q    Do you remember the purposes of you talking

9    to Ms. Russell?

10        A    I think it was to get into school.

11        Q    The beginning of school at the jail?

12        A    Yes.

13        Q    Okay.

14             HEARING OFFICER:  Is that getting in school?

15             MS. HARRIS-LINDSEY:  He said beginning of

16   school.

17             MR. TULMAN:  I thought he said to get into

18   school.

19             HEARING OFFICER:  Getting into school.  Ask

20   him again.

21             MS. HARRIS-LINDSEY:  Sure.

22             HEARING OFFICER:  Is it getting into school?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 44

1    or --

2              MS. HARRIS-LINDSEY:  Did you say getting

3    into school, Mr. Pimble?

4              THE WITNESS:  I said to get in school over

5    here at the jail.

6              MS. HARRIS-LINDSEY:  Okay.  Okay.

7              HEARING OFFICER:  Okay.  That's fine.

8              BY MS. HARRIS-LINDSEY:

9        Q    Did you get in school at D.C. Jail?

10       A    Yes.

11       Q    Did you attend?

12       A    Yes.

13       Q    Did you attend regularly?

14       A    It was only one day out of the week.

15       Q    Okay.  Okay.  Now, when you indicated

16   you indicated on direct that you requested several

17   you made several requests to receive special education

18   services while under the supervision of the Federal

19   Bureau of Prison?

20       A    Yes.

21       Q    Okay.  How long after -- that would be after

22   February 15th, 2005?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 45

1       A       Yes.

2       Q       Do you -- have you or have you been in

3    school or received classes since being with the Federal

4    Bureau of Prisons?

5       A       Yes.

6       Q       You have received -- how often do you attend

7    classes -- strike that.  What type of classes are you

8    being provided under the Federal Bureau of Prisons?

9       A       GED class.

10      Q       I'm sorry.  Say that again.

11      A       GED class.

12              HEARING OFFICER:  I didn't hear.

13              MS. HARRIS-LINDSEY:  I didn't hear it.  I'm

14   sorry.

15              HEARING OFFICER:  Can you repeat, please?

16              THE WITNESS:  GED class.

17              MR. TULMAN:  I think he said GED classes.

18              MS. HARRIS-LINDSEY:  I know, but he's got to

19   say it for the record.

20              HEARING OFFICER:  You've got to say -- can

21   you please repeat your answer as to what type of

22   classes you received at the Federal Bureau of Prison?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 46

1                THE WITNESS:  GED classes.

2                BY MS. HARRIS-LINDSEY:

3         Q      Are you saying GED classes?

4         A      Yes.

5         Q      Okay.  Can you give a little more detail

6    what type of classes are you taking?

7         A      The class that I was able (inaudible)

8    time is a class that's one day out of the week for six

9    hours.

10        Q      Okay.  One class for six hours a week -- I'm

11   sorry?

12        A      One class for six hours a day.

13        Q      Six hours a day.  Okay.  And how long is the

14   class to assist you in earning your GED and -- not how

15   long in hours but in duration, days, weeks, months.

16        A      You have to pass some tests before you're

17   eligible to take the GED.

18        Q      Okay.  And you're taking the class now to

19   take the test?

20        A      Take the -- try to pass the test to get my

21   GED.

22        Q      Okay.  Do you know when the test is to be

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 47

1    provided?

2         A    Once a month.

3         Q    Okay.  And have you been provided any

4    feedback on where you are in the belief that you'll be

5    able to pass the class?

6         A    I don't understand the question.

7         Q    Okay.  Are you given feedback in how you are

8    doing in the class by the instructor?

9         A    Yes.

10        Q    Okay.  And what is the feedback that you've

11   been provided?

12        A    That I need to practice more on math,

13   reading and science.

14        Q    Okay.  Is assistance provided to you at the

15   jail in those subjects?

16        A    No.

17        Q    Okay.  Now, you indicated that you requested

18   -- you made -- you requested quite a few times special

19   education services while at the Federal Bureau of

20   Prisons?

21        A    Yes.

22        Q    Okay.  And you indicated that was done

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 48

1    through a grievance process?

2         A    Yes.

3         Q    And what response were you given in -- to

4    that grievance request -- to that request made to the

5    grievance process?

6         A    When I was down at Rivers they told me,

7    because I actually took three tests on the GED down

8    there, that I passed three tests, that they wouldn't --

9    I wouldn't be able to get in special education, if I'm

10   not mistaken.

11        Q    Okay.  You said you passed the test three

12   times already?

13        A    I passed three subjects.

14        Q    Three subjects?

15        A    Yes.

16        Q    And so based on that they said they weren't

17   able to provide you special education services?

18        A    Yes.

19        Q    Okay.  Can you tell me what subjects you

20   passed?

21        A    Social studies, science and I think reading.

22        Q    Okay.  And do you know when is your

Page 49

1    projected release date?

2         A    Yes.

3         Q    Okay.  What is that?

4         A    2011.

5         Q    2011?

6         A    Yes.

7         Q    Okay.  Okay.  It's your testimony that

8    -- before 2002 --

9         A    Yes.

10        Q    -- you never -- you were never tested

11   DCPS for special education services?

12        A    I was not.

13        Q    Okay.

14             MR. TULMAN:  What did he say?

15             MS. HARRIS-LINDSEY:  I was not.

16             MR. TULMAN:  Okay.

17             MS. HARRIS-LINDSEY:  Okay.  Just bear

18   me one minute.  I'm almost done.

19             BY MS. HARRIS-LINDSEY:

20        Q    You say you were tested since you have been

21   in jail, right?

22        A    Yes.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 50

1      Q     Okay.  And that testing took place in 2005?

2      A     Yes.

3      Q     Okay.  Do you remember what tests were

4   provided to you -- were conducted?

5      A     I'm thinking he gave me a round of different

6   tests, like different puzzles and reading.  I'm not

7   sure.

8      Q     That's fine, Mr. Pimble.  I was just

9   wondering if you were able to tell us what tests were

10  done.  That's fine.  While you were attending school at

11  Johnson Junior High you said is it 2000 -- is it

12  actually 2000/2001 or is it 2001/2002, do you recall?

13     A     No.  I think it was 2001/2002.

14     Q     Okay.

15           HEARING OFFICER:  That he was?

16           MS. HARRIS-LINDSEY:  Attended, that he

17  attended Johnson Junior High.  Okay.

18           BY MS. HARRIS-LINDSEY:

19     Q     Did you attend regularly, Mr. Pimble?

20     A     Yes.

21     Q     Okay.  You said in the classroom that you

22  were assigned to there were two teachers in that

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 51

1    classroom?

2        A    Yes.

3        Q    And what type of work was provided in the

4    classroom?

5        A    They would pass out like little sheets to

6    do.  You didn't have to do it, though.

7        Q    They were worksheets?

8        A    Yes.

9        Q    You said you didn't have to do it?

10       A    No.

11       Q    Did you work on the worksheets?

12       A    I tried.

13       Q    Okay.  Were the teachers in the classrcom to

14    provide assistance if you had difficulty?

15       A    No.

16            MS. HARRIS-LINDSEY:  Okay.  Okay.  I have

17    nothing further.  Thank you, Mr. Pimble.

18            HEARING OFFICER:  Thank you.  Your counsel

19    will have redirect.

20            MS. ARCHER:  Thank you.

21            HEARING OFFICER:  They'll ask you a few

22    questions.  Go ahead.

Page 52

1                      REDIRECT EXAMINATION

2              BY MS. ARCHER:

3       Q     Maurice, while you were at the D.C. Jail you

4   stated that you received special education services

5   Can you tell me what that consisted of?

6       A     Can you repeat the question, please.

7              MR. TULMAN:  He didn't say he got special

8   ed. at the jail.

9              HEARING OFFICER:  There's only one person

10  allowed to ask a question at a time, Counsel, so the

11  student will go ahead -- the student lawyer advocate

12  will ask the question, please.

13             BY MS. ARCHER:

14      Q     Maurice, while you were at the D.C. Jail did

15  you ever, if ever, receive special education services?

16      A     No.

17      Q     Did you receive any kind of education

18  services?

19      A     As far as like going to school?

20      Q     Right.

21      A     Yes.

22      Q     What did that -- what was that like?

Page 53

1    A    They got -- they had school books and they

2    do like little stuff on the computer for about two

3    hours and a half, but it's pretty much you just have to

4    show your face.

5    Q    Did you work on the assignments assigned to

6    you?

7    A    The stuff that I knew how to do.

8    Q    Was there anyone, if anyone, who provided

9    help for you?

10    A    There was a teacher in there.

11    Q    Did she help you if you had difficulty?

12    A    No.

13    Q    Okay.  Do you know the difference between a

14    pre-GED program and a GED program?

15    A    Yes.

16    Q    Have you at any time taken pre-GED courses?

17    A    Yes.

18    Q    Where were those -- where did you take

19    those?

20    A    Down at Rivers.

21    Q    Are -- is the pre -- was -- okay.  Strike

22    that.  Is that where you were tested?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 54

1       A       The test to take the GED?

2       Q       Right -- okay.

3               HEARING OFFICER:  You're confusing him.

4               MS. ARCHER:  Sorry.  I'm sorry.  Okay.  The

5       hearing officer's indulgence.

6               (There was a brief pause in the

7       proceedings.)

8               HEARING OFFICER:  Nothing further?

9               MS. ARCHER:  I have something further.

10              BY MS. ARCHER:

11      Q       Maurice?

12      A       Yes.

13      Q       While you were taking the pre-GED classes in

14      Rivers is that when you were tested?

15      A       No.  Are you like talking about by -- like

16      by a doctor?

17      Q       No, I mean just any kind of tests, social

18      studies, science, math, English, packets, worksheets,

19      anything like that.

20      A       Yes.

21      Q       Okay.  How long were you enrolled in the GED

22      program?

Page 55

1    A    I was enrolled for -- down at Rivers for

2  about the majority of my stay down there.

3    Q    Was that the pre-GED program or the GED

4  program?

5    A    Both.

6    Q    Okay.  Why did you stop -- are you currently

7  attending -- taking GED classes?

8    A    Yes, out of Pennsylvania, yes.

9    Q    Are you taking GED classes at D.C. Jail?

10   A    No.

11   Q    In Pennsylvania at Schuylkill when was the

12  last time that you attended a GED class?

13   A    If I recall it was the Thursday before I

14  came back up here.

15   Q    How long have you been taking the GED

16  course?

17   A    Since I've been up there.

18   Q    Why haven't you gotten your GED so far?

19   A    To me because a lot of the stuff is

20  difficult where I can't -- I really don't understand

21   Q    Have you attempted to take the GED test?

22   A    Not since I -- I haven't passed the test so

Page 56

 1    get to the test to pass the GED.

 2         Q    And why were you unable to pass that test?

 3         A    Because it's difficult.

 4         Q    When you encounter these difficulties does

 5    anyone, if anyone, help you?

 6         A    As far as a teacher or just people period?

 7         Q    A teacher.

 8         A    No.

 9         Q    Have you received any counseling at all?

10              MS. HARRIS-LINDSEY:  I'm going to object

11    because I think we're stepping outside of the scope of

12    my cross which stayed within the scope.

13              HEARING OFFICER:  Sustained.

14              MS. HARRIS-LINDSEY:  Okay.

15              BY MS. ARCHER:

16         Q    You stated that you stopped going to high

17    school, correct?

18         A    Yes.

19         Q    Why was it that you stopped going to

20    Roosevelt?

21         A    Because of transportation.

22         Q    Did you learn anything while -- if anything

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 57

1    while you were attending Roosevelt High School?

2        A    No.

3        Q    What were your feelings, if you had any,

4    towards Roosevelt High School?

5        A    To me they put too many people in one class

6    and it's difficult for one teacher to rotate between 20

7    to 25 students.

8        Q    Did you receive any special education

9    services while at Roosevelt High School?

10        A    No.

11            MS. ARCHER:  Okay.  Thank you, Maurice.  I

12    don't have anymore questions for you.

13            HEARING OFFICER:  Any recross?

14            MS. HARRIS-LINDSEY:  There was one thing.

15    I'm sorry.

16                    RECROSS-EXAMINATION

17            BY MS. HARRIS-LINDSEY:

18        Q    Maurice, I'm sorry.  On redirect you

19    provided some additional information.  If you could

20    just clarify for the record just so we can be sure.

21    There was a period of time that you were in North

22    Carolina.  That was in February of 2005; is that

Page 58

1    correct?

2         A    Yes.

3         Q    When were you transferred to Pennsylvania?

4         A    March 2006 -- no, no, March 2007.

5         Q    Okay.  So you were in North Carolina for two

6    years?

7         A    Yes.

8         Q    And then moved to Pennsylvania?

9         A    Yes.

10        Q    And now you're currently back here.  Are you

11   back here temporarily -- I'm not -- don't give too much

12   information.  Are you back here temporarily or are you

13   being transferred back here to finish your

14   incarceration?

15             MS. ARCHER:  Objection.  Relevance.

16             HEARING OFFICER:  It is relevant.  I would

17   like to know what his status is now.  Is he going to be

18   in D.C. Jail or is he going back to Pennsylvania.  Go

19   ahead and ask the question.

20             BY MS. HARRIS-LINDSEY:

21        Q    Mr. Pimble, how long are you back in D.C.

22   at D.C. Jail?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 59

1        A     Temporarily.

2        Q     Okay.  Do you know how long you're going to

3    be in D.C. Jail?  Okay.  Let me -- I'm going to reask.

4    Why are you back at D.C. Jail?

5        A     A new charge.

6        Q     It was a new -- okay.  Do you know how long

7    your stay at D.C. Jail will be?

8        A     No.

9        Q     Okay.  So what you're currently imprisoned

10   on, that sentence is supposed to -- will be complete in

11   2011?

12       A     Yes.

13       Q     And is it your understanding you will return

14   to Pennsylvania, the Schuylkill Correctional Facility,

15   when you finish with this matter that you're here in

16   D.C. on?

17       A     Yes.

18       Q     Okay.  And your present status at D.C. Jail,

19   are you allowed to go to classes under your present

20   conditions?

21       A     Yes.

22       Q     Are you going to classes?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 60

1      A      No.

2            MS. HARRIS-LINDSEY:  Okay.  Thank you.  I

3      have nothing further.

4            HEARING OFFICER:  Thank you very much.

5      Thank you.  Call your next witness.

6            MS. HARRIS-LINDSEY:  May I take a two-minute

7      --

8            HEARING OFFICER:  Yes, we'll take a

9      two-minute recess.

10            MS. HARRIS-LINDSEY:  Thank you.

11            HEARING OFFICER:  Thank you.

12            MS. HARRIS-LINDSEY:  Okay.

13            MR. TULMAN:  Maurice, just hang on.  Okay.

14            (There was a brief recess in the

15      proceedings.)

16            HEARING OFFICER:  Okay.  We're back on the

17      record.  Call your next witness.

18            MS. ARCHER:  Good afternoon -- or good

19      morning -- good afternoon.  Would you please state your

20      name for the record?

21            THE WITNESS:  Tawanda Lewis.

22            HEARING OFFICER:  Okay.  Ask the witness to

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 61

1    sit over here, please.  She's way too far and I can't

2    hear her.

3              MS. ARCHER:  Okay.

4              HEARING OFFICER:  Move the other microphone

5              MR. TULMAN:  Move that one up to her and you

6    can use this one.

7              HEARING OFFICER:  She can sit here.

8              MR. TULMAN:  All the way up there?

9              HEARING OFFICER:  Yeah.

10             MR. TULMAN:  Okay.

11             HEARING OFFICER:  Raise your right hand

12                  TAWANDA LEWIS,

13   having first been duly sworn, was examined and

14   testified as follows:

15             HEARING OFFICER:  State your name for the

16   record.

17             THE WITNESS:  Tawanda Lewis.

18             HEARING OFFICER:  Okay.  What is your

19   relationship to the student?

20             THE WITNESS:  Mother.

21             HEARING OFFICER:  Okay.  Your witness

22                  DIRECT EXAMINATION

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 62

1          BY MS. ARCHER:

2      Q    Ms. Lewis, what city did Maurice go to

3  school in?

4      A    Washington, D.C.

5      Q    And can you describe what Maurice's academic

6  performance was like?

7      A    It was -- well, very poor.

8      Q    Do you know if he failed any grades?

9      A    Yeah, he's failed several grades.

10     Q    Okay.  When he failed those grades did

11 anyone, if anyone, contact you?

12     A    No, they did not.

13     Q    Okay.  Did anyone, if anyone, advise you

14 that he may need special education?

15     A    No, they did not.

16     Q    Did you at any time ever -- were you ever

17 contacted by D.C. schools or anyone from D.C. schools?

18     A    Just for behavior problems.

19     Q    Okay.  Did you at any time ask anyone from

20 D.C. the status of his educational progress?

21     A    Well, yeah, but the only thing, the main

22 thing they told me was behavior problem.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 63

1      Q      Okay.  Was it the main thing or the only

2   thing?

3      A      It was like the -- well, the only thing.

4      Q      Okay.  Did you at any time attend an IEP

5   meeting to talk about his educational goals and

6   progress?

7      A      No, I didn't.

8      Q      Did anyone, if anyone, ever advise you of

9   what your rights were as a parent with a child with a

10  learning disability?

11     A      No, they didn't.

12     Q      Did you ever attend a meeting with teachers

13  and a psychologist?

14     A      No, I didn't.

15     Q      Okay.  To your knowledge was Maurice ever

16  tested or evaluated by D.C. Public Schools?

17     A      No.

18     Q      In your opinion --

19            HEARING OFFICER:  What was that answer?

20            THE WITNESS:  No.

21            HEARING OFFICER:  He was never -- what was

22  the question, never evaluated?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 64

1          MS. ARCHER:  Uh-huh.

2          HEARING OFFICER:  Go ahead.

3          MS. ARCHER:  By D.C. Public Schools while he

4    was at D.C. Public Schools.

5          BY MS. ARCHER:

6      Q      In your personal opinion what do you think

7    Maurice lost from a lack of education?

8          MS. HARRIS-LINDSEY:  Objection.  Once you

9    say opinion that just kind of -- I'm going to -- I'm

10   objecting to that line of reasoning because I think

11   it's speculative at this point and I'll leave it at

12   that.

13         HEARING OFFICER:  Okay.  She's not an expert

14   witness, so -- she's a fact witness.

15         MS. ARCHER:  I think that --

16         HEARING OFFICER:  Sustain the objection.

17         MR. TULMAN:  Can we just respond to the

18   objection?

19         MS. ARCHER:  I think that she's his mother

20   and she was the person who was his guardian at this

21   time, and her opinion on -- and based on -- her

22   knowledge of what happened is very relevant and this is

Page 65

1    an equitable --

2                HEARING OFFICER:  Well, she's telling me the

3    facts of what happened.  I can draw my own conclusion

4    from it.

5                MS. ARCHER:  Okay.

6                HEARING OFFICER:  Anything further?

7                MS. ARCHER:  I don't have anything further

8    at this time.

9                HEARING OFFICER:  Cross.

10                MS. HARRIS-LINDSEY:  Just a couple of

11    questions.

12                        CROSS-EXAMINATION

13                BY MS. HARRIS-LINDSEY:

14        Q    Ms. Lewis, just a couple of questions.  You

15    indicated that -- now, how did you learn that Maurice

16    had been retained -- let's start with the first grade.

17    How did you learn he was retained in the first grade?

18        A      Through his report card.

19        Q      And what did you do when you learned -- when

20    you found out?

21        A      Basically it's like he just -- when he

22    stayed back he had to do that grade again.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 66

1    Q    And what -- when he was retained in the

2    third grade how did you find out?

3    A    Report card.

4    Q    The report card.  What did you do when he

5    was retained that second time?

6    A    He had to do the same thing over again.

7    Q    No, I mean, but what did you do when you

8    received the report card and saw that he was retained?

9    A    It's like he had to do that same grade all

10   over again because, like I said, that's what it was

11   back then.  If he was retained in like the first or

12   third grade he had to -- the next year he had to do it

13   again.

14   Q    But did you talk to any of the teachers at

15   that time?

16   A    It was like no, no one talked to me and said

17   nothing.  That's all that was on the report card, so --

18   Q    And now the fifth grade he was retained

19   twice?

20   A    Uh-huh.

21   Q    Okay.  And how were you informed or advised

22   that he was being retained?

Page 57

1        A       The report card.

2        Q       And on the first retention in the fifth

3   grade what dialogue or communication did you have with

4   the school?

5        A       None.

6        Q       Okay.  And what about the second -- the

7   second retention, any communication with the school?

8        A       None.

9        Q       Did you go to the school or call them to

10  talk to the principal or teacher?

11       A       No, I did not.

12               HEARING OFFICER:  What was that answer, you

13  didn't go to the school?

14               THE WITNESS:  No.

15               HEARING OFFICER:  Okay.  You have to speak

16  up so I can record it.  So your answer is you didn't

17  go?

18               THE WITNESS:  I did not go.

19               BY MS. HARRIS-LINDSEY:

20       Q       Okay.  Now, when Maurice attended Johnson

21  Junior High --

22       A       Uh-huh.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 68

1     Q    -- was that for one year or two years?

2     A    I don't know if it was one or two.  I think

3  it was maybe one.

4     Q    Okay.  Did you have any communication with

5  any of the teachers at Johnson Junior High?

6     A    No, the only things that they was

7  communicating to me was he had a behavior problem.

8     Q    Can you describe the behavior problem that

9  was described to you?

10    A    Acting out.

11    Q    Did you attend any meetings about Maurice's

12  behavior?

13    A    The behavioral problem.

14    Q    You did attend?

15    A    Yes.

16    Q    Okay.  Can you tell me about the meetings

17  you attended when he was at Johnson?

18    A    They was telling me that he has a anger -- I

19  mean a anger problem, you know what I'm saying.  It was

20  always based on his behavior, what he did wrong, okay,

21  if somebody said something to him, you know, saying he

22  would get upset or whatever.  It was always behavior.

Page 69

1    It was nothing else but that.

2        Q    Okay.  And what -- were there strategies

3    that were proposed or you all discussed to address the

4    behavior problem?

5        A    No, it was always just behavior and can we

6    put our heads together, but it was never nothing really

7    kind of solved in there.

8        Q    Well, if we can follow that line, when you

9    said they said let's put your heads together and come

10   to --

11       A    Put your heads together as far as behavior.

12       Q    Right.  I'm following that.

13       A    You know what I'm saying?

14       Q    But did you all come up with any strategies

15   to address the behavior?

16       A    Nothing like to make his grades better, his

17   work better, you know what I'm saying.  It was none of

18   that, you know, as far as educationalwise, but it was

19   always like a behavior so I figured, you know what I'm

20   saying, like I said, I didn't know, you know what I'm

21   saying, because this is what they're telling me.

22       Q    Right.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 70

1       A       So --

2       Q       Did you not see these behaviors at home?

3       A       Well, not the way they said, so I don't --

4       Q       Can you tell me what you and the school

5   discussed to address the behaviors?

6       A       Basically they just said okay, you can talk

7   to him, you know what I'm saying, basically okay, say

8   this, like we can go on outings, and basically it was

9   automatic talk to him.  It was always on a

10  communication level.

11      Q       Okay.  Now, when Maurice went to Roosevelt,

12  did you have any communications with the school --

13      A       No.

14      Q       -- about behaviors?

15      A       No.

16      Q       Were you aware that -- did you know that

17  Maurice had stopped attending?

18      A       No.

19      Q       Now, I just wanted to go back.  When he was

20  in elementary school --

21      A       Uh-huh.

22      Q       -- were -- did you say you did have

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 71

1    communications with the school or you didn't when he

2    was in elementary school?

3        A    No, I didn't.

4        Q    Were there reports of behavior problems in

5    elementary school?

6        A    That's all there was, behavior problems.

7        Q    Okay.  But you did talk to them about the

8    behavior problems?

9        A    Didn't no one talk to me.  It was always --

10   I mean, it was like a staying back type of process, so

11   --

12            MS. HARRIS-LINDSEY:  Okay.  Okay.  I have

13   nothing further.  Thank you.  I appreciate it.

14            HEARING OFFICER:  Any redirect?

15                    REDIRECT EXAMINATION

16            BY MS. ARCHER:

17       Q    Ms. Lewis, did you ever, if ever, become

18   concerned about Maurice's educational progress?

19       A    Yeah.

20       Q    Did you ever, if ever, contact anyone from

21   DCPS to discuss his educational progress?

22       A    No.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 72

1       Q       You never contacted?

2       A       No.

3       Q       You said that you did meet with DCPS,

4    though?

5       A       Yes.

6       Q       And can you state again what those

7    conversations pertained to?

8       A       Emotional behavior.

9       Q       Did anyone from DCPS ever bring up his

10   educational progress or lack thereof.

11      A       No, they did not.

12              HEARING OFFICER:  Thank you.

13              MS. ARCHER:  I have no more questions.

14              HEARING OFFICER:  Okay.  Thank you very

15   much.  Call your next witness.

16              MS. ARCHER:  Okay.  Next I'm going to call

17   Mr. Hobdy.

18              HEARING OFFICER:  Have a seat.  How are you

19   doing?

20                      ALFRED HOBDY,

21   having first been duly sworn, was examined and

22   testified as follows:

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 73

1              HEARING OFFICER:  State your name for the

2    record.

3              THE WITNESS:  Alfred Hobdy.

4              HEARING OFFICER:  And your relationship to

5    the student?

6              THE WITNESS:  Friend.

7              HEARING OFFICER:  Okay.  Your witness.

8                   DIRECT EXAMINATION

9              BY MS. ARCHER:

10    Q       Good afternoon.

11    A       How are you doing?

12    Q       Good.  Do you know Maurice Pimble?

13    A       Yes.

14    Q       How do you know Maurice?

15    A       Through family.

16    Q       Okay.  Based on your personal knowledge and

17    the relationship that you've had with Maurice was

18    Maurice at any time, if at any time, homeless?

19              MS. HARRIS-LINDSEY:  I'll object for a

20    minute.  I'm going to object because the foundation is

21    not present based on what's been provided so far with

22    that line of questioning that counsel is about to have

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 74

1    into.

2              BY MS. ARCHER:

3        Q    Okay.  How did you come to know Maurice?

4        A    Through father.

5              HEARING OFFICER:  What?

6              THE WITNESS:  Father.

7              HEARING OFFICER:  Okay.

8              BY MS. ARCHER:

9        Q    Can you elaborate a little bit more on that?

10       A    Well, I knew his father so he was having

11   problems going in and out of the house late, staying

12   out late and sometimes he couldn't go home, whatever,

13   so I would see him out late and tell him come on over,

14   you don't need to be out on the street at this time of

15   the night, come on over, so he won't go home, is not

16   trying to go home, you won't go to school, come on over

17   and --

18             HEARING OFFICER:  You're going to have to

19   speak up a little louder so you can be recorded.

20             THE WITNESS:  Okay.  So that's how I got to

21   know him.

22             BY MS. ARCHER:

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 75

1       Q       Okay.  You stated that at some point he

2   couldn't go home?

3       A       Yes.

4       Q       Okay.  How long have you known Maurice?

5       A       Since 2003, I believe, 2000 -- it could be

6   2002, or between 2 and 3.

7       Q       Okay.  And --

8       A       It could be longer.

9       Q       Did at any time Maurice live with you?

10      A       Yes.

11      Q       How did Maurice come to live with you?

12      A       Like I said, he had nowhere to go so he

13  started coming over, staying, coming over eating,

14  falling asleep, and so I just Maury, it seems like

15  you're here every day now so you might as well just

16  stay.

17      Q       Okay.

18      A       As long as you're not out on the street and

19  do the right thing, go to school, you can stay here.

20      Q       So based on your personal knowledge prior to

21  living with you was Maurice at any point, if at any

22  point, homeless?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 76

1      A     Well, he said he couldn't go home, so he

2   couldn't go home, he'd have to be homeless.

3      Q     Okay.  And about how old was Maurice during

4   this time?

5      A     I think he was about 15.  Yeah, 15.

6      Q     While Maurice was living with you did he at

7   any time, if at any time, attend school?

8      A     Yeah, I put him in -- it was like a trade

9   school.  They tried to teach him a trade and try to get

10  him to get his -- prepared for a GED so he have to do

11  both, so he was going in and also he was paid, he was

12  getting paid while he was doing this, so he liked that.

13     Q     Okay.  And based on your personal knowledge

14  of that did -- strike that.  Did Maurice, through the

15  relationship that you've had with him, ever talk to you

16  about school?

17     A     All the time.  That's why I put him in

18  school.

19     Q     Okay.  And based on your personal knowledge

20  what is your personal knowledge about Maurice's

21  education?

22     A     Well, I think he's not a dummy, but he's not

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 77

1    -- he's more like a street person so a street person is

2    pretty smart, but educationwise he's away from being

3    educated, so that's what he was trying to go to school

4    for.

5             He was getting old so he was scared or shy

6    to be in the school with the young kids, so that's why

7    I put him in the trade school, because he was more

8    comfortable, and he said a lot of things he didn't know

9    and he need to know, he want to learn, and with the

10   little education he had he just wasn't comfortable with

11   the little stuff he had.

12        Q    Did at any time through the relationship

13   that you have with Maurice, did he attend a D.C. public

14   school?

15        A    D.C. public school.  I believe he was going

16   to Roosevelt.

17        Q    Okay.

18        A    In and out of Roosevelt.  He was going to

19   Roosevelt.

20        Q    And based on your personal knowledge did he

21   ever receive special education while he attended

22   Roosevelt?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 78

1      A      No.

2      Q      Okay.

3      A      Not that I know of.

4             MS. ARCHER:  Okay.  Thank you.  I have no

5      more questions at this time.

6             HEARING OFFICER:  Cross.

7             MS. HARRIS-LINDSEY:  Sure.  I just have a

8      couple of questions.

9                        CROSS-EXAMINATION

10            BY MS. HARRIS-LINDSEY:

11     Q      Mr. Hobdy, can -- what period of time did

12     Maurice live with you?

13     A      I believe it was -- I said '93, but I

14     believe it could have been earlier than that because

15     '93, that's when he got --

16     Q      You mean 2003?

17     A      2003, I'm sorry.

18     Q      That's okay.

19     A      2003, because I think that's when he got

20     incarcerated, so it was two years before he got

21     incarcerated so it must have been in 2001.

22     Q      Okay.  So 2000 -- about -- you say

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 79

1    approximately 2001?

2        A      Right.

3        Q      And how long -- you say he was attending

4    Roosevelt when he lived with you?

5        A      I believe that was Roosevelt.

6        Q      So that would have been 2002?  Would that be

7    around 2002?

8        A      2002, yes.

9        Q      And if you're not sure that's fine.  I'm not

10   trying to pin you into something you're not sure of,

11   but it's somewhere between 2001 and 2003 he lived with

12   you?

13       A      Right, yeah.

14       Q      Do you remember how long he lived with you?

15       A      From that time until he got incarcerated.

16       Q      Oh, so the whole time he was with you?

17       A      Yeah.

18       Q      Were you in communication with his mom or

19   his dad at that time?

20       A      Yes.

21       Q      Okay.  Were you his legal guardian?

22       A      No.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 80

```
 1       Q       Okay.  Okay.  So the school would not have

 2  called you if they were having concerns with Maurice?

 3       A       No.

 4       Q       Okay.  You indicated that he was in a trade

 5  program?

 6       A       Yes.

 7       Q       Do you know the name of the program?

 8       A       You'd have to ask Maury.  I can't remember

 9       Q       Okay.  Okay.  And do you know how long

10  that program or how far into that program he went

11       A       I think he stayed in there for a good

12  months to a year.

13       Q       Okay.  Did he complete the program?

14       A       No.

15       Q       Okay.  That was preceding the incarceration

16       A       Yes.

17       Q       Okay.  Okay.  Now, you say he talked

18  a lot about school?

19       A       Yes.

20       Q       Can you tell me the kind of things he told

21  you?

22       A       Well, he wanted to get his GED.
```

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 81

1       Q      Okay.

2       A      And a lot of things he didn't understand and

3    he know he have to get back in school, so that's what

4    he talked to me about, trying to get back in school,

5    trying to get his GED.

6       Q      Okay.

7       A      And just trying to get back to learn what he

8    didn't know.

9       Q      Okay.

10      A      A lot of things he didn't know.  A lot of

11   things he didn't understand, you know, and he need to

12   get back in school.  That's why I put him in the

13   program.

14      Q      Okay.  Now, you indicated at some point he

15   indicated to you that he couldn't go home?

16      A      Yes.

17      Q      Okay.  Did you talk to his mom or -- who was

18   he living with at the time when he told you he couldn't

19   go home?

20      A      His mother.

21      Q      Okay.  Did you talk to his mom about his --

22      A      Not at that time, no.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 32

1     Q    Okay.  Okay.  Now, you said your connection

2  to Maurice is to his father?

3     A    Right.

4     Q    Okay.  Did you talk to his dad when he told

5  you he couldn't go home?

6     A    Yes.

7     Q    Okay.  Which -- was it his father that said

8  it was okay that he stayed with you?

9     A    Yes.

10     MS. HARRIS-LINDSEY:  Okay.  Okay.  Thank

11  you.  I appreciate it.

12     HEARING OFFICER:  Anything else?  Any

13  further questions?

14     MS. ARCHER:  Just a few.

15          REDIRECT EXAMINATION

16     BY MS. ARCHER:

17     Q    About how old was Maurice during the time

18  that he lived with you?

19     A    I believe he was 15 -- between 14 and

20     Q    Okay.  And how long did he live with you?

21     A    Until he got incarcerated.

22     Q    Okay.  You stated that Maurice was at

Page 83

```
 1   point homeless before he came to live with you.  Do you

 2   know based on your own knowledge if DCPS ever appointed

 3   a surrogate parent during that time?

 4            MS. HARRIS-LINDSEY:  I'm going to object.

 5   wanted to let her get her question out first.  Mr.

 6   Hobdy did not say that he was homeless.  That wasn't

 7   his testimony.

 8            MS. ARCHER:  Yes, he did.

 9            MR. TULMAN:  He did testify to that.

10            MS. HARRIS-LINDSEY:  If I might get my

11   objection out, what he indicated was that he couldn't

12   go home so he would presume he would take that to mean

13   he was homeless.

14            MR. TULMAN:  He did testify he was homeless

15   so your premise is wrong.  He did testify to that.

16            MS. ARCHER:  On cross-examination --

17            HEARING OFFICER:  Wait one second.  Are you

18   finished?

19            MS. HARRIS-LINDSEY:  Yes.

20            HEARING OFFICER:  Now you can speak.

21            MS. ARCHER:  Thank you.  On

22   cross-examination he said that he couldn't go home so
```

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 84

1    the questions that she asked, but on the questions on

2    direct he did state that before Maurice came to live

3    with him that he was homeless, that he couldn't go home

4    and that he was homeless.

5             HEARING OFFICER:  Do you know how long a

6    period he was not living at home and not living with

7    you?

8             THE WITNESS:  Well, Maurice told me he had

9    been walking around the streets for a good year.

10             HEARING OFFICER:  I see.  And then he lived

11    with you for two years before he was incarcerated?

12             THE WITNESS:  Right.

13             HEARING OFFICER:  And when he was living

14    with you he was -- started to attend Roosevelt and then

15    he stopped attending Roosevelt, right, is it your

16    testimony?

17             THE WITNESS:  He was going to Roosevelt.  He

18    stopped going to Roosevelt.

19             HEARING OFFICER:  And then you put him in a

20    trade school?

21             THE WITNESS:  I put him in a trade program.

22             HEARING OFFICER:  Okay.  Who ran the trade

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 35

1    school?  It was a private school?

2          THE WITNESS:  It was a private school.  It

3    was right around the corner from the house so I had no

4    problems.

5          HEARING OFFICER:  Okay.  All right.  Thank

6    you very much.  Call your next witness.  Thank you,

7    sir.

8          MS. ARCHER:  Thank you.

9          MS. HARMAN:  We would like to call Dr. Rhona

10   Fields.

11         HEARING OFFICER:  You can sit up here,

12   please.  Good afternoon, Doctor.  Please raise your

13   right hand.

14               RHONA FIELDS, M.D.

15   having first been duly sworn, was examined and

16   testified as follows:

17         HEARING OFFICER:  State your name for the

18   record.

19         THE WITNESS:  Rhona Marsha Fields, Doctor.

20         HEARING OFFICER:  Okay.  And your position?

21         THE WITNESS:  I'm a licensed clinical

22   psychologist.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 86

1           HEARING OFFICER:  Okay.  Your witness.

2           MS. HARMAN:  Thank you.

3           THE WITNESS:  Do you have a copy of my CV

4      for the hearing officer?

5           MS. HARMAN:  Yes, I do.

6           MS. HARRIS-LINDSEY:  No, we don't.  We don't

7      have it.

8           THE WITNESS:  You don't?

9           MR. TULMAN:  Did you swear her in?

10          HEARING OFFICER:  I just swore her in.

11          MR. TULMAN:  Okay.  I just missed it.

12          MS. HARRIS-LINDSEY:  No, we don't have it.

13          HEARING OFFICER:  Could you move the

14     microphone in front of you, please?

15          MS. HARMAN:  Sure.

16          HEARING OFFICER:  Are you doing it?

17          MS. HARMAN:  I'm doing it.

18          HEARING OFFICER:  Proceed.  Counsel, go

19     ahead.  Ask your questions.

20          MS. HARMAN:  Okay.  We did not put that --

21     her curriculum vitae in our five-day disclosure.

22     However, we have it provided today to qualify her as an

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 87

1    expert witness and we also want to (inaudible).

2                HEARING OFFICER:  Well, you're not allowed

3    it to put it -- if it's not in your five-day disclosure

4    I can't allow it.

5                MS. HARMAN:  Okay.  Well, let's just ask the

6    questions.  All right.  Good afternoon, Dr. Fields.

7                THE WITNESS:  Good afternoon.

8                HEARING OFFICER:  Unless DCPS is willing to

9    stipulate as to it.

10               MS. HARRIS-LINDSEY:  I won't stipulate to

11   it.

12               HEARING OFFICER:  Because I don't have a

13   copy.

14               MR. TULMAN:  It would save us some time, but

15   --

16               MS. HARRIS-LINDSEY:  I'm not going to

17   stipulate to it, and there was nothing in the record

18   that put us on notice that Dr. Fields is being admitted

19   or identified as a expert witness.

20               HEARING OFFICER:  I don't have those -- I

21   don't have that disclosure document.

22               MS. HARRIS-LINDSEY:  Well, I have the

Page 38

1    disclosure and the disclosure does -- it just indicates

2    Dr. Fields' position, but it does not indicate that she

3    was being identified for the purposes of being

4    disclosed for the purpose of being a expert witness

5    and I believe the practice was to identify if someone

6    was being identified as an expert.  We were supposed

7    be put on notice of that and their CV be identified.

8              MS. HARMAN:  I didn't hear the last part.

9    You had received notice?

10              MS. HARRIS-LINDSEY:  I said we did not

11    receive -- DCPS did not and I did not receive in the

12    disclosure --

13              HEARING OFFICER:  Can I see that?

14              MS. HARRIS-LINDSEY:  Sure.  As part of the

15    disclosure packet did not receive any information that

16    indicated that Dr. Fields would be testifying, would be

17    put forth as an expert.

18              HEARING OFFICER:  I will -- if you're not

19    willing to agree to the submission of the vitae i'll

20    allow her to ask questions as to her qualifications if

21    you're trying to qualify her as an expert, so go ahead

22    and you will have an opportunity to voir dire.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 89

1          MS. HARRIS-LINDSEY:  In what capacity as an

2    expert?

3          HEARING OFFICER:  I have no idea.  She

4    hasn't started, so you have to -- are you -- can you

5    proceed please?

6          MS. HARMAN:  Sure.

7          HEARING OFFICER:  What are you asking to

8    qualify this person as?

9          MS. HARMAN:  A licensed clinical

10   psychologist.

11         HEARING OFFICER:  So you want her to be an

12   expert in the field of clinical psychology?

13         MS. HARMAN:  Yes.

14         HEARING OFFICER:  Is that what you want her

15   to be?

16         MS. HARMAN:  Yes, and educational

17   psychology.

18         HEARING OFFICER:  In what?

19         MS. HARMAN:  And educational psychology.

20         HEARING OFFICER:  You want her to be an

21   expert in clinical psychology and --

22         MS. HARMAN:  Educational psychology.  Should

Page 90

1    I proceed?

2                    HEARING OFFICER:  All right.  Go ahead.

3                        DIRECT EXAMINATION

4                    BY MS. HARMAN:

5        Q    Okay.  Dr. Fields, what do you do for a

6    living?

7        A    I'm a licensed clinical psychologist.

8        Q    How long have you been practicing?

9        A    Since 1962.

10       Q    Okay.  Where did you receive your formal

11   education?

12       A    My undergraduate work was at Lake Forest

13   College in Lake Forest, Illinois.  One master's level

14   work was at University of Illinois in Champaign,

15   Urbana, Illinois, and I received a master's in clinical

16   psychology from Loyola University of Chicago.  Then I

17   went on to the University of Southern California, got

18   my doctorate in an interdisciplinary program that was

19   psychology, sociology and education.

20       Q    Okay.  Have you published any articles, and

21   if so can you give us an idea of what you published and

22   what subjects?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 91

1        A        I have published at least seven books all by

2    academic presses.  I have published well over a hundred

3    articles, chapters in 20 something books.  Again, these

4    are -- the articles were both scholarly articles and

5    popular articles.

6                    I've appeared as an expert on Science Friday

7    and national public radio a number of times.  I've been

8    quoted in popular press like Washington Post and New

9    York Times.  I have been -- my work has been included

10   in the Congressional Record, as of February 16th, 1972

11   was entered by Ron Dellums, and I was cited as an

12   expert on children and violence and the issue of

13   psychological torture in terrorism.

14                    HEARING OFFICER:  Can I look at that?

15                    THE WITNESS:  Uh-huh, please.

16                    MS. HARMAN:  Okay.

17                    HEARING OFFICER:  One second.

18                    THE WITNESS:  I'm presently --

19                    HEARING OFFICER:  One second.

20                    THE WITNESS:  Okay.

21                    (There was a brief pause in the

22   proceedings.)

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 92

1            HEARING OFFICER:  All right.  Counsel, do

2    you wish to voir dire this witness?

3            MS. HARRIS-LINDSEY:  I don't.

4            HEARING OFFICER:  You don't?

5            MS. HARRIS-LINDSEY:  I'll stipulate.

6            HEARING OFFICER:  At this time I'm going to

7    qualify her as an expert in clinical psychology.  If

8    you wish to point out to me where the educational

9    component is in the vitae, please.  Counsel, do you

10   know where it is?

11           MS. HARMAN:  No, not without Ms. Fields or

12   Dr. Fields.

13           THE WITNESS:  I've taught in schools of

14   education.

15           HEARING OFFICER:  Well --

16           THE WITNESS:  And I've taught courses in

17   special education and my doctorate was in education

18   psychology and sociology.

19           HEARING OFFICER:  Is your doctorate in --

20   all right.  In 1977 to 1982 you were at Montgomery

21   County Public Schools --

22           THE WITNESS:  Right.

Case 1:08-cv-00344-RJL    Document 10-5    Filed 08/26/2008    Page 43 of 50
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 93

1           HEARING OFFICER:  -- diagnostic and

2    professional support?  Were you a school psychologist

3    at that time?

4           THE WITNESS:  Yes.  I was after that

5    part-time consultant with them.

6           HEARING OFFICER:  All right.

7           THE WITNESS:  Continued until 1999.

8           HEARING OFFICER:  Continued what until 1999.

9           THE WITNESS:  Being a consultant with

10   Montgomery County Public Schools.

11          HEARING OFFICER:  Well, that's not in

12          THE WITNESS:  Uh-huh.

13          HEARING OFFICER:  Is it here in your

14          THE WITNESS:  It was one of the many

15   part-time jobs.

16          HEARING OFFICER:  I have you at 1977

17          THE WITNESS:  That was full time.

18          HEARING OFFICER:  And then you were a

19   part-time consultant to school psychology?

20          THE WITNESS:  Uh-huh.

21          HEARING OFFICER:  And where is that in your

22   vitae?

Page 44

1              THE WITNESS:  Montgomery County Public

2    Schools.

3              HEARING OFFICER:  Is that here?  Is that

4    listed somewhere?  I was trying to find it.

5              THE WITNESS:  That I continued to work as a

6    consultant at Montgomery County Public Schools, I don't

7    know.  Maybe under consultancies because I did

8    consulting in a number of different school systems and

9    earlier had been a consultant and full time with

10   Monrovia Unified School District in California on the

11   National Institute, National Defense Education Act

12   starting elementary school counseling programs.

13             HEARING OFFICER:  That's on there.

14   Consultations are -- so 1982 to present, Montgomery

15   County Public School special ed. programs, you were a

16   consultant in school psychology.  Is that your --

17             THE WITNESS:  Uh-huh.

18             HEARING OFFICER:  All right.  I'll qualify

19   her as an expert and I'll determine what weight to give

20   to her testimony.  Go ahead.  Ask your questions.

21             BY MS. HARMAN:

22       Q     Okay.  Do you know Maurice Pimble?

Page 95

1      A      Yes, I do.

2      Q      How do you know Maurice?

3      A      I was asked to do a psychological evaluation

4   of him when he was in the D.C. Detention Center.

5      Q      And what did you evaluate him for?

6      A      I evaluated him both for clinical and

7   psychoeducational, and I did also do a

8   psychoneurological screening test.  Although I hadn't

9   been asked to do a neurological I wanted to see if he

10  needed one and I did the screening.

11     Q      Okay.  Which tests did you administer?

12     A      Oh, dear.  I gave him the --

13            MS. HARRIS-LINDSEY:  Just for the record so

14  we can know what document Dr. Fields is referring to --

15            MS. HARMAN:  Okay.  Dr. Fields is going to

16  likely be referring to MP 43.

17            MR. TULMAN:  MP what?

18            MS. HARMAN:  43.  That's her evaluation.

19            THE WITNESS:  Do you want me to finish

20  telling you what I did?

21            BY MS. HARMAN:

22     Q      Yeah, go ahead.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 96

1     A     All right.  I did a Wexler Adult

2  Intelligence Scale.

3     Q     Uh-huh.

4     A     I did a Bender-Gestalt.  I did a memory for

5  designs test.  Those are the two that are neurological

6  screening instruments.

7     Q     Uh-huh.

8     A     And I did a -- I did the Wexler Individual

9  Achievement Test, and I believe -- and the clinical I

10  also did the Manic At Perception (phonetic) test, the

11  TAT, and I did projective drawings, draw a person,

12  self-portrait, (inaudible) street person and clinical

13  interview.

14     Q     How reliable are those tests that you just

15  covered in determining if a student has special

16  education needs?

17     A     Well, this is a standard battery for

18  determining special education needs.  This is what was

19  done in Montgomery County for -- and still is done to

20  make the determination and also to do triannual

21  evaluations to find out if the student is still in need

22  of special education services.

Case 1:08-cv-00344-RJL    Document 10-5    Filed 08/26/2008    Page 47 of 50
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 97

1         This is the standard procedure that I taught

2    students in school psychology in California and here at

3    Howard and George Washington University.  This is the

4    standard battery.

5         Q    Okay.  Did you rely on any evaluations to

6    develop your recommendations?

7         A    There were no other evaluations in the file

8    at the time I began testing, but since I've also seen

9    the evaluation by Dr. Stewart (phonetic) which was done

10   in Rivers I think --

11            (There was a brief interruption in the

12   proceedings for a telephone ringing.)

13            MS. HARRIS-LINDSEY:  I'm sorry.

14            THE WITNESS:  -- which is also --

15            MS. HARRIS-LINDSEY:  One second.  It's my

16   son.  Okay.  Just a second.  I apologize.

17            (There was a brief pause in the

18   proceedings.)

19            HEARING OFFICER:  Okay.  We're back on the

20   record.  Go ahead.

21            BY MS. HARMAN:

22        Q    Okay.  You were talking about if you relied

Page 98

1    on any other evaluations.  Did you rely on any other

2    evaluations?

3        A    Not at the time I did my report.  Now I've

4    seen two other evaluations.

5        Q    Okay.

6        A    And I can speak to them.

7        Q    Okay.  So can you tell me what you learned

8    about Maurice through the evaluations that you

9    conducted and the others that you have read?

10        A    All right.  This is --

11        MS. HARRIS-LINDSEY:  I'm sorry.  For

12    completion of the record can Dr. Fields identify the

13    evaluations that she read subsequent to her evaluation?

14        THE WITNESS:  Yes.  Do you want me to -- Dr.

15    Stewart and Ms. Horrell (phonetic).

16        MS. HARMAN:  Okay.  And that would be -- for

17    the record Dr. Stewart's evaluation is at MP 42.  The

18    Horrell's evaluation is at MP 41.

19        MS. HARRIS-LINDSEY:  Okay.

20        HEARING OFFICER:  Okay.

21        MS. HARRIS-LINDSEY:  Okay.  Thank you

22    Sorry.

Page 99

1          THE WITNESS:   Okay.   I have to say that I

2     saw him at least three times because trying to examine

3     anybody at the D.C. Detention Center is a very

4     difficult, complicated task.   You can make several

5     trips there before you're allowed to finally meet with

6     a person.

7               You can wait for three or four hours before

8     you meet with them, and the conditions for testing are

9     not very good so that you don't want to spend more than

10    an hour at a time doing the testing, and that does mean

11    that you're going to make several trips anyway.   So he

12    was tested under not very good conditions, but the

13    tests that I used seemed to have -- or came out with

14    high validity scores, which means that they were

15    testing what they were intended to test.

16              All right.   On the individual intelligence

17    tests, and this is where my scores corresponded with

18    Dr. Stewart's, which was kind of interesting and

19    gratifying.   On the individual intelligence tests one

20    of the things that was impressive was that although

21    most of his scores were in the range of borderline

22    retarded or low normal his verbal scale IQ was slightly

Case 1:08-cv-00344-RJL    Document 10-5    Filed 08/26/2008    Page 50 of 50
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 100

1  higher than the performance scale IQ, and what it

2  indicates is not only some verbal deficiencies but it's

3  a lack of formal education.

4       It also suggests that this young man has

5  been unable to communicate effectively and would feel

6  marginal in peer groups because he lacks the common

7  knowledge that informs school and peer activities

8  combination with these disparities he has a very

9  depressed understanding of social consequences or

10  legal, you know, sequences and common sense judgment

11  and these are all skills, not just native intelligence

12  but these are skills that one learns in formal

13  education.

14       They're also skills that one learns in a

15  normal home life.  His home life was extremely chaotic

16  You can't even say that he had one, and that his

17  academic life was likewise chaotic.  He was out of

18  school more than he was in.  He showed some learning

19  deficiencies from the time he was in first grade.

20  Obviously he failed first grade, and the kind of

21  learning disability he has suggests that, even though I

22  tested him as an adult, that these were probably

Case 1:08-cv-00344-RJL    Document 10-6    Filed 08/26/2008    Page 1 of 43
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 101

1    evidenced at a very early age.

2              He had an inability to distinguish

3    right/left progressions, for example, and this is --

4    suggests that the development of the hemispheres of his

5    brain was late.  That doesn't mean that he's slow, but

6    that development is what determines being able to make

7    left/right progressions that help you learn to read,

8    and sequences and conceptualizations that help you

9    learn basic, you know, arithmetic, so he had that

10   slowness to begin with.

11             There is some probability, and I suggested

12   it and this is why I wanted to do the neurological

13   screening tests, that he may have been -- he may have

14   had some head trauma or exposure to toxicity while in

15   uterus, and although there's no record of his having

16   been born in withdrawal from what I gathered of his

17   mother's use of drugs in pregnancy and not in pregnancy

18   it's quite likely that his brain/central nervous system

19   development was affected prebirth.

20             So given that the chances are very great

21   that he will have verbal deficiencies as well as

22   perceptual deficiencies, yet he scored in the normal

Page 102

1    range on spatial orientation and perceptual

2    organization.  Now, these are two real skill areas for

3    him.  It was in the normal range.  It wasn't above

4    normal.  It was just, you know, like low normal, but it

5    is normal, and those are two skills that can be

6    mobilized if he's -- if he has a real IEP done.

7              You can take those skill areas and mobilize

8    them into a learning or training program and into

9    vocational training, and you can use them in teaching

10   reading when there's a reading deficit because there

11   are reading programs and math programs that utilize

12   those skills, those couple of skills to teach the

13   reading and teach the math.  So that's a very important

14   factor even though in all of these verbal areas that

15   are most affected by formal education he's below

16   average, below normal, actually in the mildly mentally

17   retarded range.

18              BY MS. HARMAN:

19        Q     Okay.  What did you determine is Maurice's

20   specific disability?

21        A     He has a perceptual motor handicap.  He also

22   has developmental delays in language learning, and then

Page 103

1    I can't leave that without referring to the clinical

2    examination because Maurice has the kinds of learning

3    disabilities that are not only a consequence of central

4    nervous system damage but they're also a consequence of

5    severe emotional damage.

6            And I think this needs to be addressed

7    because without psychological psychotherapy counseling

8    services, both individual and group, Maurice is not

9    going to progress in learning either.  He definitely

10   requires some emotional assistance.  There's evidence

11   that he suffered posttraumatic stress disorder.  Dr.

12   Stewart found this as well.

13           My suggestion, because I probably spent more

14   time with him than Dr. Stewart did, is that he has had

15   a chronic traumatic stress from the time he was, you

16   know, a very young child and it has never been

17   addressed.  And what happens when a person grows up

18   through that is they become identified, you know,

19   diagnostically as an adjustment disorder which means

20   it's a kind of permanent, you know, just clinical

21   disorder, carries with it depression and anxiety, but

22   those are only some of the aspects of an adjustment

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 104

1    disorder.

2              It does make it very hard for this person to

3    relate with peers, feelings of great inferiority,

4    inadequacy.  The anxiety of course leads to fear, and

5    in a prison environment it makes any kind of hope for a

6    regular classroom atmosphere a very dubious learning

7    environment.  He needs a lot of one-on-one instruction

8    and he needs to have experiences of success.  One of

9    the things I suggested that would be very useful for

10   him, because he needs to have some kind of vocational

11   training and he's very interested in auto mechanics.

12   He's got the skill for it --

13       Q    Right.

14       A    -- but he doesn't have the reading level and

15   he would need special education to bring up his reading

16   and math level so that he could really do some

17   constructive work in auto mechanics.  There's a certain

18   amount of reading you've got to do.

19       Q    Right.

20       A    And he doesn't have the word -- the skills

21   for sounding out words.  He needs that.  I think it's

22   -- you know, it's significant that any education that

Page 105

1    he was provided in D.C. Detention Center was not

2    special education and was only I think six hours one

3    day a week, which is not enough because he needs --

4    because of his problems he needs to have daily

5    reinforcement of learning.

6            Probably Maurice could memorize things that

7    would help him, quote, pass a pre-GED test, you know,

8    because he's used to relying on his memory and he's not

9    really able to read, so he could get certain facts in

10   his head and then spew them forth on a test.  If it's

11   something like a multiple choice test, something where

12   he has to read the questions, chances are he's not

13   going to be able to read them adequately and he's going

14   to take a stab or a guess at the multiple choice.

15           And if the level for passing is like 50

16   percent he's got a 50 percent chance of having made the

17   right guess, and that's --

18       Q     Okay.  Let me cut in with a question.

19       A     Uh-huh.

20       Q     I want you to -- and we may have talked

21   about this, but I just want to make it clear for the

22   record.  I want you to consider his educational

Page 206

1    history.  What kind of educational setting did Maurice

2    need while he was growing up?

3         A    You know, the first clue that he needed

4    something else was when he failed first grade.

5         Q    Okay.

6         A    And the standard procedure in many, many

7    school systems has been when a child is failing first

8    grade there's a child study meeting pulled together.

9    The teachers, the parents and usually a school

10   psychologist, sometimes a speech and language teacher

11   and they go over what the child hasn't been able to do

12   and what they have done, and they start planning the

13   individual educational program.

14        Q    And what should have been on that IEP for

15   Maurice?

16        A    Well, that will include having complete

17   psychological testing.

18        Q    Uh-huh.

19        A    And that means that for any of these basic

20   areas in learning a child who is picked up with

21   learning disabilities is going to get served by special

22   reading programs that are, you know, X number of hours

Page 107

1    depending on what the IEP says per week, and they may

2    require, you know, a self-enclosed classroom.

3              Often when there's also an emotional problem

4    -- in fact, there must be when there's an emotional

5    problem that group and individual counseling is part of

6    the program.

7         Q    Right.

8         A    And very often a school system will have a

9    psychologist who goes in and does therapy with a child

10   with parents' permission as an individual and then

11   directs the counseling service to do -- to include this

12   child in certain small groups for small group

13   counseling, but there's somebody writing (inaudible) on

14   all of that and putting together what the child's --

15   and that's the IEP, what the child's classroom needs

16   are, what their emotional needs are in developing a

17   functioning system for them.  That's the individual

18   part.

19             Then the next part of it that told me a lot

20   that's really without making a judgment shocking was

21   that he failed again in third grade, and there still

22   was not a child study called.  There still was not an

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 108

1    investigation into why he was failing.  When a child

2    exhibits, especially in the lower grades, in quotes

3    behavior problems that is a signal.  It's a signal that

4    the child is frustrated in learning in the classroom.

5              It's a signal that the child is not getting

6    support at home.  It's a signal that there's an

7    emotional problem.  Behavior problems do not spring

8    forth out of thin air.  Behavior problems are a

9    consequence of, you know, real emotional issues like

10   continued frustration, like feelings of inadequacy,

11   like lack of support, like lack of sleep, like lack of

12   proper nutrition, like inhaling drugs, not even

13   purposely.  I mean, it could be inhaling cigarette

14   smoke, but inhaling marijuana in the household,

15   cocaine, any of these things.

16        Q    Are you --

17        A    These are behavior problems.

18        Q    I think --

19        A    Fifth grade again.

20        Q    Right.

21        A    I mean, this --

22        Q    The record does reflect that he failed fifth

Case 1:08-cv-00344-RJL   Document 10-6   Filed 08/26/2008   Page 9 of 43
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 109

1   grade twice and I think we're all aware of the facts,

2   but I kind of want you to more so speak to what

3   services did Maurice need.  Can you specifically lay

4   out the services that he needed for his disability

5   while he was growing up?  I think you said counseling.

6   Can you --

7        A     Counseling, psychological services, special

8   education services.  He needed a reading specialist.

9   He needed a speech and language therapy specialist.

10  His needs were just enormous.  He certainly needed to

11  be in closer supervision by a physician.  He ought to

12  have been seen by a psychiatrist.

13       Q     Okay.

14       A     And certainly somewhere along the way he

15  needed to be seen by a neuropsychologist, and this is

16  somebody with enormous needs that were totally unmet by

17  the educational system.

18       Q     How far behind is Maurice now since he did

19  not have his needs addressed?

20       A     Well, we have to look at the WIAT for that,

21  the Wexler Individual Intelligence Achievement Test,

22  and compare it with his full scale IQ to see whether he

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 110

1    is behind where he could be even with the lower IQ, and

2    this is an important distinction that needs to be made.

3          Just because someone has a borderline IQ

4    doesn't mean that they can't learn.  When presented

5    with the appropriate tools for learning for their need

6    the person can learn -- I'm looking for the WIAT

7    report.  His -- I'm looking for the WIAT report.

8    Sorry.

9          Q     That's okay.

10         A     I wish I could hold all of this in my head,

11   but I can't.  Oh, here we go.  He needed to have --

12   okay.  He was -- he was below his IQ level in

13   achievement by a good bit.  Here we go.  Given his IQ

14   of 75, given his other subtest scores he was in the

15   fourth percentile in basic reading, which means that

16   not just for kids his age, young people his age was he

17   low, but for young people with an IQ of 75 there were

18   like 96 out of 100 others who did better than he did,

19   so this is really way behind.

20         Mathematics reasoning, second percentile,

21   spelling, second percentile, reading comprehension,

22   fifth percentile, numerical operations, zero point

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 111

1    three percentile.  The only place where he approached

2    normalcy was in oral expression.  Written expression he

3    was zero point four percentile.  He was so far behind

4    that if we put this in terms of grade levels he was --

5    he was like, you know, five, six, seven, maybe eight

6    years behind.

7         Q    What kind of services does he need to catch

8    up?

9         A    Well, first of all, he isn't going to learn

10   one year's worth of work for every year of school

11   because he is slow.

12        Q    Okay.

13        A    He's going to have to have like a year and a

14   half to get one year's work accomplished, so he's going

15   to need special education in reading and language arts

16   really big time, very important.  He's going to need

17   special education services certainly in numerical

18   skills.  He's that far behind.

19        Q    How long in your best guess, how long will

20   it take Maurice to catch up academically?

21        A    Well, just using the formula that it's going

22   to take him a year and a half to do a year's work and

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 212

1    that he's about, you know, six years behind minimum we

2    have to figure that it's going to be at least 10 years

3    for him to catch up.

4        Q    Okay.  And about how long will it take for

5    him to go -- have -- you say he's emotionally stressed

6    and he needs counseling.  How much time does he need in

7    counseling?

8        A    That's harder to estimate because you don't

9    know how much he's able to engage in therapy at this

10   point.  He's in a highly stressful environment.  Some

11   of the kinds of therapy that are offered in prison may

12   be very effective if there isn't a problem of prolonged

13   trauma.  And most prisoners are suffering depression,

14   and depression has a strong connection with the

15   problems that get them into trouble with the law

16   anyway, but we're going to have to deal with that and

17   deal with the posttraumatic stress.

18            Now, one would want him to be seen several

19   times a week in individual and group.  When I've worked

20   with populations of people who are adjudicated not

21   guilty by reason of insanity, like Northern Virginia

22   Mental Health Institute or Saint Elizabeth's, you know,

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 113

1    there's a constant therapeutic program, constant,

2    scheduled every hour between classes and individual

3    sessions, group sessions, all kinds of things.

4         Q    Can we -- if I phrase the questions like

5    this can we just -- if I say if you were his personal

6    therapist what would -- how much time would you like

7    for him to spend working on his emotional problems?

8    Can we just boil it down to how long you would like to

9    work with him considering the evaluations that you've

10   done?

11        A    I would think that he needs five hours a

12   week combined individual and group.

13        Q    For how long, how many years?

14        A    How many years.  It's just hard to say

15   because you don't know -- I would be, you know, really

16   foolish to try to predict how many years.  I can

17   predict how many years of special education he's going

18   to need.

19        Q    Okay.  And you say it's 10 years for that,

20   right?

21        A    Yeah.

22        Q    Okay.

Page 114

1      A      The problem even with the special education

2    is that unless he's getting emotional support services

3    at the same time he isn't going to absorb a lot of the

4    special education he gets, so you see that it's a

5    chicken and an egg problem --

6      Q      I see, I see.

7      A      -- you know.

8      Q      And you stated in your -- when you were

9    going over the evaluation you said that Maurice might

10   have some aptitude for a vocation or --

11     A      Right.

12     Q      Can you say how -- what will it take to

13   develop those skills and where can we get to?

14     A      Even while he's doing the catch-up on

15   reading and math skills he could be engaged in a

16   vocational education program in mechanics, car

17   mechanics kind of thing, which he's interested in.

18   He's got the skill for it yet at a normal level.  It's

19   one area that he's got skill at.

20            That in itself could give him increased

21   confidence to make him willing to really engage in the

22   special education academic side of this because right

Case 1:08-cv-00344-RJL    Document 10-6    Filed 08/26/2008    Page 15 of 43
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 115

1    now he is so lacking in confidence in his ability to

2    learn that it's really hard to get him engaged in a

3    academic program, so these are all things that will be

4    spelled out if this young man ever gets an individual

5    educational program, an IEP.

6         Q    Right.

7         A    And it can all be spelled out through an

8    IEP, and really for -- even purposes of economy unless

9    it gets spelled out through an IEP we have no way of

10   knowing from one year to the next what's been effective

11   and what isn't.  We have no way of knowing what

12   specific services to give him or do we take a scatter

13   gun approach and just throw everything in.  It doesn't

14   work.

15        Q    Right.

16        A    So you got to start with an IEP and you got

17   to figure it out on that basis.

18             MS. HARMAN:  Okay.  I think that's all the

19   questions that I have for you.

20             HEARING OFFICER:  All right.  Cross.

21                  CROSS-EXAMINATION

22             BY MS. HARRIS-LINDSEY:

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 116

1        Q       Dr. Fields, I just want to start with the

2    premise that you said --

3        A       Uh-huh.

4        Q       -- that just when you were testing, trying

5    to test Maurice in the D.C. Jail that was problematic

6    in and of itself; is that correct?  That was your

7    testimony?

8        A       It was stressful.

9        Q       Okay.  And then the scheduling of that and

10   the timing required a lot of coordination and it was

11   difficult, correct?

12       A       Uh-huh.

13       Q       Okay.  So I'm trying to address this

14   realistically in where we are, and the reality is this

15   22-year-old young man, we're here for compensatory

16   education and so the development of an IEP is less

17   likely to be effective at this point, although it is

18   your testimony that he requires an IEP?

19       A       He requires an IEP.

20       Q       Okay.  Have you been to either facility that

21   Maurice has been incarcerated in since he's been moved

22   to the Federal Bureau of Prisons?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 117

1        A      No, I haven't.

2        Q      Are you familiar with either one of those

3    facilities, the one in North Carolina or the facility

4    in Schuylkill, in Pennsylvania?

5        A      The one in North Carolina is what?  Is that

6    Butler?

7                MS. HARMAN:  Rivers.

8                THE WITNESS:  Rivers.

9                BY MS. HARRIS-LINDSEY:

10       Q      Rivers in North Carolina or Schuylkill in

11   Pennsylvania, either one.

12       A      No, I'm not.

13       Q      Okay.  Do you know whether his security

14   level is minimum or maximum?  Are you aware of that?

15       A      I do not know.

16       Q      Okay.  And in your experience --

17               MR. TULMAN:  Objection on the basis of

18   relevance.

19               THE WITNESS:  Pardon?

20               MR. TULMAN:  I'm just objecting on the basis

21   of relevance.

22               HEARING OFFICER:  She said she doesn't know.

Page 118

1    Go ahead.

2              BY MS. HARRIS-LINDSEY:

3        Q     Okay.  Now, in your experience have you

4    worked with incarcerated -- students who are

5    incarcerated?

6        A     Oh, yes.

7        Q     Okay.  And so are you aware of the

8    limitations in providing services, special education,

9    just not talking about educational services but special

10   education services to the incarcerated?  Well, first if

11   you answer the question I'll give you some leeway if

12   you can answer.

13       A     Yes.

14       Q     Okay.

15       A     They're not necessary obstacles.

16       Q     Uh-huh.

17       A     One of the obstacles is providing special

18   education teachers to do it, and I have struggled for

19   many years at the Alexandria jail, for example, because

20   the Alexandria city schools would not send in a special

21   education teacher and would only send in a vocational

22   education teacher, and I had found in a study of the

Page 119

1    Alexandria jail that some 85 percent of the inmates at

2    any given time tested positive for learning

3    disabilities and attention deficit disorder.

4              And again, a very large percentage, I forget

5    how many now but it was over 60 percent, were

6    functionally illiterate, so sending in a vocational ed.

7    teacher is a very commendable thing, but most of them

8    needed special education and the Alexandria schools

9    were responsible for providing it and they didn't.

10   D.C. Public Schools is responsible also under federal

11   law for providing special education services and --

12        Q     In the D.C. Jail?

13        A     In the jail, and I believe it's not doing

14   that so sending in a teacher who is accustomed to

15   students in a, quote, normal classroom is not going to

16   provide the array of special education needs because

17   there are teaching methods, there are computer

18   programs, there are -- there's a whole array of

19   materials to use --

20        Q     Let me ask you --

21        A     -- in doing special education.

22        Q     -- and just kind of bring you to the pcint,

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 120

1      I guess, but Maurice is -- his location of

2      incarceration is not going to be -- well, you hear it's

3      not going to be D.C. Jail.

4           A      Right.

5           Q      So moving him we're dealing with a facility

6      that's not D.C. Jail.  I understand you were giving me

7      your scenario with the Arlington --

8           A      Well, hopefully because it's federal --

9           Q      Uh-huh.

10          A      -- and as a federal facility it's really

11     bound even stronger to follow federal law with regard

12     to handicapping conditions.  One would hope that they

13     would have the capacity to provide this kind of

14     educational service.

15          Q      Okay.  And let me ask you what -- can you

16     tell me just in a nutshell because -- what are you

17     proposing for Maurice?

18          A      To start with I'm proposing an IEP, and then

19     I'm proposing the probability of about 10 years of

20     compensatory special education services, and then I'm

21     proposing an additional component of therapy.  It may

22     be intensive therapy for the first couple of years and

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 121

1    after that it might be a once a week kind of therapy.

2        Q    For how long?

3        A    For however long this person needs the

4    support and is willing to engage in therapy.  Had his

5    childhood been what we consider normal he'd probably

6    like many of the patients I have in my private

7    practice, be able to go on for once a week for a couple

8    or three years until they hit a rough patch, and

9    usually if they experience a -- they experience another

10    trauma they're back in, you know, in intensive therapy

11    schedule.

12            Somebody who has had as much trauma in his

13    life as this one, this young man, is going to have

14    reoccurrences.  You know, people who have combat stress

15    disorder and have experienced a tremendous amount of

16    trauma may not show up -- it may not show up for then

17    for six months or even a year and then it comes on real

18    heavy, so I think he may be in a similar category

19        Q    Have you -- now, I didn't -- and I was

20    sure.  Have you worked with incarcerated youth who are

21    housed in a federal facility or has it been limited to

22    the city facilities?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 22

```
1        A       City and state.

2        Q       City and state.  Okay.  Okay.  It's your

3   testimony that based on your review of -- your

4   evaluation of Maurice and his -- your testing of him

5   that he would require a year and a half every year of

6   service --

7        A       About, uh-huh.

8        Q       -- to be -- to catch up is what I think the

9   term was?

10       A       If he has a special education program.

11       Q       But you said the special education program

12  is not going to be as effective without the emotional

13  component, the counseling component?

14       A       That's right, so he needs both.

15       Q       And in addition to the special education and

16  emotional component you are recommending a vocational

17  program to -- for his auto mechanic interests or

18  vocation, for that interest?

19       A       Yes, yes.

20       Q       Okay.

21       A       It should be simultaneous with the rest.

22       Q       Okay.
```

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 123

1        A        It could be an incentive to learn to read

2   and use numbers.

3               MS. HARRIS-LINDSEY:  Okay.  Okay.  I think

4   your report is pretty straightforward so I'm not going

5   to go back through that.  Thank you very much.  I have

6   nothing further.

7               HEARING OFFICER:  Thank you very much.

8               THE WITNESS:  Okay.  Thank you.

9               HEARING OFFICER:  Call your next witness.

10  Is that your case?

11              MR. TULMAN:  We have one more witness by

12  phone who is an expert.  I just want to talk with him

13  for a minute to see if we actually want to call him.

14              HEARING OFFICER:  All right.

15              MR. TULMAN:  If I can just stand down for a

16  minute.

17              (There was a brief recess in the

18  proceedings.)

19              HEARING OFFICER:  Back on the record.  Rests.

20              MR. TULMAN:  (Inaudible).

21              HEARING OFFICER:  Okay.  The counsel for Mr.

22  Pimble rests.  DCPS.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 224

1          MS. HARRIS-LINDSEY:  D.C. rests on the

2  record.

3          HEARING OFFICER:  D.C. rests on the record.

4  Closing statement.

5          MS. ARCHER:  The evidence has shown that

6  DCPS consistently violated child find and FAPE

7  throughout Maurice Pimble's educational career.  DCPS

8  failed to provide Maurice with a free appropriate

9  public education as defined in the Individuals with

10 Disabilities Education Improvement Act.

11         DCPS failed to identify, locate and evaluate

12 Maurice.  A FAPE must be in accordance with state

13 administrative agency standards, must include an

14 appropriate elementary and secondary education in the

15 state involved, and must be based on an individual

16 education program designed for the individual child

17 that pursuant to 34 CFR section 300.17.

18         Maurice failed the first grade, Maurice

19 failed the third grade.  Maurice was 12 years old in

20 the fourth grade.  Maurice failed the fifth grade

21 twice.  Our expert has testified that this failing of

22 the first grade should have and could have qued DCPS

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 225

1    into the fact that this was a child with a severe

2    learning disability who was emotionally disturbed and

3    needed the necessary special educational services in

4    order to educate him properly in accordance with the

5    law.

6          Moreover, DCPS violated 5 DCMR section

7    2201.9 which said prior to 1998 if the student failed a

8    grade level and DCPS did not assess and evaluate the

9    student for special education DCPS violated D.C. law

10   Maurice failed the first grade, the third grade twice

11   and the fifth grade twice all prior to 1998 -- excuse

12   me, the third grade once, excuse me.

13          A proper IEP was never evaluated, as our

14   expert has stated, and the record reflects that the IEP

15   was also inappropriate based on the fact that Maurice

16   never improved in school.  In fact, the one year that

17   he did receive some special educational services where

18   he was actually in a class and was supposed to have

19   been receiving education services he testified that

20   nothing went on in there, and I think that that is

21   proved and evidenced that that year he improved none at

22   all and the year after that he failed every single

Case 1:08-cv-00344-RJL    Document 10-6    Filed 08/26/2008    Page 26 of 43
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 126

1    grade, grade level on every test.

2              He consistently tested below basic.  All of

3    these were red flags that went up beginning in 1992

4    when Maurice failed the first grade.  A parent under

5    the IDEA has no affirmative duty to contact DCPS or to

6    insist that DCPS renders special education services to

7    a child with a learning disability.  The law says that

8    the burden is on DCPS to identify, locate and evaluate

9    a child with a learning disability.

10              Here the burden was on DCPS and DCPS failed

11    consistently to meet this burden.  Ms. Lewis, Maurice's

12    mother, was consistently misled to believe that

13    Maurice's lack of educational progress was based on a

14    behavioral problem.  DCPS by this consistent misleading

15    misrepresented critical facts.  Section 301.2B of the

16    standard operating procedures manual states that the

17    exceptions to the 2-year statute of limitation are the

18    time line described in section 301.2A1 shall not apply

19    to a parent if the parent was prevented from requesting

20    the hearing due to, A, specific misrepresentations by

21    the local educational agency that it had resolved the

22  .  problem forming the basis of the complaint.

Case 1:08-cv-00344-RJL    Document 10-6    Filed 08/26/2008    Page 27 of 43
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 127

1          It is our contention and I think -- and as a

2    matter of fact the evidence has proved that DCPS did

3    misrepresent, and therefore based on this provision in

4    the standard operating procedures manual that the

5    two-year statute of limitations period is not

6    applicable to the case at bar.  There are other --

7              MR. TULMAN:  Thank you.

8              HEARING OFFICER:  This was misfiled in one

9    of my cases.

10             MR. TULMAN:  Oh, thank you very much.

11   Better late than never, our disclosures.

12             MS. ARCHER:  We briefed further issues on

13   the statute of limitations issue.  Would you like to

14   go over those or --

15             HEARING OFFICER:  No, it's in your brief.

16   That's fine.

17             MS. ARCHER:  Okay.  We, because of this

18   blatant and inconsistent denial of FAPE since beginning

19   in 1992 when Maurice failed the first grade, and based

20   on the recommendations of the expert who testified here

21   today, we request 10 years of compensatory education

22   with whatever -- with 5 or more years, whatever it

Case 1:08-cv-00344-RJL    Document 10-6    Filed 08/26/2008    Page 28 of 43
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 128

1    takes for him to be counseled to a level where he is

2    functional emotionally.

3              And we also request two years of

4    transitional and vocational services that should have

5    been given to him if he had been properly educated in

6    the first place to address his goals of obtaining his

7    truck driver's license, a barber's license --

8              HEARING OFFICER:  So in light of the Hestor

9    (phonetic) case just decided by the Court of Appeals

10   here on October 19th how is DCPS to provide services in

11   a federal penitentiary?

12             MS. ARCHER:  DCPS is liable under 300.

13             HEARING OFFICER:  No, how are they supposed

14   to provide it in the Federal Bureau of Prisons?  We

15   have the Hestor case which said that DCPS is not

16   responsible to provide services in Maryland, right,

17   because they couldn't get in there, so why should they

18   have to provide comp. ed. in -- they can't.  They can't

19   get access.  I can't tell the federal prisons to do

20   anything.  I have no jurisdiction over federal prisons.

21             MS. ARCHER:  No, I agree with you that you

22   do not have jurisdiction over the Federal Bureau of

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 129

1    Prisons, but you do have jurisdiction over DCPS.

2              HEARING OFFICER:  But I can't order DCPS --

3    how can I order DCPS to provide services in the federal

4    prison?  The federal prison doesn't allow access.  We

5    have the Hestor case.

6              MR. TULMAN:  I'll be happy to talk to the

7    Hestor case.  Go ahead.

8              HEARING OFFICER:  It's your case.

9              MS. ARCHER:  I don't believe the Hestor case

10   comes out and says that -- that DCPS does not have to

11   provide education for inmates in states or federal --

12   or the Federal Bureau of Prisons, that the limitations

13   that the BOP puts on educating inmates is a total -- is

14   an entirely different issue.

15             HEARING OFFICER:  But I can't order DCPS to

16   provide services in a federal penitentiary when I have

17   no jurisdiction over getting access to the federal

18   penitentiary, do I?

19             MS. ARCHER:  We're not asking for you to

20   order DCPS to --

21             HEARING OFFICER:  He's going to be there

22   till 2011, so what are you asking for?

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 130

1              MS. ARCHER:  I'm asking you to order the

2     comp. ed. and the counseling and the vocational

3     services.

4              HEARING OFFICER:  So when he gets out be

5     gets it?

6              MS. ARCHER:  Or if -- I mean, things change

7     We could get -- somehow or another there are cases

8     where there are federal inmates who are getting those

9     services.  There are situations where state --

10             HEARING OFFICER:  But I don't have any

11    authority over federal penitentiaries.

12             MS. ARCHER:  No, and I'm not asking you to

13    order DCPS to specifically implement that for the DOC.

14    I'm asking you specifically to order DCPS in general to

15    give Maurice these services --

16             HEARING OFFICER:  All right.

17             MS. ARCHER:  -- that they should have given

18    him all along, to -- as persuasive authority Gibson

19    versus DCPS also dealt with a similar issue if not an

20    identical issue as here, and in that --

21             MR. TULMAN:  That was a hearing officer's

22    decision.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 131

1          MS. ARCHER:  Yes, it's a hearing -- Gibson

2    versus DCPS is a petition with a hearing officer, and

3    the hearing officer there ordered DCPS to implement

4    these services.  That inmate was located in the Bureau

5    of Prison.  The order was not specific that it must be

6    done in the Bureau of Prisons.  It's an order to render

7    the services that should have been rendered all along.

8          HEARING OFFICER:  Sometime way in the

9    future.

10         MS. ARCHER:  Or next week if we can get in

11   there.  There is no law that states that --

12         HEARING OFFICER:  I'm supposed to send

13   somebody from DCPS up to Pennsylvania or wherever next

14   they place him?

15         MS. ARCHER:  The fact of the matter is

16   Maurice is here now.

17         HEARING OFFICER:  Yeah, but that's

18   temporary.  He even indicated that he's on a -- he's

19   arrested on some other charge and that has to be taken

20   care of, whatever that is, and then he himself said

21   he'll have to go back to Pennsylvania.  At least that's

22   what he assumes.

Page 132

1          MS. ARCHER:  Eventually.  As we all know,

2    the judicial system is very slow and he could be here

3    for quite some time.

4          HEARING OFFICER:  That's speculative.

5          MR. TULMAN:  That's not the basis of our

6    request.  We're not asking you to do anything in regard

7    to the Bureau of Prisons or even to make a decision or

8    order on what DCPS has to do vis-a-vis the people at

9    the Bureau of Prisons.  That's not your job.

10          We're just asking you to make findings based

11    on this record of whether he was denied services and

12    what it would take to make that up.  It's our job to

13    see if we can get it enforced.  You clearly don't have

14    the power to enforce that.  I mean, I can easily

15    distinguish Hestor if you want to do that, but I don't

16    think it's a limit on what you can order.  What we're

17    asking you to do is just make the findings on what was

18    denied and what would compensate for that denial.

19          HEARING OFFICER:  All right.

20          MS. HARRIS-LINDSEY:  Me?

21          HEARING OFFICER:  Yes.

22          MS. HARRIS-LINDSEY:  Mine, I'm short.  I'm

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 133

1    not going to -- I think the expert said what she said I

2    thought in a -- if we were in an environment, or if

3    Maurice were in an environment where he could benefit

4    from the plan she proposed that would -- may be

5    persuasive, but what I wanted to do is start from the

6    last part first, something that she said.

7           The period of services, she said the

8    years and she gave a long story of what he could have

9    been and what she believed because it was all

10   speculation, but here's what came -- what was on the

11   record.  Mom sat here and said in response to cross

12   that she learned he was being retained through a report

13   card and made no contact with the school.

14           When he was in the third grade she realized

15   he was being -- she saw that he was being or was put on

16   notice that he was being retained through a report card

17   and never called the school.  The same with the fifth

18   grade, twice, never communicated with the school.  She

19   said her only communication with the school was about

20   behavior.

21           I understand the belief his parent has no

22   affirmative duty to do anything, but I think when you

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 134

1    come in and you start seeking relief, and the

2    allegation is I was prevented and that is the

3    allegation -- in order to waive a statute of limitation

4    you have to show that DCPS in some way prevented this

5    parent or misled the parent, I think the term was

6    misled or misinformed the parent of information that

7    precluded her from being advised of her due process

8    rights.

9                HEARING OFFICER:  Would you agree that what

10   the three-year statute of limitations is not the

11   current one?

12               MS. HARRIS-LINDSEY:  Right, three years

13               HEARING OFFICER:  The three years is in

14   effect, but you're saying there's not an exception to

15   that showing here, that therefore --

16               MS. HARRIS-LINDSEY:  In this case.

17               HEARING OFFICER:  -- if an award was made it

18   would have to be limited to the three years?

19               MS. HARRIS-LINDSEY:  Yes, but even more so,

20   and this is Dr. Fields own -- this is her evaluation.

21   The first paragraph -- and she gives a background of

22   Maurice's history.  In his evaluation it says, one his

Page 135

 1   parents were drug dealers and users who had little

 2   involvement with their children, and it goes into some

 3   more detail about the home life.

 4          So I think -- and mom never provided the

 5   information that Maurice -- there was a period of time

 6   when I took her through the sequence of his education,

 7   Johnson and Roosevelt.  She never volunteered

 8   information that Maurice wasn't even living with her

 9   for that period of time.  It was the mentor, the family

10   friend that gave the information that it was at some

11   point mom either put him out or wouldn't allow him to

12   come home or made him feel he could not come home that

13   he ended up living with someone else.

14          That information wasn't put forth by the

15   parent, so I'm not really sure where mom -- where it

16   comes in that DCPS was preventing mom or impeding her

17   ability to access, give her information about special

18   education.  I think the record is clear there were some

19   deficits, and I do not sit here and say DCPS is scott

20   free and was upstanding in all rights afforded to

21   Maurice.  But I think that there is some -- there is

22   absolutely nothing that came forward in parent's

Case 1:08-cv-00344-RJL    Document 10-6    Filed 08/26/2008    Page 36 of 43
HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 136

1    testimony that showed she reached out to DCPS or that

2    --

3                HEARING OFFICER:  So when would you argue

4    that the period would run for?  If he was liable

5    -- if the student -- if I find that the student is

6    entitled to comp. ed. what did you say the period

7    time would be run from and why?

8                MS. HARRIS-LINDSEY:  If you were to go

9    beyond the three-year period of time --

10                HEARING OFFICER:  Not the -- what would

11    three years begin with you?

12                MS. HARRIS-LINDSEY:  I think the three

13    would have to begin when he was (inaudible) 200

14    you have to go back to 2002.  It is that period

15    in 2002 and I was not sure -- I think when Maurice

16    stopped going to school and I didn't see anything

17    here where DCPS -- where there were truancy acts

18    whatever.

19                Apparently he wasn't in some education

20    program, but I think he was entitled to special

21    education at least going from 2000 forward or 200

22    because there's some indication that DCPS identifi

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 137

1    him as of that period of time, and even the testimony

2    of Maurice was that he was in a special education

3    classroom although he indicated that they gave him

4    worksheets but there was no one to help him, and based

5    on the testimony of Mr. -- I'm sorry, the mentor which

6    I think actually is more substantive, Mr. Hobdy.

7              MR. TULMAN:  Hobdy.

8              MS. HARRIS-LINDSEY:  Yeah, Hobdy who

9    indicated that at that point at the time that Maurice

10   lived with him that he just wanted to get his GED and

11   get out but he wanted to learn but there was this

12   barrier to learning, so I'm not opposed to the three

13   years.  I think 10 and 13, I think 13 was requested and

14   it's -- I don't think they've met their burden to show

15   that there was the barrier that DCPS kept -- prevented

16   the parent from accessing the due process rights.

17              I don't think this parent was engaged on any

18   level whatsoever and wasn't prevented.  I don't think

19   she even bothered to look based on the record that --

20   parent's counsel's documents and their own evaluations.

21   So I'm comfortable to allow the hearing officer to look

22   at the record and make a determination, but I would ask

Page 138

1    based on the Hestor case, not just the opinion that was

2    just issued on September 10th, but the substance that

3    this student will be going back to a facility in

4    Pennsylvania and that he's not here being housed here

5    just for the purposes of being housed here, he's here

6    for answering charges which may be a trial along with

7    the sentencing.

8         We didn't get into that, but he's not here

9    just sitting around in jail.  He's here for a purpose,

10   so I don't know.  He's not being educated and I don't

11   know if he's in trial how much education he's going to

12   be getting anyway, so I think there's some limitations

13   here and some real limitations and barriers when he

14   returns to wherever he's going to be housed federally,

15   so I think an award for the sake of an award doesn't

16   benefit Maurice.

17        It's an award he will have benefit from, and

18   comp. ed. is not just something you bank and say this

19   is what we have.  It's what he can actually use and

20   what will benefit him, so I think there are some true

21   limitations.

22        HEARING OFFICER:  Okay.  The case is

Page 139

1    submitted.  Thank you all very much.

2              MS. ARCHER:  At this time if I could I'd

3    like to resubmit my motion that DCPS also violated

4    McKinney-Vento and the cross-reference.

5              HEARING OFFICER:  I notice it and I was just

6    handed it.  It was in the materials.

7              MR. TULMAN:  There's a couple of points we

8    need to clarify because I'm not sure it was clear from

9    what we've said so far.

10             MS. ARCHER:  That also there was a violation

11   of 300.519 of the regulations which said that a

12   surrogate parent must be appointed during any time.

13             HEARING OFFICER:  Is that in that motion?

14             MS. ARCHER:  Yes.

15             HEARING OFFICER:  Is that in that motion?

16             MR. TULMAN:  I'm not sure it's clear in the

17   motion.  In the motion we said we want to talk about

18   this.  We're just pointing out now that 519 says that

19   for a period he was homeless he should have had a

20   surrogate parent, so the period of statute of

21   limitations (inaudible) if he's homeless.

22             HEARING OFFICER:  Okay.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 140

1              MR. TULMAN:  Let me just --

2              HEARING OFFICER:  I don't know (inaudible).

3              MR. TULMAN:  Well, because if he was

4  homeless for a period of time then he's entitled to a

5  surrogate parent.  If DCPS has no surrogate parenting

6  program in place then there's no parent there to

7  exercise the rights.

8              HEARING OFFICER:  But if that period of time

9  -- if I award comp. ed. for that period of time what's

10  the big deal?

11             MR. TULMAN:  There is no big deal.  I'm just

12  saying --

13             HEARING OFFICER:  Okay.  I mean, it doesn't

14  even come into play.

15             MR. TULMAN:  Let me say one other thing

16  about the Hestor case.  The Hestor case does not relate

17  to the federal government.

18             HEARING OFFICER:  I understand.  It's

19  involving Maryland and D.C.

20             MR. TULMAN:  It was a consent order.

21             HEARING OFFICER:  I understand.  I read the

22  case.

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 141

1            MR. TULMAN:  Okay.  I'm just distinguishing

2    it from the federal situation.  The federal government

3    --

4            HEARING OFFICER:  No, I understand the

5    distinction and I know it's not the federal.  I know

6    there's a difference.

7            MR. TULMAN:  The federal government under

8    the revitalization act took over the educational

9    responsibilities of the District of Columbia.  In

10   addition to that, 20 USC 1415 M1D says that a federal

11   prisoner is entitled at the age of majority to enforce

12   his rights.  That's never been interpreted by a ccurt

13   so there are two bases upon which --

14           HEARING OFFICER:  It's not going to be

15   interpreted by me either.

16           MR. TULMAN:  No, and we're not asking --

17   listen, we're not asking you to interpret it.  What

18   we're asking you to do is give us what we're due --

19           HEARING OFFICER:  No, I know what you want.

20           MR. TULMAN:  -- vis-a-vis by DCPS.  It's our

21   job to go to the Bureau of Prisons and say you have to

22   provide these services either because you're obligated

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 242

1    to do what DCPS owes him or because as a federal prison

2    you have some obligations, or if none of that works

3    just say DCPS still has an obligation for the comp

4    to provide under Burlington and those provisions

5    private services, for example, from a private provider

6    in Pennsylvania.  If they say we can't do it and it's

7    impossible it's our job to litigate that, but Hes

8    would not control that situation.

9                HEARING OFFICER:  That's another case

10   Okay.  Thank you all very much.  The case is submitted

11               MS. ARCHER:  Thank you.

12               (The hearing was concluded at 2:12 p.m

13

14

15

16

17

18

19

20

21

22

HEARING IN RE: MAURICE PIMBLE
CONDUCTED ON WEDNESDAY, OCTOBER 31, 2007

Page 143

1                CERTIFICATE OF TRANSCRIBER

2          I, Bonnie K. Panek, do hereby certify that

3    the foregoing transcript is a true and correct record

4    of the proceedings; that said proceedings were taken by

5    me stenographically and thereafter reduced to

6    typewriting under my supervision; and that I am neither

7    counsel for, related to, nor employed by any of the

8    parties to this case and have no interest, financial or

9    otherwise, in its outcome.

10

11

12

13   BONNIE K. PANEK

14

15

16

17

18

19

20

21

22